# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GREG ADKISSON, ET AL,                    )
                                         )
                    PLAINTIFFS,          )
                                         )
VS.                                      )    NO. 3:13-CV-505-TAV-HBG
                                         )
JACOBS ENGINEERING GROUP, INC.,          )
                                         )
                    DEFENDANT.           )

KEVIN THOMPSON, ET AL,                    )
                                         )
                    PLAINTIFFS,          )
                                         )
VS.                                      )    NO. 3:13-CV-666-TAV-HBG
                                         )
JACOBS ENGINEERING GROUP, INC.,          )
                                         )
                    DEFENDANT.           )

JOE CUNNINGHAM, ET AL,                    )
                                         )
                    PLAINTIFFS,          )
                                         )
VS.                                      )    NO. 3:14-CV-20-TAV-HBG
                                         )
JACOBS ENGINEERING GROUP, INC.,          )
                                         )
                    DEFENDANT.           )

CRAIG WILKINSON, ET AL,                   )
                                         )
                    PLAINTIFFS,          )
                                         )
VS.                                      )    NO. 3:15-CV-274-TAV-HBG
                                         )
JACOBS ENGINEERING GROUP, INC.,          )
                                         )
                    DEFENDANT.           )



```
 1
 2    ANGIE SHELTON, as wife and next of  )
      kin on behalf of Mike Shelton,      )
 3    et al,                              )
                                          )
           PLAINTIFFS, )
 4                                        )
      VS.                        )  NO. 3:15-CV-420-TAV-HBG
 5                                        )
      JACOBS ENGINEERING GROUP, INC.,   )
 6                                        )
           DEFENDANT.  )
 7
 8    JOHNNY CHURCH,                      )
                                          )
 9          PLAINTIFF,  )
                                          )
10    VS.                        )  NO. 3:15-CV-460-TAV-HBG
                                          )
11    JACOBS ENGINEERING GROUP, INC.,   )
                                          )
12          DEFENDANT.  )
13
      DONALD R. VANGUILDER, JR.,          )
14                                        )
            PLAINTIFF,  )
15                                        )
      VS.                        )  NO. 3:15-CV-462-TAV-HBG
16                                        )
      JACOBS ENGINEERING GROUP, INC.,   )
17                                        )
            DEFENDANT.  )
18
19    BILL ROSE,                          )
                                          )
20          PLAINTIFF,  )
                                          )
21    VS.                        )  NO. 3:13-CV-17-TAV-HBG
                                          )
22    JACOBS ENGINEERING GROUP, INC.,   )
                                          )
23          DEFENDANT.  )
24
25    PAUL RANDY FARROW,            )
```

```
 1              PLAINTIFF,  )
                            )
 2    VS.              )  NO. 3:16-CV-0000636-TAV-
                            )  HBG
 3                          )
      JACOBS ENGINEERING GROUP,        )
 4                          )
            DEFENDANT.  )
 5
 6    JUDY IVENS, as sister and next of  )
      kin, on behalf of JEAN NANCE,     )
 7    deceased,                         )
                            )
 8          PLAINTIFF,  )
                            )
 9    VS.              )  NO. 3:16-CV-00635-TAV-HBG
                            )
10    JACOBS ENGINEERING GROUP,        )
                            )
11          DEFENDANT.  )
12
13
14
15         VIDEOTAPED DEPOSITION OF DR. PAUL TERRY
16                  August 24, 2018
17
18
19
20
21
22    _____
23            PEGGY F. MCCRORY, LCR #532
              Registered Professional Reporter
24              Knoxville, TN  37901
25
```

```
 1
 2    Appearances:
 3         On Behalf of the Plaintiffs:
 4         GARY A. DAVIS, ESQ.
           Davis & Whitlock
 5         21 Battery Park Avenue
           Suite 206
 6         Asheville, NC  28801
           828.622.0044
 7         gadavis@enviroattorney.com
 8         JEFF FRIEDMAN, ESQ.
           Dazzio Zulanas & Bowling, P.C.
 9         3800 Corporate Woods Drive
           Birmingham, AL  35242
10         205.278.7010
           jfriedman@friedman-lawyers.com
11
           JAMES SCOTT, ESQ.
12         KEITH STEWART, ESQ.
           TYLER ROPER, ESQ.
13         625 Market Street
           14th Floor
14         Knoxville, TN  37902
           865.245.0989
15         jimscott264@gmail.com
           keithdstewart@gmail.com
16         tyler@marketstreetlawyer.com
17         On Behalf of the Defendant:
18         JAMES F. SANDERS, ESQ.
           ISAAC SANDERS, ESQ.
19         Neal & Harwell, PLC
           1201 Demonbreun Street
20         Suite 1000
           Nashville, TN  37203
21         615.244.1713
           jsanders@nealharwell.com
22         isanders@nealharwell.com
23
24
25
```

```
 1                    I N D E X
 2    Exhibit No. 1 - Kingston Ash Health Questionnaire ........  28
      Exhibit No. 2 - Exhibit B - Report of Dr. Paul Terry .....  35
 3    Exhibit No. 3 - Expert Disclosure ........................  37
      Exhibit No. 4 - Spread sheet with worker names ...........  42
 4    Exhibit No. 5 - Spread sheet with worker names ...........  42
      Exhibit No. 6 - Report of James Scott's clients' health
 5        conditions, to be supplied ...........  55
      Exhibit No. 7 - Omitted in numbering
 6    Exhibit No. 8 - Supplemental Disclosure of Dr. Paul
         Terry ................................  59
 7    Exhibit No. 9 - E-mails and spread sheet data, to be
         supplied ............................  105
 8    Exhibit No. 10 - Control group spread sheet .............  105
      Exhibit No. 11 - Client group spread sheet ..............  105
 9    Exhibit No. 12 - Declaration of Dr. Paul Terry ..........  119
      Exhibit No. 13 - Selected Adverse Health Effects of
10        Selected Constituents in Coal Fly
          Ash - a Preliminary Report, by Dr.
11        Robert Levy, February 7, 2018 ........  154
      Exhibit No. 14 - Article from Environmental Science and
12        Technology Journal ...................  180
13
14
15
16
17
18
19
20
21
22
23
24
25
```





1  Q     I know -- I know you didn't.
2  A     Just get a little --
3        MR. DAVIS:  Just wait.  Let him ask his
4  questions and you answer.
5  BY MR. SANDERS:
6  Q     Do you know how many of the plaintiffs had
7  worked in construction after the Kingston work?
8  A     No.
9  Q     Do you know when the Kingston work was;
10 what were the -- the bracketed dates for when work started and
11 when work was completed?
12 A     Exact dates, no.
13 Q     All right.  Do you have a sense of how
14 long people worked on the Kingston site that are plaintiffs?
15 A     So specific to plaintiffs.  Not specific
16 to all workers who were there.
17 Q     Right.
18 A     I don't know how they were different from
19 the normal -- what's been reported in the general news as to how
20 long people worked.  I don't know if there's -- I don't know of
21 any differences, no.
22 Q     Okay.  But do you -- then let me ask the
23 question I think you do know the answer to.  How long did work
24 go on on the Kingston site as a result of this spill and
25 cleanup?

1  A     I'm under the impression it went on for a
2  year or two.  But I don't know the exact number of months.
3  Q     Okay.  Okay.
4  A     Sometime -- no.  Never mind.
5  Q     All right.  I want to -- to take you now
6  to the -- to a declaration or report that you did in October of
7  last year.  Less than a year ago.
8  A     Yeah.
9        MR. SANDERS:  And we'll mark that Exhibit
10 Seven.
11       MR. DAVIS:  Are you counting the
12 late-filed exhibit in here?
13       MR. ISAAC SANDERS:  Yeah.  I think that
14 would be the next one unless it --
15       (EXHIBIT NO. 7 WAS OMITTED.)
16       MR. SANDERS:  Okay.  We'll make this one
17 Eight, then.
18       MR. DAVIS:  If we have Seven, will be a
19 place for it.
20       (EXHIBIT NO. 8 WAS FILED.)
21 BY MR. SANDERS:
22 Q     I want to give you a chance to look at
23 this.  While it is -- it is -- Exhibit Eight is entitled a
24 supplemental disclosure of Dr. Paul Terry, on the last page it
25 is signed by you apparently.

1        MR. DAVIS:  Objection to the comment.
2        MR. SANDERS:  Geez --
3        MR. DAVIS:  You accusing someone of
4  forgery, is that what you're doing?
5        MR. SANDERS:  No.  I'm going to ask him
6  first did you sign that.
7        MR. DAVIS:  Okay.  That's a good question.
8  BY MR. SANDERS:
9  Q     Did you sign that?
10 A     Yes.
11 Q     So -- and you dated it.  That's your
12 handwriting, too, the date?
13 A     It looks like my handwriting.  I -- I
14 can't say it's not.
15 Q     All right.  All right.  And you note that
16 it's signed under penalty of perjury.
17 A     Yes.
18 Q     Okay.  Did you author this or did someone
19 else author this and present it to you for your review and
20 signature?
21 A     I did not type it.  I did not type it
22 myself.
23 Q     Okay.  That's not my question.  Who's the
24 author of this?  You or someone else, or do you remember?
25 A     I don't remember.  But I do remember that

1  I discussed this with the lawyer.
2  Q     Okay.  And the lawyer, when you say it in
3  this -- as I understand it, is Mr. Scott.
4  A     Well, at this point in time I can't say
5  that with certainty.
6  Q     Okay.  All right.
7  A     Because now we're getting closer to the
8  present.
9  Q     Okay.
10 A     And --
11 Q     And there are more lawyers.
12 A     There's more lawyers.
13 Q     All right.  I gotcha.
14       Doctor Terry, we had some discussion,
15 and -- and I want to make sure I'm giving you every opportunity
16 here to -- to compare and contrast.  Go back to Exhibit Two.
17 A     Yes.
18 Q     And there's a description in Exhibit Two
19 that refers to the control group, as you define it, in July of
20 2017.
21 A     Yes.
22 Q     Would you -- would you read that for me?
23 A     What paragraph?
24 Q     The paragraph that defines the -- the --
25 the comparison group or the control group, the comparable.



```
1       A       In Exhibit Two.
2       Q       Two. Which is your July report, 2017.
3       A       Bullet point number --
4       Q       Look at number one.
5       A       Yeah.
6       Q       Well, I'm going to read it to you.
7               "Doctor Terry's opinions in this case
8       pertain to the statistical analysis of data related to various
9       health conditions identified with the subject workers that
10      helped to remediate the Kingston ash spill. He will provide
11      testimony as to how the odds ratios in this matter indicate that
12      the higher incidence of these health problems in the workers can
13      be linked statistically to their exposure to fly ash" -- and
14      here's the part I want you to concentrate on -- "by comparing
15      the workers' experience of health problems with those of certain
16      other population groups including, but not limited to, various
17      local and regional populations."
18      A       Uh-huh.
19      Q       Is that -- did I read that accurately?
20      A       Yes.
21      Q       Okay. Now, in that group, literally,
22      would be people who live in proximity to the Kingston plant,
23      right?
24      A       Yes.
25      Q       And I want to contrast that with what you
```

```
1       say in Exhibit Eight.
2       A       Uh-huh.
3       Q       On bullet point one, page one.
4       A       Uh-huh.
5       Q       You say, "I am using a control group
6       persons who have not been exposed to fly ash or fly ash
7       constituents."
8               Is that accurate, doctor?
9       A       It is accurate if you take into account
10      that my case control study at that point was being morphed into
11      what I thought would have been better as what's called a case
12      cohort study. So we were looking at different designs at this
13      point. So these two documents reflect a shifting in how I was
14      planning to do the analysis.
15      Q       Do you see that anywhere in this report?
16      A       That I am changing my --
17      Q       That it's morphing? That it's changing?
18      A       No.
19      Q       Had you gotten -- how many more
20      questionnaires from your control group, as we -- as you and I
21      have defined it, and I'm using that word loosely and you are
22      too.
23      A       Yes, sir. Yes, sir.
24      Q       But to describe the people you're going to
25      compare --
```

```
1       A       Yes, sir.
2       Q       -- to the plaintiff workers, right?
3       A       Yes, sir.
4       Q       Fair enough?
5       A       Yes, sir.
6       Q       How many of those did you have by
7       October 27th?
8       A       I don't know.
9       Q       Okay. Did you know by October 27th you
10      weren't going to be able to do an epidemiological study?
11      A       I was starting to -- I don't know when --
12      when the realization that I was not getting data that would
13      support a fair and publishable study. And I can't tell you
14      exactly when it became clear to me. But as -- for example, as
15      we -- as we were getting more reports in, at some point they
16      slowed down. At some point, regardless of the study design,
17      which was changing, it didn't matter. We were not getting
18      enough numbers to do a reliable analysis.
19      Q       Okay. Let me -- let me interrupt you
20      there a second. And I want to focus on this time period you're
21      talking about.
22      A       Yes.
23      Q       That we're talking about a time period
24      between July 14, 2017 --
25      A       Yes.
```

```
1       Q       -- and October 27, 2017, which is less
2       than a year ago, now. And your memory ought to be a little bit
3       better, right?
4               MR. DAVIS: Objection. You may answer.
5               THE WITNESS: My memory is what it is, and
6       I'm going to do the best I can.
7       BY MR. SANDERS:
8       Q       Okay. All right. So when -- strike that.
9               You've already told me your best
10      recollection of what you had by mid July of 2017 in terms of
11      questionnaires --
12      A       I --
13      Q       -- and dates.
14      A       I told you the best that I could.
15      Q       Did you get any more data --
16      A       Possible.
17      Q       -- after July --
18      A       Possible.
19              MR. DAVIS: Let him finish his question.
20      BY MR. SANDERS:
21      Q       -- after July 14, 2017, and before October
22      27, 2017?
23      A       Possibly. I don't know for sure.
24      Q       Well, was it much?
25      A       It wasn't too much, no. It was concerning
```




1 that there wasn't enough to do the work that we had thought we
2 could do.
3     Q     All right. Did you report that concern to
4 the lawyers?
5     A     I did.
6     Q     When?
7     A     Around that time.
8     Q     Well, was it before or after you made this
9 sworn declaration?
10     A     I don't know.
11     Q     You don't know?
12     A     No, sir. Can I -- can I -- can I qualify
13 that a little bit?
14         MR. DAVIS: You can -- if it completes
15     your answer, please do.
16         THE WITNESS: It's not like one day I woke
17     up and said this is not going to work. It's more
18     like a gradual -- a gradual sense that it's not going
19     to work. And when I came to the more definitive
20     conclusion that it wasn't going to work, I can't tell
21     you that. I can tell you it was more recently. But
22     I can't tell you the exact date that that conclusion
23     was reached on a more definitive level.
24 BY MR. SANDERS:
25     Q     And -- and at some point you informed the

1 lawyers on that more definitive level.
2     A     Yes.
3     Q     How soon after you reached that conclusion
4 did you tell the lawyers?
5     A     I don't know. At what -- I don't know.
6 In general, I did not reach out to the lawyers so much as
7 waited for them to reach out to me. So I don't know exactly how
8 long that interval was.
9     Q     Was it weeks?
10     A     I don't --
11     Q     Days?
12     A     I don't know. I -- I don't think days.
13     Q     Weeks?
14     A     It would be weeks or months.
15     Q     Okay. So is it a fair statement that you
16 were having problems with whether you were going to be able to
17 complete the epidemiology study that you had intended to do?
18     A     Very fair.
19     Q     Okay. And that a reason for that was the
20 lack of data from questionnaires either in control group or the
21 plaintiffs' group, right?
22     A     That is fair.
23     Q     And that -- and that was more predominant
24 in the control group.
25     A     That's -- that's true.

1     Q     Had you made an assessment of whether you
2 had sufficient information in the -- in the plaintiff worker
3 group data?
4     A     Yes. I thought that we could use some
5 more to be more concrete in our conclusions.
6     Q     Well, wait a minute, now. So you had made
7 an assessment and that you needed more.
8     A     I would have liked more, yes.
9     Q     Did you tell the lawyers that?
10     A     Yes.
11     Q     Did you get more?
12     A     I -- they -- as mentioned earlier, the
13 reports came in over the course of months. Many, many months.
14 And I can't tell you if at the time that I suggested that we did
15 not have enough or would desire more, I can't tell you that if
16 that occurred -- you know, when exactly that occurred. And --
17 and more specifically, I mentioned it more than once.
18         So the first time I mentioned it we
19 definitely did get more. Second time I mentioned it we probably
20 got some more, And I don't know at that point. But there was a
21 point when I mentioned it when we didn't get anymore.
22     Q     Okay. I'm going to get quickly above my
23 pay grade here. But I gather from your testimony and the
24 context, that the more information you got came in the form of
25 additions to Excel spread sheets as opposed to hard copies of

1 questionnaires. Is that a fair statement?
2     A     No, sir. I believe that additional
3 information was sent in the form of hard copies.
4     Q     Questionnaires?
5     A     Questionnaires, yes. Which I assumed
6 would be included in any updates I received on the Excel spread
7 sheet.
8     Q     And -- and -- so you got questionnaires
9 after July --
10     A     It's possible that I did.
11     Q     -- of July of 2017.
12     A     It's possible.
13     Q     And what happened to those? Where are
14 they?
15     A     I do not -- I did not retain any
16 questionnaires. I can tell you what I strongly believe here, is
17 that after they took the questionnaires from my office I did not
18 receive anymore at that point.
19     Q     Okay.
20     A     But what date they took it, I don't know.
21     Q     Well, I -- maybe I misunderstood you. And
22 correct me if I'm wrong.
23     A     Yes.
24     Q     But I thought you testified a few minutes
25 ago that the -- the data you were relying on in July of 2017 was



1  MR. SANDERS: Sure.
2  MR. DAVIS: Okay. Five-minute break.
3  THE VIDEOGRAPHER: We're going off the
4  record. This is the end of disk one.
5  (A recess was had.)
6  THE VIDEOGRAPHER: We are back on the
7  record. The time is 11:43. This is the beginning of
8  disk two.
9  BY MR. SANDERS:
10  Q  Doctor Terry, you and I were talking about
11  Exhibit Eight. And specifically we were talking about the
12  problems you were having in completing your epidemiological
13  study, which is always hard for me to say.
14  A  Me too.
15  Q  Good.
16  And -- and I read you the sentence on page
17  one of Exhibit Eight about the control group as you described it
18  there.
19  A  Yes.
20  Q  And would you agree with me that that --
21  that's a bit different from your description in Exhibit Two when
22  you defined --
23  A  Yes.
24  Q  -- or described the control group?
25  A  Yes.

1  Q  Was that on purpose? Did -- did you
2  change your concept of your control group?
3  A  I -- I -- I changed my concept of the --
4  of the study along the way. I guess it had to be due in part to
5  the way that data were being collected. And so I thought it may
6  be better to treat this not as a retrospective analysis, but as
7  a -- what's called a prospective analysis. Starting with the
8  exposure point and going forward in time from there.
9  Q  But, doctor, on page two, when you
10  describe methodology under point two, it's still a retrospective
11  observation of historical cohort study, isn't it?
12  A  Yes, sir. But that -- that's something I
13  tell my students all the time. I like to use the word
14  "historical" because the word "retrospective" is, unfortunately,
15  leads people to think that that is the directionality, the
16  directionality of the study, when it's not. It's a
17  retrospective in the fact that you are reconstructing a cohort
18  based on historical records. I -- I prefer the term "historical
19  cohort." But it's actually used anonymously, retrospective
20  cohort, versus an historical cohort. They're both used.
21  Q  Yeah. But I thought you were changing to
22  prospective at about this time.
23  A  Well, it's changing to a prospective
24  directionality or forward directionality, which is a cohort. A
25  cohort attempts to categorize people according to exposure and

1  then look forward in time, which is what makes it -- now, you
2  could do this all retroactively, which is probably why it's
3  better to say a retroactive cohort study than a retrospective
4  cohort study. But you can retroactively assemble a cohort if --
5  if the records are there to do so.
6  Q  Right. And that was your problem, the
7  records weren't there?
8  A  Well, the records were being estimated by
9  this -- by this questionnaire.
10  Q  Right.
11  A  And the medical records, yeah.
12  Q  And you weren't getting what you needed.
13  A  Not -- not -- I wasn't getting optimal,
14  let's say.
15  Q  All right. Now, the next sentence,
16  however --
17  A  Yes.
18  MR. DAVIS: Which --
19  MR. SANDERS: After the one we've just
20  been talking about. I am using a control group
21  that's not been exposed to fly ash or fly ash
22  constituents.
23  THE WITNESS: Yes.
24  BY MR. SANDERS:
25  Q  We talked about that's different from what

1  you said in July.
2  A  It certainly is.
3  Q  The next sentence says, "I have not
4  completed my work, as I intended to rely heavily on air
5  monitoring data and industrial health information, which Jacobs
6  Engineering, Inc. as the safety contractor for TVA was required
7  to maintain pursuant to CERCLA."
8  Did I read that right?
9  A  I believe you did.
10  Q  And you swore to that.
11  A  Yes, sir.
12  Q  In October.
13  A  Yes, sir.
14  Q  2017.
15  A  Yes, sir.
16  Q  And signed it.
17  A  Yes, sir.
18  Q  Well, let me ask you about air monitoring
19  data.
20  A  Yes, sir.
21  Q  Had you seen any air monitoring data?
22  A  No, sir.
23  Q  Don't shake -- and let me finish.
24  A  I'm sorry.
25  Q  This is -- this is important.


MAGNA
LEGAL SERVICES

1       A       Oh, I thought you had finished. I'm
2   sorry.
3       Q       That's okay.
4               Had you seen any air monitoring data
5   whatsoever for the Kingston site prior to October 27, 2017?
6       A       No, sir.
7       Q       Okay. And had anyone told you that there
8   was air monitoring data that was available?
9       A       I believe verbally I was told that it was
10  possible. I don't think I was promised that data.
11      Q       Anybody tell you that there was a spread
12  sheet, which looks like this, of air monitoring data collected
13  by Jacobs during the entire time Jacobs was collecting data --
14  air monitoring data on this site?
15              MR. DAVIS: Objection. Witness has not
16              been shown a spread sheet. Just held up a notebook.
17  BY MR. SANDERS:
18      Q       I don't know if it's going to make any
19  difference to show it to you. But I will be glad to show it to
20  you.
21      A       Thank you.
22              My best answer is, I don't specifically
23  recall ever being shown these. However, I can't -- I can't
24  state absolutely that I had not at least been offered the
25  opportunity to see that. I -- I don't know --

1       Q       Okay. You just don't remember.
2       A       No, sir.
3       Q       But whether you were given the opportunity
4   or not, you didn't look at any air monitoring data to this day,
5   is that right --
6       A       Except for --
7       Q       -- other than what I just showed you.
8       A       I have seen various spread sheets on
9   constituents of coal ash but not air monitoring data.
10      Q       Okay. All right. But I'm -- I'm asking
11  now specifically -- and I'll get to this other in a minute.
12      A       Yes.
13      Q       We're going to run it into it inevitably.
14      A       Yes, sir.
15      Q       But I'm talking about air monitoring data.
16      A       I don't recall ever seeing air monitoring
17  data of that type from that, no.
18      Q       All right. At some point -- and Isaac or
19  Gary can help us. At some point you list in the materials that
20  you reviewed the On-Scene Coordinator Reports. Do you remember
21  looking at those?
22      A       Could you say that again? What --
23      Q       Yes. On-Scene Coordinator Reports from
24  the Kingston project.
25      A       "On-scene" meaning on site?

1       Q       Yes.
2       A       Okay. I don't remember --
3       Q       It may be in the newest report.
4       A       I don't remember any specific data --
5       Q       Now, I'm not asking about data right now.
6   I'm going to get to data going this way.
7       A       Sure.
8       Q       I'm asking about the On-Scene Coordinator
9   Reports. And it probably would help me -- there is one that is
10  for the time-sensitive phase of the project and the other for
11  the non time-sensitive phase.
12              MR. DAVIS: Let me just -- let the record
13              reflect that we were just handed something that
14              appears to be Exhibit Four from the summary judgment
15              response of the plaintiffs in the case and not an
16              Exhibit Four for this deposition.
17              MR. SANDERS: Thank you for that
18              clarification.
19              MR. DAVIS: And this appears to be Dr.
20              Terry's report; is that correct?
21              MR. ISAAC SANDERS: The -- the new one.
22              MR. DAVIS: Right.
23              MR. SANDERS: The new one. And --
24              MR. ISAAC SANDERS: (Inaudible.)
25  BY MR. SANDERS:

1       Q       Is that yours?
2       A       Yes.
3               MR. DAVIS: And also his declaration,
4               which is in front.
5   BY MR. SANDERS:
6       Q       And if you look on page 18 of the -- your
7   report from -- on page 26 of the document. But 18 on the --
8               MR. DAVIS: Eighteen in your report.
9   BY MR. SANDERS:
10      Q       Eighteen of your report. Yes. At the
11  bottom there it says "document" -- or page 26 of 139.
12      A       Page 26 --
13      Q       Yeah. It's -- it's -- I'm just trying to
14  show you where --
15      A       Oh, yes. Okay. In the corner.
16      Q       Yeah.
17      A       Yes.
18      Q       But the whole point of this is for you to
19  look at item eight on page 18.
20      A       Yes. I see it.
21      Q       On-Scene Coordinator Report for the
22  Time-Critical Removal Action.
23      A       Yes.
24      Q       Great.
25              So apparently you considered that.



```
1     A      Everything -- yes.
2     Q      Okay.
3     A      Apparently I did, yes.
4     Q      Do -- do you -- do you recall or did you
5   notice that there is a section in that On-Scene Coordinator
6   Report on air monitoring and a summary of results?
7     A      At the time I --
8            MR. DAVIS:  We -- we provided you what he
9     was provided from that report.  It was an excerpt of
10    the report.  It -- it was among the documents
11    produced.
12           MR. SANDERS:  Well, if you can help me a
13    second, in the stack which you gave me, which is
14    hopefully here.
15           MR. DAVIS:  It may be on the thumb drive.
16    And it's identified as an excerpt from the On-Scene
17    Coordinator Report.
18           MR. SANDERS:  And that excerpt concerned
19    what?
20           MR. DAVIS:  Concerns the constituents of
21    coal ash.
22           MR. SANDERS:  Okay.  But you didn't
23    provide him with a copy -- with the excerpts having
24    to do with air monitoring.
25           MR. DAVIS:  I -- I can tell you we didn't.
```

```
1     I don't know what he was provided before we got
2   involved in the case.
3   BY MR. SANDERS:
4     Q      Okay.  Well, let me ask you the question
5   directly, doctor.
6     A      Yes, sir.
7     Q      Does the conversation among counsel here
8   help refresh your recollection of -- of what you may have seen
9   from the On-Scene Coordinator Report?
10    A      No.
11    Q      Okay.  And as you sit here today you can't
12  remember ever seeing from the On-Scene Coordinator Reports
13  anything about air monitoring and air monitoring results at the
14  site.
15    A      Not to the point where I can recall any --
16  any of it.
17    Q      Okay.  Air monitoring results would be
18  important, wouldn't they?
19    A      In theory, yes.
20    Q      Okay.  Well, you say in your declaration.
21  "I intended to rely heavily on the air monitoring data." right?
22  Didn't you say that?
23    A      I said that.
24    Q      Okay.  So that's pretty important, isn't
25  it?
```

```
1     A      Yes.  Under --
2     Q      Okay.
3     A      Yes.  A few assumptions would need to be
4   made.  But, yes, it -- it is all dependent on the quality and
5   relevance of the data.
6            MR. DAVIS:  You mean for his
7     epidemiological study, is that what you're referring
8     to?
9            MR. SANDERS:  Yes, sir.
10           THE WITNESS:  Yes, sir.  Of course, like
11    everything else, it depends on the quality of the
12    data.
13  BY MR. SANDERS:
14    Q      Then you go on to say, "My information is
15  that the air monitoring data was altered, destroyed or otherwise
16  rendered unreliable."  This is still on page one from Exhibit
17  Eight.
18    A      Yes, sir.
19    Q      Did I read that correctly?
20    A      Yes, sir.
21    Q      From whom did you get that information or
22  from where?
23    A      From plaintiffs' attorney and/or
24  attorneys.
25    Q      Okay.
```

```
1     A      I can't remember how many may have relayed
2   that information to me.
3     Q      Did they give that to you verbally, orally
4   or did they give it to you in writing?
5     A      Verbally.
6     Q      Okay.
7     A      To the best of my recollection.
8     Q      And verbally, as we're using it here,
9   means they talked to you about it.
10    A      To the best of my recollection, that's the
11  way I learned of it.
12    Q      Right.  And you don't remember getting any
13  written communication about this information that the air
14  monitoring data was altered, destroyed or otherwise rendered
15  unreliable.
16    A      At this point in time I have no
17  recollection of ever receiving any written documentation
18  regarding that.
19    Q      All right.  What did the lawyers tell you?
20    A      They told me what -- what's here.  I don't
21  remember the -- the words.  I think this is a reasonable
22  representation of what they told me.  But I don't remember their
23  exact words.
24    Q      Well, did you ask them how -- how -- how
25  is that -- how -- how could they do that?
```



```
1        A     I probably did.
2        Q     Do you remember the answer?
3        A     I don't.
4        Q     So even now --
5        A     Even now, I don't.
6        Q     -- you have no -- you have never looked at
7   air monitoring results.
8        A     No.
9        Q     From Kingston, I'm sorry.
10       A     No. Yes, I'm glad you -- because, yes, I
11  have looked at air monitoring results.
12       Q     Okay.
13       A     But, no, I have not looked at air
14  monitoring results from Kingston.
15       Q     All right. And -- and had you asked for
16  them before you were told they were unreliable?
17       A     I inquired as to their availability.
18       Q     And what were you told?
19       A     They're not reliable.
20       Q     That was your answer. Their answer to
21  you.
22       A     I believe. But you know what, I may have
23  asked for it several times before getting that answer. I don't
24  remember if it was I asked and they immediately told me that. I
25  can't tell you that.
```

```
1        Q     Okay. I have to ask this --
2        A     Sure.
3              MR. DAVIS: You dropped your mike.
4              MR. SANDERS: I saw it. Thanks.
5              MR. DAVIS: Only supposed to do that when
6   you really go out with a big hit.
7              MR. SANDERS: I don't have any of those.
8              MR. ISAAC SANDERS: (Inaudible.)
9              MR. SANDERS: I didn't -- I didn't need
10  confirmation from you.
11  BY MR SANDERS:
12       Q     The best time guide post we have that --
13  that's been somewhat successful for us this morning is the
14  July 14th report that you signed and then the October 27 report
15  that you signed.
16       A     Yes.
17       Q     And a little bit of help from May 1st --
18       A     Yes.
19       Q     -- 2017.
20       A     Yes.
21       Q     Do you think you inquired about the air
22  monitoring results before you signed this report in mid July of
23  2017 or can you just not remember?
24       A     Well, most accurately, I just can't
25  remember. I mean, I know guessing is not usually encouraged in
```

```
1   a deposition.
2        Q     And I'm not encouraging you to guess.
3              MR. DAVIS: So don't guess.
4   BY MR. SANDERS:
5        Q     I'm -- I'm -- I'm simply asking you --
6        A     No.
7        Q     And -- and -- and with thinking about the
8   fact that you're going to make this report and you're going to
9   sign it, do you think you asked for the air monitoring results
10  before you did that report?
11             MR. DAVIS: Wait. Which one we talking
12  about now?
13             MR. SANDERS: July 14, 2017.
14             MR. DAVIS: Exhibit Two.
15             MR. SANDERS: Exhibit Two, yes, sir.
16             THE WITNESS: I do think so. I do think
17  so. But I --
18  BY MR. SANDERS:
19       Q     And when -- I'm sorry. When did you --
20  when did you form your intent to rely heavily on air monitoring
21  data? Probably was from the beginning, wasn't it?
22             MR. DAVIS: Objection. It's a compound
23  question. Either answer the first one or the second
24  one.
25             THE WITNESS: Oh, well, as to when,
```

```
1   probably not until I was told that there might be
2   some air monitoring data. Because I wasn't -- I
3   didn't independently look for that. I think that --
4   I think that from earlier on before this, as to what
5   date, I don't remember, I was told --
6   BY MR. SANDERS:
7        Q     Well, stop -- let me stop you a second.
8   Before this --
9        A     Before the July 17th --
10       Q     Thank you.
11       A     -- 19 -- 2017 report.
12       Q     Yes, sir.
13       A     I was told that there might be such data.
14  And at that point I thought it would be very scientifically
15  useful, and I was excited by it. And as to what point I found
16  out that those data were not going to be available, relative to
17  the point that I found out that they might be available, I don't
18  know exactly. I don't even -- can't even tell you the interval
19  between finding out that they might be available to finding out
20  that they probably would not be available. I don't know what
21  the interval was. To me, it's all squashed together.
22       Q     Okay. You finished?
23       A     Oh, yeah. I'm sorry.
24       Q     Okay. I think this is clear, but let me
25  ask you a direct question. It -- it's clear from your testimony
```



1    Q    Are we ready to proceed to the next
2 issues?
3         MR. DAVIS: Are you through with the
4 spread sheet?
5         MR. SANDERS: I am for the moment.
6         MR. DAVIS: Okay.
7         MR. SANDERS: Unless -- unless Dr. Terry
8 needs it for other questions or previous questions.
9         MR. DAVIS: Okay.
10 BY MR. SANDERS:
11    Q    You're fine right now?
12    A    Fine.
13         MR. ISAAC SANDERS: Are we done with that?
14         MR. SANDERS: Uh-huh.
15         MR. ISAAC SANDERS: Off the record really
16 quick.
17         (Off the record.)
18 BY MR. SANDERS:
19    Q    I want to take you back to Exhibit Two, I
20 believe. Did I identify that for you? And Exhibit Two, yes, is
21 your report that you signed in July of 2017.
22    A    I -- I may have a different exhibit.
23 Because there's no signature on this. Maybe it's -- maybe it's
24 not the Exhibit Two that you're referring to.
25    Q    No. This is something else.

1         MR. DAVIS: Wasn't Exhibit Two the May
2 one?
3         THE WITNESS: Maybe I should look for the
4 stickers.
5         MR. DAVIS: Yeah, look for the stickers.
6 BY MR. SANDERS:
7    Q    Yeah, look for the stickers. I don't know
8 where this came from. Here's Exhibit Two.
9    A    Thank you.
10    Q    Here we go.
11    A    Thank you.
12         MR. DAVIS: This was in your files.
13 BY MR. SANDERS:
14    Q    You found it?
15    A    I did. You found it.
16    Q    Still under item number one on page one of
17 Exhibit Two, which is your report from July of 2017. At the end
18 of that first paragraph --
19    A    Yes.
20    Q    -- you talk about the -- the data. And
21 you go on to say, "The data suggests that the fly ash increased
22 the risk of having these diseases and conditions when compared
23 with the data from the population as a whole" -- et cetera.
24    A    Uh-huh.
25    Q    Okay. Do you have that data?

1    A    I do not any longer have the population
2 data. But they should be accessible to anybody. They're
3 publicly-available.
4    Q    Okay. You no -- you no longer have it.
5    A    I did a calculation based on what I had.
6 And I looked at the numbers and I made what they suggest and I
7 said what they suggest. That's --
8    Q    Okay. Here -- here's what I'm trying to
9 get at.
10    A    Yes.
11    Q    I don't see anything in Exhibit Two or in
12 your October report or in your present report from -- from April
13 of this year that tells us what this calculation is or what the
14 data is that -- that helped you make that calculation.
15    A    Got it.
16    Q    I need to know what that data is.
17    A    Okay.
18    Q    You're telling -- you're telling me that
19 you -- you got it and you used it, and apparently -- let me just
20 ask you -- you relied on it.
21    A    In conjunction with other things, yes.
22    Q    Okay. Right.
23    A    Yes.
24    Q    And it's not in the reports, is it?
25    A    It certainly wouldn't be in the most

1 recent one. Because the most recent one hadn't -- really was
2 taking a totally different approach.
3    Q    Well, that's another question I want to
4 ask you.
5    A    Yes, sir.
6    Q    Maybe this will make it quicker to go
7 through what I was getting ready to go through.
8    A    Yes.
9    Q    You're no longer relying on data of the
10 association between the incidence of disease here in these
11 plaintiff workers and the population as a whole.
12    A    Correct.
13    Q    It's not part of what you're doing.
14    A    Not part of my calculus and not part of my
15 consideration for the report that's most recent, the one that
16 you mentioned from April of 2018.
17    Q    Right.
18    A    I did not consider anything --
19    Q    Okay.
20    A    -- other than the published literature.
21    Q    So you're not relying on any of that --
22    A    No. No, sir.
23    Q    -- for purposes of the opinions you're
24 going to give in this trial.
25    A    No, sir.





MAGNA
LEGAL SERVICES

1    Q    Correct?
2    A    Correct.
3    Q    I'm correct.
4    A    You are correct.
5         MR. DAVIS: Did that shorten the
6    deposition a little bit?
7    BY MR. SANDERS:
8    Q    A little bit.
9         I'm still -- I still want to ask you,
10   though. Is there a place where you have this data and this
11   calculation that you could provide us?
12   A    No. And it's not an unwillingness to do
13   so, it's a not available to do so.
14   Q    Why is it not available?
15   A    Because once I made a -- first of all,
16   once I made a calculation and realized that we were still
17   waiting for more data, that's a preliminary judgment. It's a
18   preliminary. And I -- I certainly intended to make that
19   preliminary nature of the data explicit. If I did not then that
20   was an oversight, trust me. It was not intentional. But it was
21   a preliminary calculation with the expectation that more data of
22   a reliable nature would be provided to me. Because I think I
23   made it clear to anyone who would listen to me that we needed
24   more data to -- to be able to state things with the kind of
25   certainty that a -- a journal editor would -- would find

1    acceptable. And at that time I was still aware of the -- of the
2    possible use of these data for the larger scientific community
3    at that point.
4    Q    The data that you had before it went away,
5    did you provide that to the lawyers in this case; the
6    calculations or the data?
7    A    I did not. I would have if they had asked
8    me, but they did not ask me.
9    Q    Do you remember the percentage of higher
10   incidence of disease as to any disease or any constituent
11   element of fly ash?
12   A    Nothing exact. The figures that I kind of
13   remember is a doubling of incidence compared to what would be
14   expected. But, again, confidence intervals were wide.
15   Estimates varied based on what the disease was. And I couldn't
16   give you a number that would reflect all of those things. I --
17   I just couldn't.
18   Q    Okay. Maybe I can shorten this down a
19   little bit. And I'm closed over my pay grade in my
20   understanding of these things. So I want you to listen very
21   carefully to what -- what I'm saying. And if you disagree with
22   me, I want you to correct me.
23        It sounds to me like what you -- you did
24   enough work in this case when you were going to do an
25   epidemiological study that formed a hypothesis and that you

1    didn't have enough information data in order to prove or
2    disprove that hypothesis. Is that a fair statement?
3         MR. DAVIS: Objection to the form. You
4    may answer if you can.
5         THE WITNESS: Okay. Well, I would say
6    that the word "hypothesis" is not exactly correct.
7    Because a hypothesis to me is a prediction. I had no
8    predictions.
9    BY MR. SANDERS:
10   Q    Okay.
11   A    In other words, a hypothesis is an A
12   priority prediction of what the data will show. I simply wanted
13   to see what the data showed. Now, I could possibly answer your
14   question by saying while the data -- I've seen data that shows
15   something when the numbers are small and then as more data come
16   in, it gets bigger, it gets smaller, it could even go away.
17   Q    Go the way -- other -- go away.
18   A    Even go the other way or go away. So I
19   think that's why if one were to apply statistical definitions of
20   likely, then you'd want confidence intervals that exclude going
21   away. Put it that way. But if you want to say likely in a more
22   preponderance weight of the evidence kind of thing, that doesn't
23   -- that doesn't have a number to it except that, well, it's more
24   -- at this point in time it seems more likely than not. But
25   you're not putting any weight of judgment except to say it seems

1    more likely than not. And in -- in order for me to get more
2    statistically certain I would have required more data. And I
3    started wondering whether that was going to happen. And at some
4    point I -- I don't know if gave up is the right word, but I --
5    it sort of effectually gave up on it.
6    Q    Both in terms of -- of your helping the
7    plaintiffs in this case as an expert and publishing a paper.
8    A    Yeah. I thought that the -- the -- the
9    data as a -- as a end point in itself was worth the effort.
10   Q    Okay.
11   A    Otherwise it stays as a point of
12   litigation and the scientific community never -- never can use
13   it. So that was my original idea for the ultimate use, from my
14   perspective.
15   Q    Right. I think -- I think I understand.
16        And it sort of answers my next question.
17   And probably does, but I'm going to ask it anyway. You didn't
18   -- at the time that you signed this report that somebody else
19   wrote in July of 2014 --
20   A    Yes. No. It wasn't 2014, sir.
21   Q    I mean '17.
22   A    Yes, sir. Yes, sir.
23   Q    This deposition and accident occurred in
24   2014.
25   A    Yeah. I think you meant the 14th of July,



```
1    2017.
2    Q        Yeah.  That's a better explanation.
3    A        Yes, sir.
4    Q        So we're talking about Exhibit Two.
5    A        Yes, yes, yes.
6    Q        When you wrote that.
7    A        Yes.
8    Q        You hadn't actually formed an opinion yet,
9    right?
10             MR. DAVIS:  Objection.
11             THE WITNESS:  Well, no.  I -- I did form
12             an opinion, but it wasn't backed up with the
13             statistical significance aspect of it.
14   BY MR. SANDERS:
15   Q        Okay.
16   A        And so -- by the way, journals, when they
17   publish something and reviewers of journal articles, they're
18   less concerned with your personal opinion than they are with
19   statistical certainty.  So there's my -- there's my opinion and
20   there's what's going to fly in a journal.
21   Q        Okay.  I understand.
22             Doctor Terry, do you know, from your work
23   in this case, or any other work that you've done, what is a
24   health harmful level of exposure to fly ash?  How much fly ash
25   does it take to cause harm to -- to individuals?
```

```
1    A        I can tell you that I don't know.  And I
2    can qualify that a little bit if you want.
3    Q        No.  I'm happy for you to qualify it.
4    A        One of the reasons is because exposure
5    itself is hard to determine.  There's different routes of
6    exposure.  There's multiple routes of exposure.  Somebody can
7    breathe it, somebody can ingest it, somebody can have it exposed
8    to their skin, some people can ingest enough of it that it --
9    it's clearly evident in the digestive tract, for example.  I
10   suppose eyes and -- and -- there -- in other words, there are
11   multiple routes by which you can be exposed.  So to be able to
12   say what level of exposure is important is highly dependent on
13   two things; the route of exposure, the concentration of the
14   substances that might be -- acting causally to cause a
15   condition.  And, finally, the sensitivity of the person.
16   Because there are people who are still smoking after 96 years
17   and still alive.
18   Q        Still alive.
19   A        So, yes, there's individual susceptibility
20   to exposures that make -- all these things make it very
21   difficult to say anything sort of blanket statement by saying,
22   okay, you need two of -- you know, pick any number you want.
23   Pick any unit you want; you know, milliliters per this or grams
24   per that.  It's -- it's very hard to say.  And I think that -- I
25   think that the literature is deficient in that area.  I think
```

```
1    that understanding the susceptibility factors is being fleshed
2    out as we speak.
3             But I think that the knowledge of the
4    genetic factors and other lifestyle factors -- and I'll give you
5    one more.  If you just got a certain level of pick your
6    substance, arsenic -- and I'm not picking on that for any reason
7    except that it starts with the letter A.  It could be that
8    arsenic by itself requires a higher dose than arsenic when
9    you're also exposed to lead or arsenic when you're also exposed
10   to lead and -- and something else.
11   Q        So a synergistic effect.
12   A        Yes.  And -- and those -- those things
13   combined make it extremely difficult -- I mean, people do, and
14   governments do set limits, but they'll never tell you it's an
15   easy thing to do.
16             MR. SANDERS:  Okay.  I need to do two
17             things with what -- at least two things with what you
18             just told me.  First I would like for you to read
19             back because I lost it and I want to use your exact
20             words.  In -- in the first couple of sentences of his
21             qualification on his I don't know, could you read
22             that back to me?
23             (A portion of testimony was read by
24             the court reporter.)
25             THE WITNESS:  Inhalation, I said.
```

```
1    BY MR. SANDERS:
2    Q        I didn't hear you.
3    A        Inhalation, I said too.
4    Q        Well, that's -- let me go back and do --
5    that's part of what I want to do.  Would it help your answer or
6    reduce the qualifications if I limited my question about what --
7    how much is harmful of fly ash exposure, now.  Not any of these
8    constituent elements.  I'm going to ask you about those in a
9    minute.  But in terms of fly ash exposure, airborne, inhalation,
10   what is a harmful level, do you know?
11   A        No.  Because it depends on the person and
12   their susceptibility and how they inhaled it.
13   Q        Okay.
14   A        How deeply they inhaled it, how often --
15   Q        I think the word I'm trying to remember --
16   and you also said the concentration.
17   A        Yes, sir.
18   Q        Now, concentration is dose, right?
19   A        Yes, sir.
20   Q        So dose matters.
21   A        Yes.
22   Q        I know where I'm going to start with this.
23   I'm going to ask you the same question -- constituent elements.
24   I'm going to start as "did you" with, A, arsenic.
25   A        Yes, sir.
```



1    Q    How much airborne exposure to arsenic will
2    cause harmful health effects, do you know?
3    A    No. I can't give you an exact number that
4    applies to everybody. I can't.
5    Q    Okay. Can you give me an exact number
6    that applies to anybody?
7    A    No, sir.
8    Q    All right. The same question as to
9    beryllium.
10   A    No, sir.
11   Q    Cadmium.
12   A    No, sir.
13   Q    Indeed -- here, we can make this easier.
14   In -- in your last report, your April 30 report, you have a list
15   of chemicals --
16   A    Yes, sir.
17   Q    -- that you considered.
18   A    Yes, sir.
19        MR. DAVIS: Which we haven't marked.
20   BY MR. SANDERS:
21   Q    I'm going to read them off to you and then
22   we'll mark it.
23   A    Yes, sir.
24   Q    And -- and if you want to look at these --
25   A    Yes, sir. You want -- do you want me to

1    wait until you're done reading?
2    Q    Do you have it in front of you?
3    A    I -- what page would that be?
4    Q    It's going to be on page five.
5    A    Yes, sir.
6        MR. SANDERS: And what I'd like to do,
7    Gary, if it's all right with you, our copies, for
8    some reason, have Exhibit Four because it came from
9    some proceeding.
10       MR. DAVIS: Right.
11       MR. SANDERS: Can we tear off this Exhibit
12   Four thing and just mark this as Exhibit 12?
13       THE COURT REPORTER: Twelve.
14       MR. SANDERS: Can we do that?
15       MR. FRIEDMAN: Just flip that over.
16       MR. DAVIS: Well, it's -- it's big. It's
17   like that.
18       MR. FRIEDMAN: Oh, okay. I'm sorry.
19       (Inaudible discussion about Exhibit 12.)
20       MR. SANDERS: I'm going to -- she's going
21   to mark this and I'm going to hand it to you.
22       (EXHIBIT NO. 12 WAS FILED.)
23   BY MR. SANDERS:
24   Q    I think we're trying to find page five?
25   A    Yeah.

1    Q    And the -- I've already asked you about
2    arsenic. I asked you about beryllium, but that wasn't on your
3    list. Then cadmium, it is? It's on your list?
4    A    Yes, it is.
5    Q    Do you know what a harmful level of that
6    is?
7    A    Not for any individual.
8    Q    Okay. Chromium?
9    A    No.
10   Q    Lead?
11   A    No.
12   Q    Nickel?
13   A    No.
14   Q    Vanadium?
15   A    No.
16   Q    And what about naturally-occurring
17   radioactive material and ionizing radiation in general?
18   A    No, no.
19   Q    Do you know?
20   A    Not for any individual, no.
21   Q    Okay. Now, some of these, maybe all of
22   these, are all naturally-occurring. You have
23   naturally-occurring radioactive material, that means exactly
24   what it says, doesn't it?
25   A    Yes. We know, for example, that -- that

1    homes can be -- have certain levels of radon, for example.
2    Q    Well, I'm talking about
3    naturally-occurring radioactive -- in the soils.
4    A    Yeah. But that radon is
5    naturally-occurring.
6    Q    All right. All right. So --
7    A    It's a gas that comes out of the soil.
8    Q    Right. And it -- it occurs in nature.
9    A    It certainly does.
10   Q    And so does arsenic.
11   A    Certainly does.
12   Q    As a matter of fact, there's probably
13   arsenic in your backyard.
14   A    Probably.
15   Q    And in mine.
16   A    Probably.
17   Q    Is that true for cadmium?
18   A    I believe it is.
19   Q    Chromium?
20   A    I believe it is.
21   Q    Lead, for sure.
22   A    For sure.
23   Q    Nickel?
24   A    Yes.
25   Q    And vanadium.





1      A      I'm less sure about vanadium, but I would
2  imagine so.
3      Q      Okay. If you decide that that was wrong
4  later on, tell me. I don't think vanadium is going to be the
5  key to this case.
6      A      Yeah. I'm just not as familiar with it.
7      Q      I understand. Neither am I.
8             I assume also -- no, I'm not going to
9  assume. Let me just ask you. Have you looked up, for example,
10 for arsenic, the permissible exposure level for arsenic set by
11 OSHA?
12     A      No.
13     Q      Do you know how they go about -- how OSHA
14 goes about setting those permissible exposure limits for
15 something like arsenic?
16     A      I have an idea, but I have not been
17 involved with setting limits like that.
18     Q      I'm not trying to suggest that. I'm
19 asking what you know. Do you know it's, for example, based on a
20 working life of an average US worker?
21     A      Item -- there is no such thing as an
22 average US worker. But, yeah, it's based on -- to my
23 understanding, it's based on information wherever it can be
24 obtained that's relevant including, but not limited to, animal
25 studies, dose-ranging studies in animals and tissue and blood

1  levels in human beings and, in certain cases, when is allowable,
2  when it's part of a nutrient complex like -- like I believe
3  chromium can be -- or cadmium can be. They actually do what's
4  called feeding studies. I mean, they're not going to do that
5  with a poison, but --
6      Q      "They" being the OSHA people.
7      A      Yes.
8      Q      Or the people that contract with OSHA to
9  do the work.
10     A      To my knowledge, yes. They'll --
11 they'll -- in -- in certain -- but it's not only OSHA. I mean,
12 USDA does things like that as well.
13     Q      All right. What about NIOSH?
14     A      I believe they do, yes, and -- and IVHS as
15 well.
16     Q      Do you know from any of those different
17 sources what the permissible exposure limits are for arsenic?
18     A      No. And I'd -- and I'd also say that --
19 that that -- those limits do change over time. So --
20     Q      When they learn more they might change
21 things?
22     A      They have. And they -- they might
23 continue to, yes.
24     Q      But they change both ways, don't they?
25     A      Yes, sir.

1      Q      Up and down.
2      A      Yes, sir.
3      Q      You obviously know something about
4  toxicology, right?
5      A      Something.
6      Q      Yeah. Hopefully it's more than I do.
7             You -- you -- you've had to at least rely
8  on toxicologists or you've consulted toxicology texts or other
9  things in order to do some of your work.
10     A      Yes.
11     Q      In the past.
12     A      Yes. I've not contacted a person. But I
13 have looked at their data.
14     Q      Okay.
15     A      I have looked at reports from agencies
16 that deal with toxicological findings and limits and things like
17 that.
18     Q      All right.
19     A      But a great deal of my report is also
20 epidemiology.
21     Q      Right. Epidemiologists often have to use
22 toxicology in order to do your work, correct?
23     A      It's not always necessary, but it can be,
24 yes.
25     Q      Right. I thought I was being careful.

1      A      Yes.
2      Q      Can be. Doesn't have to be.
3      A      Correct.
4      Q      And you're not a toxicologist.
5      A      No, sir.
6      Q      You know something about it.
7      A      Yes, sir.
8      Q      But you're not a toxicologist --
9      A      Correct.
10     Q      -- right? Do you have any educational
11 training in toxicology?
12     A      I have no degrees in toxicology.
13     Q      Did you take any courses?
14     A      I took courses in environmental health
15 that had a component. But it was not -- we're going back a few
16 years. But I don't think --
17     Q      Just a few.
18     A      -- it was called toxicology 101.
19     Q      Right.
20     A      I think it was called -- it was variations
21 of environmental health.
22     Q      Okay. Do you agree with me there are many
23 substances in nature that potentially can be harmful, right?
24     A      Right.
25     Q      And they're around us all the time, every




MAGNA
LEGAL SERVICES

1    day.
2        A        Unequivocally.
3        Q        You agree with that.
4        A        Totally.
5        Q        And do you agree with me that dose makes
6    the poison?
7        A        On an individual level, it does.
8    Absolutely. There are some exposures which are considered no
9    amount of exposure is totally safe. In other words, there is
10   no -- the less the better. I would say that's true for ionizing
11   radiation -- unless you're being treated for something with it.
12   I would say that's true for radon gas. I would say that's true
13   for asbestos. I would say that's true for particulates. I
14   would say that's true certainly for any given individual given
15   their constitution there may be a limit that will not lead to
16   disease during their life span however long it might be.
17       Q        Okay. Let me -- let me press on you a
18   little bit on that.
19       A        Please.
20       Q        In your list of things that there is no
21   safe level --
22       A        Yes.
23       Q        -- you didn't include any of the things in
24   your list except two, right?
25       A        Yes, I --

1        Q        There -- there's no -- you wouldn't put a
2    no safe label on any of the substances that we just went through
3    from page five of Exhibit 12 except for particulates and
4    radioactive material -- radon.
5        A        Well, certainly chromium six has no
6    nutritional value, for example. I don't -- I don't see that as
7    having a quote, unquote, sure, go ahead, you know, be exposed to
8    it level.
9        Q        No, no. It's --
10           MR. DAVIS: Well, let him finish. Were
11       you finished with your answer?
12           THE WITNESS: Yeah, sure. Yeah.
13   BY MR. SANDERS:
14       Q        What I'm trying to ask is you -- I've
15   heard this before from -- from -- in other cases. There's some
16   things in which there is no safe level. The government has
17   decided at least, there's no safe level.
18       A        Yeah, there's no known safe level. Yeah.
19       Q        Right. And so that doesn't apply to
20   anything on this list with the possible exception of
21   particulates and radon, right?
22       A        Yes. But I would also mention that
23   chromium six, given it's -- to my knowledge it has no positive
24   function in the human body.
25       Q        Well -- but you seem to be back into that.

1    Because it has no good function means to you there's no --
2        A        I'm not aware of any benefits that it
3    might have.
4        Q        I'm with you. I understand what you're
5    telling me.
6        A        Okay.
7        Q        Now, let me ask you, then, about
8    particulates.
9        A        Yes.
10       Q        And I think you identified in your report
11   a particular class or size of particulates or mass of
12   particulates.
13       A        Yes.
14       Q        That is less than 2.5.
15       A        Yes.
16       Q        Right?
17       A        Yes.
18       Q        And are you saying that there's no safe
19   level for particulates of that size for all of us?
20       A        No.
21       Q        Or any of us?
22       A        No, sir. I'm saying that for -- it's just
23   like -- if I were to give a direct answer I'd say I never know
24   with an irritant, with something that could provoke an immune
25   response whether that immune response could lead to ultimately a

1    change in DNA or a change in a cell. Certainly one aberrant
2    gamma ray can cause damage while it -- while overall you might
3    say, okay, you know, when you take a plane flight, you're not
4    putting yourself at any great risk. What -- what the risk
5    category are in some cases like that is, you know, highly --
6    high risk. Because you can't quantify for any individual.
7    Medium risk -- I'm talking about doses of radiation. Low risk
8    and then risk cannot be determined. It's just not enough
9    strength signal for that.
10       Q        Let me -- let me stick with particulate.
11       A        Sure.
12       Q        I'll get to radioactive material in a
13   minute.
14       A        Sure.
15       Q        Let's go with particulates.
16       A        Sure.
17       Q        Particulates are in dust that we breathe,
18   right?
19       A        Right.
20       Q        And you're not telling me that there's no
21   safe level of dust.
22       A        There's -- there's a level of dust that is
23   so low that most people would not have any harmful effects from
24   it.
25       Q        Okay. But you're saying that there are



1  some people that could have harmful effects from some dosage of
2  dust.
3       A       The lower the exposure to particulates,
4  dust, if you want to use a catch-all term -- but we're talking
5  about the particulates you mentioned, less than 2.5, right?
6       Q       Uh-huh.
7       A       The lower the dose the rarer it is that it
8  could harm somebody. I don't know where that dose is or if
9  there's a dose where -- except zero, where the number of people
10  potentially harmed is not -- is zero, I don't know that.
11      Q       Does anybody know that?
12      A       I don't think so.
13      Q       Because it's not knowable.
14      A       It's not knowable with what we have
15  available to us, yeah.
16      Q       Exactly. And -- and -- and, the truth is,
17  all of us are exposed to dust.
18      A       That's correct.
19      Q       So how --
20              MR. DAVIS: Object to the form of the
21  question about dust. Unless you want to be more
22  precise and define it as how he defined it.
23              MR. SANDERS: Well, we've been talking
24  about it for a while now. So you're a little late.
25              MR. DAVIS: Less than 2.5 microns, defined

1  particulates.
2              THE WITNESS: Yes.
3  BY MR. SANDERS:
4       Q       Okay. Well, let's say less than 2.5
5  microns. Nobody can know that.
6       A       No. Nobody.
7       Q       Right. Now, there are, in fly ash,
8  certain things that would be included within the definition of
9  particulates, is there not, or do you know that?
10      A       Yes. There are.
11      Q       What are those things?
12      A       The by-products can be -- the ash itself
13  can be in that size category, less than 2.5 --
14      Q       I'm sorry. I didn't ask the question very
15  well. Within the definition of particulates in fly ash.
16      A       Yes.
17      Q       There are different things, are there not,
18  like quartz?
19      A       Oh, yeah. Silica or this or that.
20      Q       Exactly. Exactly.
21      A       Yes.
22      Q       Do you know that OSHA, NIOSH and some of
23  the other things, they set permissible exposure limits for those
24  constituent elements of particles less than 2.5?
25      A       I don't know what those levels are.

1       Q       Right. But you know --
2       A       There are -- there are guidelines, yeah.
3       Q       Okay. And -- and you don't know at what
4  level they would become impermissible as to any of those parts
5  of particles are in respirable dust less than 2.5.
6              MR. DAVIS: I'm going to object to the
7  question. It's confusing. You can answer if you
8  understand.
9              THE WITNESS: Yeah. It -- it --
10  BY MR. SANDERS:
11      Q       Do you understand?
12      A       I mean, if you're saying -- if you're
13  asking me whether there's a level above which would concern even
14  a government agency, there are levels above which it could
15  concern a government agency.
16      Q       Right. And do you know what those are?
17      A       No.
18      Q       Okay. Do you think the government does?
19      A       I think the government has set limits or
20  suggested limits on a lot of things based on the current
21  evidence that they have. Like dioxin, for example, I think as
22  evidence changes -- for example, we're starting to see more and
23  more that people, because of their genetic makeup, which we are
24  starting to understand, they may be more susceptible than
25  somebody without that genetic makeup. So limits are going to be

1  tailored, in my opinion, in the future to consider personal
2  susceptibility.
3       Q       And I'm going to agree with you rather
4  violently on that.
5       A       Disagree or --
6       Q       Agree with you rather violently on that.
7       A       Okay. Sure.
8       Q       And as a matter of fact --
9              MR. DAVIS: We don't need violence --
10  BY MR. SANDERS:
11      Q       As a matter of fact, this -- this is --
12  the DNA and the study of adducts and those kinds of things is
13  going to -- to better explain why it is that cancer is caused
14  and their bodies are going to be sus -- less susceptible or more
15  susceptible based upon DNA, right?
16      A       Yes. Yes.
17      Q       And that's what you're saying.
18      A       Yes, sir.
19      Q       I assume you would agree with me, then,
20  that the best we can do at any given point in time is to abide
21  by what we know in terms of --
22              MR. DAVIS: Objection.
23  BY MR. SANDERS:
24      Q       -- permissible?
25              MR. DAVIS: Objection. It's vague.

34  (Pages 130 to 133)



1      THE WITNESS: Do you want me to answer?
2      MR. DAVIS: You can if you can.
3   BY MR. SANDERS:
4      Q      Not telling you -- I'll let the question
5   stand.
6      A      And I would say that judgments are
7   normally made when those judgments are deemed necessary to be
8   made more immediately. Sometimes you compromise on the amount
9   of information you have and you go with the best evidence that
10  you have. If it's not immediately required that you make a
11  decision -- which -- which it would be with certain illnesses
12  that might be caused by a certain exposure like that
13  contaminated this or et cetera, et cetera. Then sometimes the
14  best thing is to wait for more information as -- and have very
15  clear plans for acquiring that information that you would need
16  to make a decision.
17     But, yes, often you have to make a
18  decision based on what information you have available at that
19  time.
20     Q      Do you know how a lab measures the amount
21  of a constituent element in an air monitoring sample? For
22  example, and in particular, in fly ash. It's particles, right?
23     A      Yes. I know that some studies have been
24  done with some sort of X-rays that, based on how they are
25  deflected or absorbed, can give you a clue as to the

1   constituents. I know it's involving X-rays, but I forgot the
2   exact term at the moment.
3      Q      Do you know of any other way in which a
4   lab is able to look at an air sample and determine how much
5   arsenic, for example, is included in that sample?
6      A      Right. I'm more familiar with the
7   technology that involves absorption of radiation, for example.
8      Q      I got that. Do you know of any other
9   ways?
10     A      You know, you have Selvi (phonetic) and
11  mass spec type of things; time of flight, the -- how quickly
12  molecules are -- are transmitted is sometimes used to determine
13  the constituents. Proteomics uses that to some extent, and --
14  and metabolomics. I think that there are ways to dissolve
15  chemicals. Not necessarily in the air, though. So --
16     Q      Well, to measure them in the lab. You --
17  you got -- you got a sample from air monitoring, you got
18  particles.
19     A      Air monitoring in particular. Not -- not
20  substance. Not the actual substance. How do they monitor in
21  the air, is what you're asking me.
22     Q      No. I'm sorry.
23     When a sample is taken -- there's air
24  monitoring like with these pumps that were used in this case --
25     A      Okay. So it's an air sample.

1      Q      With -- with a filter or sample in it.
2      MR. DAVIS: Let him finish.
3   BY MR. SANDERS:
4      Q      Correct? Come up with a sample. Send it
5   to the lab. Tell the lab, I want to know how much arsenic is in
6   this sample. That -- that arsenic is in the particle. How do
7   they measure how much arsenic is in that particle?
8      A      Other than what I've told you, I don't
9   know.
10     Q      Okay.
11     A      I was just trying to --
12     Q      In your -- and I realize that you may not
13  be relying on this anymore, but in your October 27th report,
14  which is Exhibit No. --
15     MR. ISAAC SANDERS: Twelve. No. I'm
16  sorry. That's the -- that's the new one.
17  BY MR. SANDERS:
18     Q      -- Eight. Exhibit Eight, your October 27,
19  2017, report.
20     A      Exhibit Eight.
21     Q      Yes, sir.
22     A      I have Exhibit Eight.
23     Q      All right. Would you turn to page two,
24  under "conclusions."
25     A      Yes.

1      Q      You write in there -- and somebody
2   decided, maybe it was you, to put in bold the phrase
3   "biologically plausible." Was that your choice or somebody
4   else's?
5      A      I did not write that.
6      Q      Okay. But you signed it.
7      A      I signed it.
8      Q      Under oath.
9      A      Under oath.
10     Q      And -- and the sentence read -- well, you
11  read it for me.
12     A      "At this point in time the data suggests"
13  -- and that would be a "sic" because "the data suggests" is not
14  right.
15     Q      Right. You didn't write that either, did
16  you?
17     A      No. No. No. This is based on my
18  discussions, which were translated into this document.
19     Q      Right.
20     A      "The data suggest that the alleged
21  injuries of the plaintiffs being caused by extended exposure to
22  fly ash is biologically plausible because exposed workers have
23  higher occurrence of several diseases and health conditions
24  compared with the general population and our control group."
25     Q      Okay. So you're saying, I believe,



1    correct me if I'm wrong, that the reason you think it's
2    biologically plausible is because of this higher occurrence
3    incidence.
4        A      Yes and no. I'm certainly -- did not mean
5    to state or imply that that's the only reason or the most
6    important reason.
7        Q      Okay. And -- and -- and I'm glad you said
8    that because I was going to ask you anyway.
9        A      Yes, sir.
10       Q      Do you have any other basis for saying
11   it's biologically plausible that the plaintiffs' injuries are
12   caused by extended exposure to fly ash other than this incidence
13   rate thing?
14       A      Yes.
15       Q      What other reasons do you have?
16       A      The -- the constituents of fly ash and the
17   level of exposure, combined with the higher incidence of
18   diseases that have been linked to those exposures, adds to the
19   overall conclusion more so even than the -- I mean, the higher
20   incidence rate is kind of necessary here. Because without it
21   you have nothing to conclude.
22              But the basis for that conclusion is not
23   the high incidence rates. That's a necessary component of the
24   conclusion. But the -- but the general picture of exposures
25   unknown completely -- not -- not completely known how much

1    exposure by different routes of exposure or how much synergy
2    there may be, the fact that there likely is synergy, and the
3    fact that the constituents in coal ash have been linked to -- to
4    these conditions so much so that there's been concern expressed
5    in the review articles that I read, and in the government
6    reports that I read, in the calls for stricter exposure
7    guidelines that I was aware of. So it was multiple things put
8    together.
9               I think that the only thing that I can
10   clearly say about -- about the higher incidence is that it does
11   not make it biologically plausible. It's -- it's the condition
12   that is necessary in order to even argue biological
13   plausibility. So I believe that I didn't state that as clearly
14   as I should have.
15       Q      Well -- and -- and -- and this -- this
16   business about the higher incidence, that's no longer part of
17   your opinion in this case, right?
18       A      Correct. I -- I have divorced myself
19   completely from the data that were collected in this case.
20       Q      Okay. Now, do you understand that these
21   -- we kind of hit on this a minute ago -- do you understand
22   these constituent elements are a part of the ash particle?
23       A      Yes, sir.
24       Q      And do you know how it is that those
25   constituent elements get unbound from that particle in order to

1    do anything in the human body?
2        MR. DAVIS: Object to the question as
3    being overbroad and vague.
4    BY MR. SANDERS:
5        Q      You can answer.
6        A      I mean, in some cases, depending on the
7    route, substances can be absorbed and metabolized with
8    ingestion, with contact with the skin, with -- you know, so they
9    do change forms. Often you'll see the excretion of a different
10   form of some of these substances than what would be in the coal
11   ash. So that implies that it's been metabolized in some way.
12       Q      What about in the lungs.
13       MR. DAVIS: Are you asking about specific
14   substances or in general?
15   BY MR. SANDERS:
16       Q      Yeah. Any constituent element, how --
17   how --
18       A      How is it --
19       Q      -- how it gets loose from --
20       A      Typically loose --
21       Q      -- the fly ash particle in order to be --
22   to do any damage whatsoever in the lungs.
23       A      Except for the process of -- some things
24   are soluble. Some things can be loosened by contact with --
25       Q      Is that --

1        A      -- fluid.
2        Q      -- so in this case?
3        MR. DAVIS: Objection.
4    BY MR. SANDERS:
5        Q      Do you know?
6        MR. DAVIS: Vague and general question.
7    BY MR. SANDERS:
8        Q      Do you know?
9        MR. DAVIS: -- very specific
10   opinions about that.
11   BY MR. SANDERS:
12       Q      Do you know, doctor?
13       A      I would know to the extent that -- no, I
14   -- I've never studied lung tissue in this case nor have I
15   directed my attention to exactly what happens on a molecular
16   level in the lung tissue. But certainly when you see leeching
17   of contaminants into water supplies, for example, they must have
18   gone through some process related to the contact that it had
19   with water. And, of course, the lung tissue has water. So I
20   would say that that is part of it. But there's enzymes in the
21   lungs. There are other things that can metabolize and loosens
22   things. I don't know -- again, I've not directed my attention
23   to -- to that specifically.
24       Q      All right. And -- and -- and to put a
25   finer point on it, you don't know if it does, how it does it.



1      A      No, sir, I don't.
2           MR. DAVIS: Objection to the -- the
3      comment. The question is vague, overbroad. If you
4      answer it, it's your answer.
5           MR. SANDERS: He did.
6           THE WITNESS: Yeah.
7      BY MR. SANDERS:
8      Q      Do you know -- I've asked you and you've
9      been very candid about this, about air monitoring results
10     from -- from Jacobs.
11     A      Sure.
12     Q      Are you aware of any other air monitoring
13     results from the Kingston site during the period that -- in
14     question here?
15     A      No, sir.
16     Q      You -- you haven't seen any air monitoring
17     results.
18     A      No, sir.
19     Q      Are you aware that there were stationary
20     air monitors in and around the site at Kingston that were
21     operating and collecting data all during the time of this
22     project at Kingston?
23     A      Okay. So the answer, I will say yes and
24     no. I was aware of it. But you have made me more aware of it
25     than I was aware of it.

1      Q      Okay.
2      A      Does that make sense to you?
3           MR. DAVIS: Assuming what he's saying is
4      true.
5           THE WITNESS: Assuming what you're saying
6      is true, you have now given me more information. If
7      you're asking if I was aware that there were
8      monitoring, I would say I probably was told that at
9      some point. But as to when it was operating, where
10     it was operating, you have now given me more
11     information than I had before.
12     BY MR. SANDERS:
13     Q      I -- I -- I made a contribution.
14     A      You have. Thank you.
15     Q      And -- and I want to draw a distinction
16     here between the air monitoring that I was asking you about that
17     Jacobs did, which was industrial hygiene individual air
18     monitoring.
19     A      Yes.
20     Q      As opposed to the one I was just asking
21     you about, which was stationary, known in the trade as
22     environmental air monitoring, which was both for the site and
23     for the surrounding neighborhood's measuring.
24     A      Yes, sir. I -- I was aware of both -- at
25     least I believe that I was made aware of individual monitoring

1      and site monitoring. But that -- but the details of -- of who
2      and how many and what and where and how long, I -- I -- I don't
3      -- I was never aware of that.
4      Q      Okay. Nobody told you that.
5      A      No, sir.
6      Q      Okay. We were talking about particles.
7      Does the shape of the particle matter in terms of airborne or
8      inhalation? Does that matter? Other -- you've told me about
9      size. You've been very clear about less than 2.5 microns.
10     A      Yeah. But I --
11          MR. DAVIS: Wait, wait. He's not finished
12     with the question.
13          THE WITNESS: Okay.
14     BY MR. SANDERS:
15     Q      Does the shape of the particle matter?
16     A      Okay. So let me just correct one thing.
17     Well, maybe not correct. But qualify that what I said doesn't
18     exclude potential harmful effects of -- of larger particles than
19     2.5 microns. I'm just saying that that's more of a problem
20     in -- in the eyes of most people.
21     Q      Fair enough.
22     A      But when it --
23     Q      Take your point.
24     A      But when -- when it comes to the shape, I
25     can -- I can -- I have to qualify that. I have to qualify what

1      limited information I can give you by giving you an analogy, if
2      it's allowed.
3      Q      I'm allowing it.
4           MR. DAVIS: Go ahead. We're going to have
5      to take a break here in --
6           THE WITNESS: I'll get spanked later. But
7      --
8      BY MR. SANDERS:
9      Q      You may get spanked now.
10     A      For example, asbestos, part of what it
11     does besides cause inflammation, which -- which triggers an
12     immune response, which could be related to why people who inhale
13     asbestos get cancer -- and I know it's not part of our issue
14     here, it's not part of our list -- but the shape of the asbestos
15     makes -- interferes with mitosis, they believe, which, of
16     course, adds to the replication errors that can lead to cancer.
17          So shape does matter even in -- you know,
18     inert particles that get caught in the lungs. What I don't know
19     is to what extent the shape -- not just the size, like you said,
20     but the shape matters when it comes to particulate matter.
21          So, by analogy, if it does what asbestos
22     does because of a certain shape, or if a certain shape can lead
23     to that kind of interference of mitosis, for example, or can be
24     more irritating, by analogy, I would say it's possible. And I
25     can't tell you any more than that.


MAGNA
LEGAL SERVICES

1      Q    Okay. What is the shape that causes
2  asbestos to do more damage?
3      A    It's a -- I'm -- I'm basing it on
4  something that I -- that's not related to this case, rather.
5  But I believe it's the kind of -- of fibers that -- that are --
6  that can -- that are long and pointy, basically.
7      Q    Okay.
8      A    But I -- but now you're getting into areas
9  where I -- I'm really not sure.
10     Q    Fair enough.
11     MR. DAVIS: Good time for a break?
12     MR. SANDERS: Yes, it is.
13     MR. DAVIS: Okay.
14     THE VIDEOGRAPHER: We're going off the
15  record. The time is 2:21.
16     (A recess was had.)
17     THE VIDEOGRAPHER: We're again back on the
18  record. The time is 2:41. Beginning of disk three.
19  BY MR. SANDERS:
20     Q    Doctor Terry, during the break I -- I told
21  you that I was going to probably next turn to Exhibit 12, which
22  is your most current report.
23     A    Yes.
24     Q    Dated April 30th, 2018.
25     A    Yes.

1      Q    Now, before we get into that, we have sort
2  of covered a little bit of the period between October 27th, when
3  you made your sworn declaration. And it was obviously after
4  that time when you decided that, you know, I can't do this
5  study. I don't have enough information. I'm going to abandon
6  this epidemiological study and -- and that was it, right?
7     A    Yes.
8     Q    Okay. And you don't remember when you
9  told the lawyers of your conclusion.
10     A    What conclusion?
11     Q    That you were going -- that you had to
12  abandon the study. You couldn't finish the epidemiological
13  study.
14     A    No.
15     Q    Okay.
16     A    I don't remember when I told them.
17     Q    You know, October 27 was getting on close
18  to Thanksgiving, which is then getting on close to Christmas.
19  Was it before Thanksgiving or before Christmas or was it in the
20  New Year, do you remember?
21     A    No.
22     Q    Okay. And what did they say when you
23  said, you know, I -- I have to abandon this study, I don't -- I
24  don't have enough information and you guys didn't get me what
25  you were supposed to get me?

1      A    I don't remember any conflict or anything
2  like that.
3     Q    Okay. I'm not asking for conflict. What
4  did they say?
5     A    Yeah. The fact is, it was such a mild
6  sort of -- the way I remember it, it was to the effect of okay.
7  It was not -- there was no major discussion about it.
8     Q    Okay. All right. When is the next you
9  heard from lawyers on this case?
10     A    I would say over the next few months.
11     Q    Okay. And -- and in the meantime did you
12  do any further work?
13     A    No.
14     Q    Okay. When did you start working again on
15  this case?
16     A    Probably March 1st or February -- the last
17  week of February. It's possible the last week of February,
18  first -- first week of March. That type of -- in that -- in
19  that area.
20     Q    And at that time tell me of the
21  conversations that you had with the lawyers that started you
22  back up again.
23     MR. DAVIS: I'm going to object to the
24  questions as being outside the scope of expert
25  discovery and instruct you not to answer.

1     MR. SANDERS: Well, his -- he's made a
2  declaration about discussions he had with counsel
3  that is part of his report and has been used by you
4  guys in connection with the motions practice. It
5  seems to me that I'm entitled to ask him questions
6  about those conversations.
7     MR. DAVIS: His declaration doesn't
8  reference conversations. I -- I don't see anywhere
9  in the declaration it references a conversation he
10  had with plaintiffs' counsel. Other than paragraph
11  five, which says what he was requested to do, which
12  you have a letter to that effect from my firm.
13     MR. SANDERS: Okay. Well, then, to that
14  extent, I think I'm entitled to ask questions.
15     MR. DAVIS: You can ask questions about
16  the letter. But not about conversations.
17  BY MR. SANDERS:
18     Q    Let me start with page five of your
19  report. Paragraph numbered five,
20     MR. DAVIS: Just to be accurate, that's
21  the declaration.
22     MR. SANDERS: You're right.
23     THE WITNESS: Yes, sir.
24  BY MR. SANDERS:
25     Q    Paragraph numbered five of your




1  all of these --
2     A  Yeah.
3     Q  -- criteria?
4     A  Yeah. You -- you -- you -- by necessity,
5  you need multiple papers. If anyone tried to apply Bradford
6  Hill to a single paper I think they'd run into some difficulty.
7  Because the -- the -- the consistency wouldn't be there.
8  Addressing biases, you know, that's something that's not listed
9  here in Bradford Hill. To my knowledge never listed it as a
10  criteria, which he should never used the term "criteria." But
11  we've subsequently started using the term "criteria." I like to
12  say guidelines, though, by the way. But --
13     Q  We'll use -- we'll use however you want
14  to. At least while you're in the room.
15     A  Either way. I'm just saying that he never
16  used the word "criteria," that I know of.
17     Q  Well --
18     A  So -- so --
19     Q  -- bias -- let me interrupt there. Bias
20  in a study can be outcome determinative, can't it, or it can
21  basically undermine a study.
22     A  Bias can do terrible things to a study.
23     Q  Right.
24     A  Yes. And one thing that I do that may not
25  be listed, although Bradford Hill discussed it. I don't think it

1  was a criteria, and that was to evaluate the extent to which a
2  particular study or a group study tried to deal with biases that
3  we commonly think are important. Such as confounding, which is
4  mentioned in my report.
5     Q  And confounding would be, for example, a
6  situation in which you have a health condition that can be
7  caused by a number of things. And you don't have enough
8  information to rule in or rule out all of those things.
9     A  Yes and no. That's -- that's -- it would
10  be -- that there are conditions under which confounding can
11  occur. And, yes, one of those conditions you mentioned is that
12  the confounder or -- or candidate for a confounder is associated
13  independently with disease. But it also needs to be associated
14  with the exposure. And it cannot be an intermediate in the
15  causal chain between the exposure and the disease. So as long
16  as it meets those three criteria again then it's a potential --
17  potential confounder that would change the results of the study
18  or alter or -- or bias the results of a study.
19     Q  Okay. And -- and -- and as I'm now
20  understanding what your report is saying as you've explained it
21  to me, you are basically applying the Bradford Hill criteria to
22  a -- a number of the studies taken together --
23     A  Correct.
24     Q  -- as opposed to study by study by study.
25     A  Correct.

1     Q  And do I take it that in all of these
2  studies considered -- well, let me stop. I -- I may be
3  overgeneralizing here.
4       How many -- did you consider the studies
5  in this long list of things that Dr. Levy proposed you read if
6  you hadn't already read them and the ones they sent you that you
7  read maybe you'd already read them? And then all the other ones
8  you selected to read, did you consider these as any separate
9  groups to apply the Bradford Hill criteria to or did you take
10  the whole mass and apply the Bradford Hill -- what did you say,
11  guidelines?
12     A  Yes, sir.
13     Q  The -- the Bradford Hill guidelines.
14       MR. DAVIS: Object to the question. It's
15  overbroad.
16       THE WITNESS: Yeah. And it's hard to
17  understand too.
18  BY MR. SANDERS:
19     Q  Okay. Then I should ask it again with
20  different words.
21     A  Please.
22     Q  Did you divide up the studies or reports
23  or articles into groups to which you would apply the Bradford
24  Hill guidelines?
25     A  Yes, I -- and -- and that's sort of laid

1  out in the structure here. I looked at studies that dealt with
2  one outcome and one exposure. For example, particulate matter
3  in chronic obstructive pulmonary disease. They would not be
4  mixed with studies of arsenic and lung cancer. I mean, they
5  just don't mix those.
6     Q  All right. So you took the arsenic
7  studies, put them together, applied the Bradford -- or
8  considered them together and applied the Bradford Hill criteria?
9     A  No, sir, I did not -- only separate
10  studies according to exposure. But within that exposure I
11  looked at the separate -- the individual relationship, between
12  one exposure and one outcome. That has to be the overall group
13  of studies that you apply the Bradford Hill criteria to.
14  Guidelines to.
15     Q  I may be the only one in the room that
16  doesn't understand that. But I don't.
17     A  Okay.
18       MR. DAVIS: Why don't you be specific?
19  Ask a specific --
20       THE WITNESS: Okay.
21  BY MR. SANDERS:
22     Q  Yeah. Why don't you give me a good
23  example.
24     A  Particulates -- particulates and chronic
25  obstructive pulmonary disease would be separated from



1 particulates and lung cancer because even though it's the same
2 exposure, particulates, it's looking at a different outcome,
3 Likewise, if it's the same outcome, particulates and chronic
4 obstructive pulmonary disease, cadmium and chronic obstructive
5 pulmonary disease, they would be separated, Because even though
6 it's the same disease, different exposure, So they're separated
7 according to exposure and outcome, So that the group of studies
8 deal only with one relationship between one exposure and one
9 outcome, Does that make sense?
10 Q I suppose, I now understand what you're
11 saying, though,
12 A Okay,
13 Q And so every time you have one of those
14 pairings, exposure and outcome --
15 A Yes, Yes,
16 Q -- you collect all the studies for that
17 exposure and outcome and you apply the Bradford Hill criteria to
18 all of that for that one exposure and that one outcome, is that
19 what you're saying?
20 A Yes, sir,
21 Q And I do take it from your conclusions
22 that each and every grouping, as you've described it, you
23 applied the Bradford Hill criteria; is that right?
24 A Yes,
25 Q And then for each of those you necessarily

1 checked off the biological plausibility box,
2 A Yes,
3 Q Okay, Well, let me ask you specifically
4 about the fly ash studies from Kingston --
5 A Yes,
6 Q -- okay? And the ones that come to mind,
7 at least to me, that I remember, are involving Ruhl and Vengosh
8 or Vengauche?
9 A Yes,
10 Q How do you pronounce it?
11 A I say Vengosh, But I don't know,
12 Q Okay, You haven't talked to him,
13 A No, sir,
14 Q Doctor Vengosh?
15 A Doctor Vengosh,
16 Q What kind of exposures did those studies
17 or papers investigate with respect to fly ash in Kingston?
18 MR, DAVIS: Object to the question,
19 Because it's vague, Doesn't refer specifically to a
20 specific study,
21 BY MR, SANDERS:
22 Q Do you need a specific study identified or
23 do you know -- do you know those studies well enough to know
24 what I'm asking you?
25 A You're -- you're talking about a study by

1 Ruhl and Vengosh --
2 Q Yes,
3 A -- et al, where they looked at
4 constituents of certain chemicals or compounds contained in the
5 coal ash from the Kingston spill, Is that what you're asking
6 me?
7 Q Right, Right, That's what I'm asking you
8 about, It's -- it's -- well, just mark it, Lucky number 13,
9 Fourteen, Sorry, I did my best,
10 (EXHIBIT NO, 14 WAS FILED,)
11 BY MR, SANDERS:
12 Q If you -- if you start on page one of
13 Exhibit 14, there -- there's a discussion of the analytical
14 methods and materials as well as an introduction, And then they
15 go to results and discussion, And the first is coal ash and
16 sediments, right?
17 A Are you referring to table one or are you
18 referring to the -- to the discussion on the first page under
19 "analytical methods and materials" or "results and discussion"
20 on the first page?
21 Q The "results and discussion" on the first
22 page,
23 A "A comparison of the chemical
24 composition" --
25 Q No, I didn't ask you to read it, It

1 starts -- are you with me?
2 A Okay,
3 Q The first is they looked at coal ash and
4 sediments, right?
5 A I don't see that,
6 Q Well, that's what the title is,
7 A Oh, Oh, oh, the title, yeah, But the
8 first thing they talk about is -- looks like calcium, But,
9 yeah, I didn't -- I wasn't reading the title, I'm sorry, Yeah,
10 Q Let me see your copy, Are we looking at
11 the same thing here, doctor?
12 MR, DAVIS: We'll stipulate that the
13 article says what it says,
14 MR, ISAAC SANDERS: Well, there were two
15 articles, I think he wanted -- one of them didn't
16 deal --
17 THE WITNESS: Yeah, There -- there is a
18 subheading that says coal ash and sediments,
19 BY MR, SANDERS:
20 Q Right,
21 A Okay?
22 Q And -- and do you understand -- and then
23 the next one seems to be water contamination, correct?
24 A Okay, That's not -- yeah, I wasn't
25 concluding that in text, I was -- that's that subheading, Yes,



1 water contamination. Correct.
2     Q     And then there's a section called
3 "potential impacts" -- "environmental impacts." Sorry.
4     A     Yes.
5     Q     That's on page -- hard to read on my copy.
6     A     That looks like --
7     Q     It's been stamped over.
8         MR. DAVIS: It's in there.
9 BY MR. SANDERS:
10     Q     If you look at the bottom line on that
11 page, it's page six of nine, is the one I'm reading from.
12     A     Potential environmental impacts, is that
13 --
14     Q     Yes, sir. You with me?
15     A     Yes, I am.
16     Q     And then it goes to potential health
17 impacts.
18     A     Yes.
19     Q     And is there -- does this survey -- this
20 is really a survey of the potential environmental and health
21 impacts in the immediate aftermath of the coal ash spill in
22 Kingston, Tennessee, right?
23     A     Potential, yeah.
24     Q     Okay. And -- and do the authors discuss
25 potential impacts from airborne exposure to fly ash?

1         MR. DAVIS: Did you mean health impacts?
2         MR. SANDERS: Yes.
3         MR. DAVIS: Okay.
4 BY MR. SANDERS:
5     Q     If you look at page seven of nine, as they
6 go into potential health impacts --
7     A     Do you want me to skip ahead to those two
8 pages?
9     Q     Yeah, I think -- I think that will
10 shorten things down. But I don't want to keep you from looking
11 at something important.
12     A     No. I -- I don't want to keep you either.
13 So I may have to go back to these.
14     Q     Well, at the top of that page -- are you
15 with me --
16     A     I'm on page seven of nine.
17     Q     Right. The first sentence starts out, "It
18 is well-known that windblown dust can travel long distances, as
19 exemplified by Asian dust storms that result in transport to
20 locations as far away as the US."
21     A     I see that.
22     Q     Do you remember that now?
23     A     Yeah. Yeah.
24     Q     Okay. And if you look at the paragraph
25 that ends about the third of the way down on the second column

1 on page seven of nine --
2     A     Okay.
3     Q     -- there is a sentence beginning with "it
4 is important to underscore."
5     A     Yes.
6     Q     Do you see that?
7     A     I see it, uh-huh.
8     Q     Read that for me out loud.
9     A     Sure. "It is important to underscore the
10 fact that at this time it is not possible to estimate the health
11 impacts of CCP ash resuspended particulates due to a lack of
12 information on the rate at which they are entrained into the
13 atmosphere as well as their chemical, physical and synergistic
14 properties linked to morbidity and mortality."
15     Q     Keep going.
16     A     Okay. "Clearly future studies are needed
17 linking ambient element and radionuclide concentrations with
18 ground level CCP ash characteristics, ambient meteorological
19 characteristics and human population exposure."
20     Q     Did they do that? Did they have follow-up
21 studies to do that that you know of?
22     A     When you say "they," do you mean this
23 group?
24     Q     Yes, this group.
25     A     Not that I know of.

1     Q     Okay. Do you know of any group --
2     A     Not with --
3     Q     -- that did this?
4     A     Not with this ash spill in particular, no.
5     Q     Do you agree with this qualification on
6 this study?
7     A     I don't have any -- I don't have any major
8 objections to what they're saying.
9     Q     Well, do you have any basis for
10 disagreeing with it?
11     A     Well, no, not -- no. I have no -- no
12 factual basis in terms of -- resuspended -- you know, there's --
13 particulates have not been studied in terms of the things that
14 they say that they need to study. I'm not aware of this group
15 with this -- whoever -- that addressed this particular issue in
16 this particular case.
17     Q     You didn't read this article?
18     A     I'm not -- I'm sorry. How -- how did you
19 --
20     Q     Did you read this article?
21     A     Yes.
22     Q     Okay.
23     A     But I'm --
24     Q     I didn't understand your question, then.
25 Your comment. Your comment.



1    A    My comment was I'm reiterating what I
2    answered earlier, that I -- I don't see where they have done
3    this, which would have been helpful. And there are unknowns
4    that they have identified.
5    Q    Do you -- do you know of -- of anybody --
6    and I've kind of asked you this, but I want to maybe make it
7    broader -- of anybody who has done this kind of future study
8    with respect to fly ash such as what we had and have at
9    Kingston, resuspended particles.
10    MR. DAVIS: Object to the question. It's
11    not --
12    BY MR. SANDERS:
13    Q    If you understand it, please answer. He's
14    not telling you you don't answer. He's just objecting.
15    MR. DAVIS: You may answer. But I don't
16    know what he's asking you.
17    THE WITNESS: I mean, there have been
18    other spills where they have looked at things that
19    were not looked at here. But I know resuspended
20    particles -- I'm not aware of the study of those as
21    it relates to constituents and human health
22    consequences.
23    BY MR. SANDERS:
24    Q    What are resuspended particles of fly ash?
25    A    Apparently -- and I'm just going by their

1    definition here -- of course, I'm on the wrong page. My
2    understanding, they don't really define it here in this section
3    that you gave me to read. But my understanding, it's particles
4    that are more permanently suspended in the atmosphere.
5    Q    Well, go back to -- to -- to the very
6    first sentence. And I caused this, and I'm sorry. I had you
7    starting on page seven. But if you read the sentence that
8    begins on page six, under "potential health impacts." "Of
9    particular concern to human health is the wind-blown
10    resuspension of fly ash into the atmosphere."
11    A    Yeah.
12    Q    What does that mean?
13    A    It means that ash is taken from the ground
14    and suspended up -- up into the atmosphere by air currents.
15    Q    Let's try it this way. I'm a simple guy.
16    What are they -- is what they are talking about that the -- for
17    example, in this -- in this tragedy where this dike burst,
18    dredge cell burst, gives way, all of this ash goes flowing into
19    the river and they had to go dredge it all up and pile it up in
20    order to clean it up, right?
21    A    Uh-huh.
22    Q    And once it gets put out there and
23    weathers and what not, it dries out, and the wind blows and
24    these ash particles are resuspended into the air. Is that what
25    it's talking about?

1    MR. DAVIS: Objection. Overbroad and
2    confusing.
3    BY MR. SANDERS:
4    Q    Am I right?
5    A    That's my understanding.
6    Q    Mine too.
7    Are there any other studies of fly ash
8    first, that you're aware of, coal fly ash, regarding health
9    effects from, in particular, airborne exposure?
10    A    No.
11    Q    No. Okay. And -- and I'm sure I know the
12    answer to this but I'm going to answer it -- ask it in the
13    language of Ruhl and Vengosh, et all.
14    A    Uh-huh.
15    Q    Do you know of any studies of resuspended
16    fly ash particles and human health effects?
17    A    No.
18    Q    Doctor Terry, do you -- do you know --
19    actually know -- whether the heavy metals that you have
20    identified in your report of issues of concern actually comes
21    unbound from the fly ash particles?
22    MR. DAVIS: Objection to the general vague
23    question.
24    THE WITNESS: It is vague. It is a vague
25    question.

1    BY MR. SANDERS:
2    Q    Well, we talked a little bit earlier about
3    the -- the -- do you -- do you agree that -- that in their
4    natural state fly ash particles bind up these constituent
5    elements?
6    MR. DAVIS: Objection. It's still general
7    and vague.
8    BY MR. SANDERS:
9    Q    Or do you know?
10    A    It's very general and vague.
11    Q    But do you know? Do you know enough to
12    answer the question?
13    MR. DAVIS: Objection. Same objection.
14    THE WITNESS: It's too vague.
15    BY MR. SANDERS:
16    Q    Okay. Let's take arsenic as an example.
17    Where is the arsenic in fly ash? Is it not in the particles?
18    A    It's on and in the particles, yes.
19    Q    Okay. And is it -- if you know, is it
20    bound in the particles? Bound to the particles of the fly ash.
21    MR. DAVIS: Objection. Compound question.
22    THE WITNESS: If there's more than one
23    question there perhaps --
24    BY MR. SANDERS:
25    Q    Okay. Do you know if the arsenic



1 constituent element is bound to the fly ash particles in a
2 chemical way.
3      A     I know that -- I don't know how bound it
4 is. I know that concern for exposure to arsenic in water, for
5 example, after a coal ash spill is -- is -- that it's -- it can
6 -- it can -- it's biologically active. I mean, I guess what
7 you're getting at, is it inert. And it's -- but, again, it's --
8 it's -- it's kind of vague for me. We can go through the --
9      Q     Well, I'm trying to get at how you checked
10 off the biological plausibility box for this group of fly ash
11 articles or this -- this fly ash article.
12      MR. DAVIS: For all of them or just
13 arsenic?
14      MR. SANDERS: Uh?
15      MR. DAVIS: For all of his report or
16 just --
17      MR. SANDERS: Well, let's take arsenic as
18 an example.
19      MR. DAVIS: Arsenic and what?
20 BY MR. SANDERS:
21      Q     Whatever health issue you were looking at
22 associated with arsenic.
23      A     Okay. I always went to the literature.
24 Always. I did not conduct any experiments on my own.
25      MR. SANDERS: Right. Okay. Let's take

1 a short break.
2      MR. DAVIS: Okay.
3      THE VIDEOGRAPHER: Going off the record.
4 The time is 3:47.
5      (A recess was had.)
6      THE VIDEOGRAPHER: We're going back on the
7 record. The time is 3:55.
8 BY MR. SANDERS:
9      Q     Do you even remember my last question?
10      A     You might want to refresh my memory.
11      Q     I'm -- I'm -- I'm going to try to go at it
12 a different way. I think, and it's certainly been confirmed by
13 my able colleague here, that we are two ships passing in the
14 night on the way I was trying to ask the questions.
15      A     Yeah. That's -- that's what it felt like.
16      Q     Okay. We got into this, talking about the
17 Ruhl Vengosh articles on fly ash, and -- and I was obviously
18 making the point that they're saying not enough is known to draw
19 any conclusions, right? More studies are needed, right?
20      MR. DAVIS: Objection. You may answer if
21 you can.
22 BY MR. SANDERS:
23      Q     Is that a fair summary of what you and I
24 went over?
25      MR. DAVIS: Objection. Article speaks for

1 itself.
2      THE WITNESS: Yes.
3 BY MR. SANDERS:
4      Q     Okay. Did you include in any of your
5 groups to which you applied the Bradford Hill criteria articles
6 such as these on fly ash?
7      A     Yes.
8      Q     Okay. And what did you conclude -- did
9 you find or did you -- do you have an opinion that fly ash
10 exposure as opposed to exposure to constituent elements of fly
11 ash caused any of these medical conditions in this case? Do you
12 find an association?
13      A     The data are consistent in several
14 instances with a -- with there being a causal association.
15      Q     Between fly ash and the health conditions
16 or constituent elements and the --
17      A     Constituent elements.
18      Q     But not the fly ash.
19      A     There's not been that many studies in
20 order to apply the Bradford Hill criteria.
21      Q     Okay. And -- and -- and -- so is it your
22 testimony, and will it be your testimony at trial, that the
23 review that you have done does not permit you to do the
24 association between fly ash exposure and these medical
25 conditions in this case as contrasted with the association

1 between constituent elements that you've listed and health
2 conditions?
3      MR. DAVIS: Objection to the form. You
4 may answer if you can.
5      THE WITNESS: Yeah, I don't think I would
6 agree with that.
7 BY MR. SANDERS:
8      Q     Why?
9      A     Because the exposure to the specific
10 constituents -- first of all, I'm looking at whether there's
11 evidence to support a causal association between those
12 constituents and the outcomes. And if those constituents are
13 found in the exposure to coal ash then, in -- in essence, I am
14 saying that exposure to coal ash. If you're saying that -- if
15 you're asking whether there's -- if you can separate the
16 constituents from coal ash and everything that remains after you
17 separate those constituents from coal ash, whether there would
18 be an association, I would say it's almost irrelevant because
19 the coal ash happens to contain I snows go Ray indication, for
20 example. And what -- to -- to some extent what practical way
21 can you separate ionizing radiation from another source and from
22 ionizing radiation from another source, you know. It's -- and
23 then you wouldn't say, well, ionizing radiation from an X-ray
24 machine is one thing or you can't then talk about ionizing
25 radiation when it comes from, let's say, a nuclear contamination



1  of some kind. I mean, I don't think that you can be so clear to
2  separate a -- a substance that's made up of constituents from
3  the constituents themselves. In other words, I -- I sort of
4  understand what you're getting at, but I don't necessarily agree
5  with it.
6        Q       Well, are you intending to offer an
7  opinion that the levels or concentrations of any of these
8  constituent elements are particular substances that were present
9  in the fly ash at Kingston were sufficient to cause the health
10  conditions you have described?
11       A       Sufficient.
12             MR. DAVIS: Objection to the term.
13             THE WITNESS: Yeah. I don't know
14       sufficient. But what I'm planning to do is talk
15       about the data from articles that looked at the
16       constituents of the coal ash. And then if there are
17       data that are pertinent to the bioavailability of
18       those constituents, I will certainly talk about that.
19       And in conjunction with what other occupational
20       exposures related to that -- those constituents have
21       shown in epidemiologic studies, I think they need to
22       all be looked at as a whole rather than
23       compartmentalize too much. For example -- yeah.
24  BY MR. SANDERS:
25       Q       Well, look, let -- let me -- let me get it

1  at this way. You have gone to great lengths to look at the
2  literature with respect to associations between health
3  conditions and each of these listed constituent elements.
4        A       Yes, sir.
5        Q       And what I -- what I'm asking you is, have
6  you seen any studies that say that these constituent elements in
7  fly ash in fact do get into the body and cause harm if you're
8  looking at airborne exposure first?
9             MR. DAVIS: Objection to the general
10       question. It's vague. Overbroad.
11  BY MR. SANDERS:
12       Q       You can answer.
13       A       Well, I've -- I've -- in my report I've
14  looked at -- for example, page 16. Otherwise known as page 24
15  of 139.
16       Q       I'm with you.
17       A       Yeah. But, yes, this is -- this is
18  literature that I obtained and read in my attempt to look at the
19  issue of bioavailability. And in this case we're looking at
20  determinations made by government agencies who also, by the way,
21  as you know, rely on individual studies. And not only their
22  own, but on -- on external studies. And, therefore, consistent
23  with these agencies, it would be difficult for me to separate
24  constituents from the source of the constituents.
25       Q       So you're assuming that the constituents

1  in fly ash are bioavailable.
2        A       I'm not making that assumption. I am
3  following the determinations of these agencies. I did not go
4  into this with an assumption of that kind. I had --
5        Q       And do these studies address specifically
6  airborne fly ash?
7        A       To the -- to what extent -- they --
8  they -- they address concerns of exposure to fly ash. As far as
9  airborne versus other forms of exposure, I would need to go back
10  and look to see to what extent they differentiated between them.
11  And I'm happy to do that.
12       Q       And -- and -- and -- and you should.
13  But -- but as of right now you don't know.
14             MR. DAVIS: Objection. I mean, it's in
15       his report.
16             MR. SANDERS: Counsel, that's coaching.
17             MR. DAVIS: Well, I'm just saying.
18             MR. SANDERS: Don't, counsel. That's
19       coaching.
20             MR. DAVIS: Okay. I won't do that
21       anymore. But you need to properly characterize his
22       testimony.
23             MR. SANDERS: Counsel, you've been
24       violating the Ruhl there, and you admit it, and now
25       you're lecturing me on what I should do?

1             MR. DAVIS: Yes.
2             MR. SANDERS: That doesn't sound right.
3             MR. DAVIS: Well, if you'd ask a proper
4        question then we won't have an objection.
5             MR. SANDERS: We're not talking about
6        objecting. We're talking about coaching.
7             MR. SANDERS: Ask a question.
8             MR. SANDERS: Quit coaching.
9             MR. SANDERS: Ask a question.
10  BY MR. SANDERS:
11       Q       Do you remember the question?
12       A       I think you may have to restate it.
13             MR. SANDERS: Can you restate my question,
14       please?
15             (The pending question was read by the
16       court reporter.)
17  BY MR. SANDERS:
18       Q       That's the question.
19             MR. DAVIS: I thought he answered that.
20             THE WITNESS: I'm sorry?
21             MR. DAVIS: I thought he answered that one
22       and then there was a follow-up.
23  BY MR. SANDERS:
24       Q       Do they?
25       A       In my report, I do -- I talk about concern

