## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| GREG ADKISSON, et al., | ) | |
|       Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-00505-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | *Lead case consolidated with* |
| _____ | ) | |
| KEVIN THOMPSON, et al., | ) | |
|       Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-00666-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |
| _____ | ) | |
| JOE CUNNINGHAM, et al., | ) | *as consolidated with* |
|       Plaintiffs, | ) | |
| v. | ) | No. 3:14-CV-00020-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |
| _____ | ) _____ | |
| BILL ROSE, | ) | |
|       Plaintiff, | ) | |
| v. | ) | No. 3:15-CV-00017-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |
| _____ | ) | |
| CRAIG WILKINSON, et al., | ) | |
|       Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-00274-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |
| _____ | ) | |
| ANGIE SHELTON, as wife and next of kin | ) | |
| on behalf of Mike Shelton, et al., | ) | |
|       Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-00420-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |
| _____ | ) | |
| JOHNNY CHURCH, | ) | |
|       Plaintiff, | ) | |
| v. | ) | No.: 3:15-CV-00460-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|       Defendant. | ) | |

DONALD R. VANGUILDER, JR.,            )
      Plaintiff,                      )
v.                                    )            No. 3:15-CV-00462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____     )
JUDY IVENS, as sister and next of kin,)
on behalf of JEAN NANCE, deceased,    )
      Plaintiff,                      )
v.                                    )            No. 3:16-CV-00635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____     )
PAUL RANDY FARROW,                    )
      Plaintiff,                      )
v.                                    )            No. 3:16-CV-00636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,       )
      Defendant.                      )
_____     )


**JACOBS ENGINEERING GROUP, INC.'S BRIEF
<u>IN ADVANCE OF JANUARY 11, 2019 STATUS CONFERENCE</u>**

# TABLE OF CONTENTS

**Page**

1. If These Cases Proceed, They Should Be Litigated Individually, with Bellwether Trials Proceeding First. ................................................................................... 1

    A. There Should Not Be Bifurcation of Any New Trial. ............................................ 2

    B. Any Cases that Proceed to Phase II Should Be Litigated Individually .................. 3

    C. Bellwether Summary Judgment Motions and Trials Would Be More Efficient than Consolidation. ................................................................. 11

2. Substantial Discovery Is Necessary for a New Trial or Phase II. ..................................... 12

3. Proposed Timing and Schedule. ............................................................................ 16

4. The Phase I Verdict, if It Remains, May Allow Stays to Be Lifted in Related Cases but Will Have No Other Impact. ...................................................................... 18

5. Mediation Is Not Appropriate at This Time. ................................................................. 18

6. Punitive Damages Are Unwarranted, but if They Are Tried, They Should Be Litigated for Each Individual Plaintiff Following a Damages Finding. .......................... 19

CONCLUSION ........................................................................................................... 20

**Page(s)**

**Cases**

*Allen v. Jacobs Engineering Group, Inc.*,
No. 3:18-cv-00153-TAV-HBG (E.D. Tenn. filed Apr. 17, 2018) ..........................................18

*Am. Sur. Co. v. Baldwin*,
287 U.S. 156 (1932) ....................................................................................................................10

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ........................................................................................................10

*Banacki v. OneWest Bank, FSB*,
276 F.R.D. 567 (E.D. Mich. 2011) ...........................................................................................4, 9

*Blyden v. Mancusi*,
186 F.3d 252 (2d Cir. 1999) ........................................................................................................20

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996) ....................................................................................................................19

*Briggs v. Merck Sharp & Dohme*,
796 F.3d 1038 (9th Cir. 2015) .....................................................................................................12

*Buckler v. EnerSys, Inc.*,
No. 09-152-JBC, 2010 WL 11526869 (E.D. Ky. Nov. 30, 2010) ...........................................6, 9

*Cantrell v. GAF Corp.*,
999 F.2d 1007 (6th Cir. 1993) ...............................................................................................4, 6, 8

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ........................................................................................................10

*In re Chevron U.S.A., Inc.*,
109 F.3d 1016 (5th Cir. 1997) .......................................................................................................3

*In re Consol. Parlodel Litig.*,
182 F.R.D. 441 (D.N.J. 1998) ..................................................................................................6, 10

*Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*,
701 F.3d 1093 (6th Cir. 2012) .....................................................................................................18

*Grayson v. K-Mart Corp.*,
849 F. Supp. 785 (N.D. Ga. 1994) ................................................................................................8

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 2008) .......................................................................................................12

**Page(s)**

*Hardyman v. Norfolk & W. Ry. Co.*,
   243 F.3d 255 (6th Cir. 2001) ................................................................5

*Hasman v. G.D. Searle & Co.*,
   106 F.R.D. 459 (E.D. Mich. 1985) ....................................................7, 9

*Hemingway v. Jacobs Engineering Group, Inc.*,
   No. 3:17-cv-00547-TAV-HBG (E.D. Tenn. filed Dec. 22, 2017).........18

*Insolia v. Philip Morris Inc.*,
   186 F.R.D. 547 (W.D. Wis. 1999) .........................................................8

*In re Joint E. and S. Districts Asbestos Litig.*,
   125 F.R.D. 60 (E.D. & S.D.N.Y. 1989).................................................9

*Jones v. Allercare, Inc.*,
   203 F.R.D. 290 (N.D. Ohio 2001) .........................................................5

*Lewis v. Walker*,
   No. 3:16-cv-00486-TAV-HBG, 2017 WL 1274094 (E.D. Tenn. Apr. 4, 2017) ....................6

*Lindsey v. Normet*,
   405 U.S. 56 (1972).............................................................................10

*Malcolm v. National Gypsum Co.*,
   995 F.2d 346 (2d Cir. 1993).........................................................9, 10, 11

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008).................................................................11

*Muse v. Jacobs Engineering Group, Inc.*,
   No. 3:17-cv-00282-TAV-HBG (E.D. Tenn. filed June 29, 2017).........18

*Organic Chems., Inc. v. Carroll Prods., Inc.*,
   86 F.R.D. 468 (W.D. Mich. 1980) ........................................................6

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007)............................................................................20

*Powell v. Oldham*,
   No. 2:16-cv-2907-SHM-tmp, 2018 WL 1249909 (W.D. Tenn. Mar. 9, 2018) ........................4

*Puerto Rico v. M/V Emily S.*,
   158 F.R.D. 9 (D.P.R. 1994) ..................................................................5

**Page(s)**

*In re Repetitive Stress Injury Litig.*,
    11 F.3d 368 (2d Cir. 1993)............................................................................7

*Sidari v. Orleans Cty.*,
    174 F.R.D. 275 (W.D.N.Y. 1996)...............................................................8

*Sterling v. Velsicol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) .....................................................................5

*In re Welding Fume Prod. Liab. Litig.*,
    No. 1:03CV17000, 2006 WL 2869548 (N.D. Ohio Oct. 5, 2006)...........9

**Statutes**

Tenn. Code Ann. § 29-39-104(a)(1) .............................................................19

Tenn. Code Ann. § 29-39-104(a)(2) .............................................................19

Tenn. Code Ann. § 29-39-104(a)(3) .............................................................19

**Other Authorities**

Adam S. Zimmerman, *The Bellwether Settlement*, 85 Fordham L. Rev. 2275
    (2017)..........................................................................................................11

Manual for Complex Litigation § 22.315 (4th ed. 2004).............................11

Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort
    Litigation Through Bellwether Trials*, 88 N.Y.U. L. Rev. 439 (2013)....11

In its November 19, 2018 order, the Court asked the parties to submit briefing addressing the following issues:

1.  Whether, how, and to what extent these cases should remain consolidated for Phase II;

2.  How much and what kind of discovery is needed for Phase II;

3.  Suggestions or proposals concerning the timing and schedule of Phase II;

4.  The impact, if any, the Phase I verdict will have on other related cases, including *Vernon D. Allen, et al., v. Jacobs Engineering Group, Inc., et al*, Case No. 3:18-CV-153;

5.  Whether this matter is appropriate for referral to mediation at this juncture and, if so, what type of mediation would be most appropriate; and

6.  Whether, when, and how the parties should litigate punitive damages.

Jacobs responds to each of the Court's questions in turn.

**1.      If These Cases Proceed, They Should Be Litigated Individually, with Bellwether Trials Proceeding First.**

Jacobs does not believe these cases should remain consolidated, no matter how the Court rules on Jacobs' pending post-trial motions.  There are presently three possibilities for how this case will proceed.  First, if the Court agrees with Jacobs that "no reasonable jury would have had a legally sufficient evidentiary basis to find in favor of Plaintiffs on their negligence claims," then this case will come to its rightful conclusion.  [Docs. 437–438 ("Motion for Judgment").]  Second, if the Court grants *in part* the Motion for Judgment [*id.*] or grants the Motion for a New Trial [Docs. 439–440], then the Phase I verdict would be vacated and a new trial ordered.  [Doc. 438 at 18; Doc. 440 at 15.]  Third, if the Court denies both Jacobs' motions in full, and if Jacobs is unsuccessful in appealing that denial, the case will proceed to Phase II.

Consolidation would obviously be unnecessary if judgment is entered in Jacobs' favor. And it would be inappropriate if the Court orders a new trial or proceeds to Phase II. In either of those scenarios, the Court should instead hold bellwether summary judgment motions and trials.

A.      There Should Not Be Bifurcation of Any New Trial.

As fully explained in Jacobs' Motion for a New Trial and Motion for Judgment, a fundamental flaw in Phase I was Plaintiffs' insistence on presenting to the jury six distinct theories of liability and their demand for a bare-bones jury verdict that did not specify which theory the jury believed. [Doc. 440 at 1–3; Doc. 438 at 18.] This fatal combination leaves us all in the dark about what the jury actually found, and if the verdict findings are allowed to stand, they will inevitably lead to a Seventh Amendment violation because it would be impossible to avoid having a second jury reexamine the findings of the Phase I jury. [Doc. 440 at 1–3.]

There is no reason to repeat this mistake again. If Plaintiffs insist on presenting six theories of liability for how they allegedly suffered ten different types of injuries (hypertension, coronary artery disease, lung cancer, leukemia, skin cancer, allergic contact dermatitis, peripheral neuropathy, asthma, chronic obstructive pulmonary disease ("COPD"), and respiratory conditions), it would be far simpler for the jury and the parties to try each Plaintiff's claims separately. This would eliminate the challenges of the Seventh Amendment, and would allow a far simpler presentation of the case. For example, Mr. Craig Wilkinson would present his evidence that Jacobs supposedly (1) "deliberately manipulated or tampered with any monitoring results or processes," (2) "did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash," (3) "failed to comply with the provisions of the safety and health plan with respect to the voluntary use of dust masks," (4) "threatened workers when they asked for dust masks or respirators," (5) "communicated to workers that fly ash was safe to consume," and (6) "otherwise failed to train or warn workers about the dangers of excessive fly ash exposure,"

assuming all six of those theories even apply to Mr. Wilkinson.[1]  [Doc. 424, 14 Trial Tr. at 3022, 3024.]  Mr. Wilkinson would then present whatever evidence he has to show how those specific acts caused his COPD, emphysema, and other medical conditions allegedly attributable to Jacobs' conduct that caused him to need a double lung transplant, and proof of his damages, if any.  The jury would then be able to easily examine whether Mr. Wilkinson had proved his case by a preponderance of the evidence, and if so, the amount of any award.

The parties did believe two years ago that bifurcation would make this case simpler and more efficient.  But that prediction proved incorrect.  If new trials are ordered, the Court instead should proceed by bellwether summary judgment motions and trials—during which a few "test" cases are tried to verdict—to enable the parties to evaluate the strengths of their respective claims and potential avenues of resolution.  As discussed below, bellwether trials have "achieved general acceptance by both bench and bar" and have become the preferred practice in mass tort cases involving individualized issues, as this case does.  *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

**B.      Any Cases that Proceed to Phase II Should Be Litigated Individually.**

Consolidation would also be inappropriate if the cases proceed to Phase II.  As the Court recognized, Phase II would address "(1) *specific causation* with respect to *individual plaintiffs*; (2) *each plaintiff's* alleged injuries; and (3) the extent to which plaintiffs are entitled to *damages*." [Doc. 136, Bifurcation Order at 7 (emphasis added).]  As the Court also recognized, these issues

---

[1] Based on Mr. Wilkinson's deposition testimony, several of these theories would not apply in his case.  For example, Mr. Wilkinson admitted that before he ever worked at the Site, he was told by his doctors that he could not pass a pulmonary function test or wear a dust mask at work, except in an emergency situation, due to pre-existing damage to his lungs from smoking.  [Wilkinson Dep. 107:8–109:16.]  Thus, any arguments pertaining to the voluntary use of dust masks or threats made by Jacobs regarding requests for dust masks or respirators would not have had any impact upon Mr. Wilkinson.

require resolution on an individualized, plaintiff-by-plaintiff basis: "[T]he cases in this litigation . . . involve *individualized* issues and evidence *specific to each plaintiff*, including *specific causation* with respect to *each individual plaintiff*, *each plaintiff's* alleged injuries, and the extent to which *individual plaintiffs* are entitled to damages." [*Id.* at 5 (emphasis added).]

And the Court was right. Among other individualized issues that must be decided in Phase II, plaintiff by plaintiff, are whether Jacobs' conduct caused *any individual Plaintiff* to be exposed to any purported harmful substance—beyond already accepted levels—such that *that individual Plaintiff* received a "dose" that was sufficient, given *that Plaintiff's* job and responsibilities, physical location, and time at the plant, to result in any illness; how other factors may have contributed to *each individual Plaintiff's* alleged injuries (i.e., whether *that individual Plaintiff* was exposed to other items that may have affected *that individual Plaintiff's* health); how *each individual Plaintiff's* history and prior conduct may have played a role in *that Plaintiff's* physical condition; what each *individual Plaintiff's* doctors have to say about *that Plaintiff's* medical history; the result of *that individual Plaintiff's* independent medical examination; and the damages—if any—that *that individual Plaintiff* is entitled to based upon the injuries suffered by *that Plaintiff*.

In these circumstances, continued consolidation would violate Federal Rule of Civil Procedure 42, which provides the Court discretion to consolidate actions involving common questions of law or fact. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993). Commonality is a "threshold requirement," and the party requesting consolidation bears the burden of showing a "common issue." *Banacki v. OneWest Bank, FSB*, 276 F.R.D. 567, 571 (E.D. Mich. 2011); *Powell v. Oldham*, No. 2:16-cv-2907-SHM-tmp, 2018 WL 1249909, at *2–3 (W.D. Tenn.

Mar. 9, 2018).  Here, Plaintiffs cannot meet their burden of showing common issues in Phase II sufficient to justify consolidation.

Indeed, specific causation, actual injury, and damages by their very nature present individualized issues that vary, plaintiff by plaintiff.  In the class action context, for instance, courts have recognized that "proof of causation" is an individualized issue not capable of coordinated determination because it "will depend on individual factors such as the nature of *each plaintiff's* exposure and personal susceptibility."  *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 301 (N.D. Ohio 2001) (emphasis added); *see also, e.g.*, *Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 14 (D.P.R. 1994) (denying class certification in part because "any injuries would be dependent upon the numerous variables present, including such matters as personal susceptibility to harm, and degree, *nature and duration of exposure*" (emphasis added)).

Similarly, Phase II will require a "differential diagnosis" for *each individual Plaintiff*, whereby *that Plaintiff's* unique medical history and exposure to other materials and substances must be examined to determine exactly what caused *that Plaintiff's* alleged injury and whether it was caused by Jacobs' conduct or not.  *See, e.g.*, *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (holding that an "appropriate method for making a determination of causation for an individual instance of disease is known as 'differential diagnosis,'" in which an expert physician "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history" (citation omitted)).

Finally, the amount of damages to be awarded any individual Plaintiff, if any, depends of course upon *that Plaintiff's* specific injuries, how much of *that Plaintiff's injury* is attributable to Jacobs, what further care *that individual Plaintiff* will need, and so on.  *See, e.g., Sterling v.*

*Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988) ("[I]ndividual particularized damages still must be proved on an individual basis.").

In short, the issues that are to make up the substance of Phase II—specific causation, injury, damages—are not common, and it would therefore be in error under Rule 42(a) to consolidate the matters any further for Phase II. *See Lewis v. Walker*, No. 3:16-cv-00486-TAV-HBG, 2017 WL 1274094, at *2–3 (E.D. Tenn. Apr. 4, 2017) (denying motion for consolidation when no common questions of law or fact existed); *In re Consol. Parlodel Litig.*, 182 F.R.D. 441, 447 (D.N.J. 1998) ("[T]he predominance of individual issues, in particular, causation and marketing evidence, . . . prevent Plaintiffs from meeting their burden on this motion to consolidate under Rule 42.").

Further, even if the threshold requirement of showing common issues in Phase II were met (which it is not), consolidation would remain inappropriate under the discretionary *Cantrell* factors. These factors include whether "the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives." *Cantrell*, 999 F.2d at 1011 (alteration omitted).

Because each Plaintiff's Phase II case is different and the issues of specific causation, injury, and damages are individualized, the risk of inconsistent verdicts is nonexistent. *Cf. Buckler v. EnerSys, Inc.*, No. 09-152-JBC, 2010 WL 11526869, at *1 (E.D. Ky. Nov. 30, 2010) (finding "a risk of inconsistent judgments" when "the legal issues in the two cases [we]re identical"). Nor would efficiencies result from consolidating Plaintiffs' necessarily individualized claims and cases—any consolidation would just result in a confusing panoply of various individuals' individual claims and issues. *See Organic Chems., Inc. v. Carroll Prods., Inc.,* 86 F.R.D. 468,

469–70 (W.D. Mich. 1980) ("[I]n complex cases with complex issues, justice is often best served if issues are separated.").  No time or money would be saved by trying these cases together—doing so would result only in duplication within any individual action of however many different plaintiffs were part of that action and their need to each establish their own individualized causation, injuries, and damages, based upon their own individualized interaction with Jacobs, medical history, contemporaneous exposures, and other individual issues.  *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) (consolidation was error where the claimed injury "cover[ed] a number of different ailments for each of which there [we]re numerous possible causes other than the tortious conduct of one of the defendants").

In contrast, further consolidation would result in great prejudice and confusion before a jury.  Plaintiffs have alleged a variety of illnesses or injuries, ranging from hypertension to lung cancer.  [*See* Doc. 408 at 4–5.]  And Plaintiffs appear to claim to have contracted these illnesses in varying combinations.  [*See* Doc. 396-01 at 3–4 ("TVA Workers' Compensation Injury Matrix").]  If the cases were consolidated and tried together for Phase II, a jury evaluating a particular Plaintiff's claims may be confused or influenced by evidence presented on behalf of another Plaintiff whose situation and injuries are different and irrelevant for any other Plaintiff.  As the court recognized in *Hasman v. G.D. Searle & Co.*, 106 F.R.D. 459, 461 (E.D. Mich. 1985):

> If the unique circumstances of the cases are considered together in one trial, the jury's verdict might not be based on the merits of the individual cases but could potentially be a product of cumulative confusion and prejudice.  It is possible jurors considering a particular plaintiff might be prejudiced by the evidence presented on behalf of the other plaintiffs, since they would be permitted to hear allegations of defects and adverse reactions not relevant to the particular plaintiff's case.

This could result in prejudice to Plaintiffs themselves. For instance, if one Plaintiff is determined by a jury to have not suffered injury on account of Jacobs' actions but instead is found to have suffered injury because of lifestyle factors, that may taint the jury's views to the disadvantage of the other Plaintiffs. Likewise, handling the cases together could result in prejudice to Jacobs, by presenting a false and misleading picture to the jury that because the various Plaintiffs worked generally at the same site (although with different jobs, responsibilities, and tenures) and are alleging various illnesses, ***all*** of their illnesses must have been caused by Jacobs. Courts have recognized the tremendous danger of this leading to "guilt by association." *See Sidari v. Orleans Cty.*, 174 F.R.D. 275, 282 (W.D.N.Y. 1996); *Grayson v. K-Mart Corp.*, 849 F. Supp. 785, 790 (N.D. Ga. 1994); *see also Cantrell*, 999 F.2d at 1011 ("Evidence relevant only to the causation of one plaintiff's cancer may indicate to the jury that the other plaintiff will likely develop cancer in the future. Even where the plaintiffs share similar work histories and suffer from other similar conditions as they do in this case, the trial court must carefully assess the risk of prejudice to the defendant before consolidating cancer and non-cancer cases.").

Beyond prejudice that could be suffered by either side in consolidated Phase II proceedings, it would also be asking too much for the jury to try to keep the individual stories of as many as 70 Plaintiffs separate; hear testimony as to each of those Plaintiff's injuries, risk factors, and medical history; and make ***separate*** determinations as to each of those Plaintiff's claims on a verdict form at the end of a lengthy trial that would have to involve the testimony of each Plaintiff, each Plaintiff's doctors, and witnesses relevant to each Plaintiff's claims. *See Insolia v. Philip Morris Inc.*, 186 F.R.D. 547, 551 (W.D. Wis. 1999) ("Judicial resources are wasted, not conserved, when a jury is subjected to a welter of evidence relevant to some parties but not others."). "When

cases involve *some* common issues but individual issues predominate, consolidation should be denied." *Banacki*, 276 F.R.D. at 572 (emphasis in original) (citing *Hasman*, 106 F.R.D. at 461).

The Second Circuit's "Maryland Factors" are not only inapposite, but they further point in favor of individual trials. *See, e.g.*, *Buckler*, 2010 WL 11526869, at *1 (citing *Malcolm v. National Gypsum Co.*, 995 F.2d 346, 350–51 (2d Cir. 1993)) (consolidating two plaintiffs' cases); *In re Welding Fume Prod. Liab. Litig.*, No. 1:03CV17000, 2006 WL 2869548, at *2–3 (N.D. Ohio Oct. 5, 2006) (consolidating two of five plaintiffs' cases). ***These cases that utilize the Maryland factors do not involve the question whether a Phase II trial, limited to specific causation, injury, and damages, should be consolidated***—which of course it should not. And even under the *Maryland* factors, the Second Circuit has explained that while consolidation may be appropriate when plaintiffs could be grouped by "type of disease," *see Malcom*, 995 F.2d at 351, other factors can and often do outweigh that single consideration. In *Malcom*, for instance, the court refused to consolidate the cases in part because: (1) the plaintiffs' occupations "ranged from plumbers to machinists to carpenters to boilermakers to sheet-metal workers" and their "exposure to asbestos" varied by occupation, *see id.*; (2) some plaintiffs suffered asbestos exposure for up to 30 years while others had "much shorter periods of exposure," which "undercut[] the benefit of efficiency" and "increase[ed] the likelihood of prejudice," *see id.*; and (3) some plaintiffs were still alive and others were dead, causing "troublesome" prejudice to the defendant, *see id.* at 351–52 (quoting *In re Joint E. and S. Districts Asbestos Litig.*, 125 F.R.D. 60, 65–66 (E.D. & S.D.N.Y. 1989)).

The same three concerns are present here. There are approximately 70 individuals seeking relief in this action, who worked at different locations within the site, with different occupations, for different periods of time, subject to different alleged exposures. [*See* Doc. 355 at 4; Doc. 109-02 (listing jobs and tenures); Doc. 255-01 (same).] Some Plaintiffs moved, loaded, or stacked fly

ash with heavy equipment, others drilled holes and monitoring wells in the ash, some moved the ash with shovels and rakes, others operated dredge equipment on barges in the Emory river, some directed traffic at the roads in and around the Kingston Site, and others cleaned fly ash off of vehicles exiting the Site. [Doc. 355 at 4.] Plaintiffs also had different alleged injuries, even within the same "injury group" (with different levels of injuries affecting different parts of the body, depending on the plaintiff) [*see* Doc. 408 at 4–5; Doc. 396-01 at 3–4]; some are alive and some are deceased [*see* Doc. 396-01 at 3–4]; and each Plaintiff obviously has different medical histories and risk factors and suffered different variations of damages. *See Malcolm*, 995 F.2d at 351–52.

Finally, trying the cases together on a consolidated basis would violate Jacobs' due process rights. Jacobs has the Constitutional right to present "*every* available defense," tailored to each individual Plaintiff's individual circumstances. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (emphasis added) (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51–52 (1st Cir. 2018) ("Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on [individual] issues."); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (defendant "has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues"). Aggregating the claims of as many as 70 individual Plaintiffs, with respect to proceedings and a trial that is supposed to be about the individualized issues of specific causation, injury, and damages, would eviscerate the right and ability for Jacobs to adequately and specifically address each individual's case—at least without the trial lasting with one empaneled jury for multiple years on end. *See In re Consol. Parlodel Litig.*, 182 F.R.D. at 447 ("A consolidated trial of these fourteen cases would compress critical

evidence of specific causation and marketing to a level which would deprive [defendant] of a fair opportunity to defend itself."); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008) (holding that when "the mass aggregation of claims" is used "to mask the prevalence of individual issues," "the right of defendants to challenge the allegations of individual plaintiffs is lost, resulting in a due process violation"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Malcolm*, 995 F.2d at 354 ("[I]t is possible to go too far in the interests of expediency and to sacrifice basic fairness in the process.").

C.   **Bellwether Summary Judgment Motions and Trials Would Be More Efficient than Consolidation.**

Instead of consolidation, the simpler and more efficient approach would be to conduct bellwether summary judgment motions and trials. Specifically, Jacobs proposes that if the Court does not grant its Motion for Judgment in full, the parties should proceed to discovery across the individual cases and then, at the conclusion of fact discovery, select two of Plaintiffs' cases from each of the 10 "injury groups" (for a total of 20 cases) to proceed to expert discovery, summary judgment proceedings, and, if necessary, trial.

This procedure would allow the parties to evaluate the strength of their evidence and whether a global resolution is possible. Indeed, the use of bellwethers in mass tort cases has become the gold standard because such a procedure, which does not have preclusive effect (given each case is individualized), allows the parties to produce sufficiently "representative" results that "enable the parties and the court to determine the nature and strength of the claims" and therefore the parties' respective posture for further negotiations, trials, and potential resolution of the remaining matters. *See* Manual for Complex Litigation § 22.315 (4th ed. 2004); Adam S. Zimmerman, *The Bellwether Settlement*, 85 Fordham L. Rev. 2275, 2276 (2017) ("For years, courts have relied on 'bellwether trials' to resolve large numbers of similar lawsuits."); Zachary

B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials*, 88 N.Y.U. L. Rev. 439, 455 (2013) ("[C]ourts increasingly use bellwethers as a device to assist defendants and plaintiffs in valuing their claims").  As the Ninth Circuit explained in another mass tort case, bellwethers "demonstrate[e] the likely value of a claim or . . . aid[] in predicting the outcome of tricky questions of causation or liability," and thereby facilitate the possibility of a global settlement. *Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015); *see also In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 995 (9th Cir. 2008) (similar).

2.     **Substantial Discovery Is Necessary for a New Trial or Phase II.**

As discussed in Jacobs' Response to Plaintiffs' Motion for Reference of Consolidated Cases to Mediation and for Stay of Phase II Proceedings [Doc. 441], substantial discovery remains in these matters.  This is true regardless of whether the Court orders a new trial or proceeds to Phase II.

Specifically, Plaintiffs still have yet to disclose which specific medical condition(s) each individual Plaintiff attributes to fly ash exposure.  Once that is done, the parties still need to: (1) obtain updated medical records and work history records for many of the Plaintiffs; (2) conduct depositions of individual Plaintiffs, their medical providers, and other fact witnesses; and (3) disclose and then take depositions of the necessary experts.

Contrary to what Plaintiffs stated in their recent reply brief in support of mediation [Doc. 446], they have not identified the specific medical conditions that many (if not most) of the individual Plaintiffs are alleging were caused by Jacobs' purported conduct.  The only document Plaintiffs have identified that purportedly contains that information—a spreadsheet that Plaintiffs produced in July 2017—confirms that this discovery has *not* been provided.  [*See* Doc. 396-01 at

3–4.] The spreadsheet does *not* identify any specific medical condition alleged by any Plaintiff. [*See id*.] Instead, it contains seven broad categories describing parts of the body and general types of medical conditions, including "lungs," "sinus," "skin," "test," "heart," "neuro," and "cancer." [*Id*.] This type of general information would not inform any substantive analysis of any of Plaintiffs' conditions, either by counsel or by any medical professional, because there are, at a minimum, dozens of possible medical conditions associated with nearly all of the listed categories. In order to even determine what type of expert medical proof would be needed to prove Plaintiffs' claims in any further proceedings (whether or not on a bellwether basis), let alone evaluate the likelihood that Plaintiffs could establish specific causation, ***each Plaintiff needs to identify with specificity the nature, extent, and the date(s) of onset of <u>each</u> alleged medical condition that he or she attributes to Jacobs' actions***.

After identifying all of the specific medical conditions that each Plaintiff attributes to Jacobs' actions, ***the parties need to obtain all of the related medical records***. While the parties have obtained some medical records for most of the Plaintiffs, there is substantial work left to do. By way of background, the parties agreed to use Records Acquisition Services, Inc. ("RAS") to obtain Plaintiffs' medical records. Plaintiffs were required to provide lists of their medical providers, and the parties were then able to submit requests for records relating to those providers through RAS. Unless and until individual Plaintiffs identify particular providers, however, records from those providers cannot be requested through RAS. Moreover, when individual Plaintiffs receive additional treatment even from previously identified providers, additional requests through RAS are required. Prior to trial it became apparent, particularly when Jacobs reviewed requests for for-proof depositions, that complete sets of medical records had not yet been produced, presumably because Plaintiffs had not provided updated lists of medical providers or because they

had not provided notice that individuals had received additional treatment.  In light of that information, Jacobs' counsel submitted renewed requests for medical records through RAS prior to trial.  As Plaintiffs also noted in their reply brief in support of mediation, thousands of pages of records have been obtained in the last six months alone, as a result of those renewed requests. While much of that production has now been completed, records were only requested from the medical providers who were previously identified by Plaintiffs, relating to injuries that were previously disclosed.  Plaintiffs' attorneys have suggested on several occasions that many of the Plaintiffs' medical conditions have changed significantly in the last couple of years, due to either the alleged worsening of existing conditions or the alleged development of new disease(s), so additional requests must be made in many of these cases.

And while Plaintiffs have provided some additional information in their written discovery responses, the responses do not provide the information that will be needed to evaluate the Plaintiffs' claims.  For example, many of the responses identified general symptoms rather than the specific underlying medical condition(s) at issue.  Mr. Kenneth Shepherd, for instance, stated in his answers to interrogatories that he had, among other conditions, "heart flutters, . . . shortness of breath[,] . . . hard spots on the bottom of [his] lungs, sinus problems, vision problems . . . ." [Shepherd Dep. Ex. 148 at 2–3.][2]  But he did not identify the specific medical conditions with which he has been diagnosed that may be associated with those symptoms.  [*See id.*]

Additionally, it became apparent during depositions that a substantial portion of the information provided by Plaintiffs was neither current nor accurate.  For example, while Mr. Shepherd testified that he did not recall being diagnosed with any of the conditions he now

---

[2] Jacobs will have available at the January 11 status conference the portions of Plaintiffs' deposition transcripts and related records cited in this brief if the Court or Plaintiffs' counsel would like to review them.

attributes to fly ash exposure prior to working at Kingston, it appears that he had already been diagnosed with *most if not all* of the conditions listed in his interrogatory responses months before he arrived at the Site. [Shepherd Dep. 95:10–98:23; Shepherd Dep. Ex. 151.] Similarly, Mr. Wilkinson stated in his discovery responses that he developed COPD and emphysema in June 2012 as a result of exposure to fly ash at the Site. [Wilkinson Dep. Ex. 01 at *4–5.] But in his deposition, he acknowledged that he had been diagnosed with both conditions, as well as severe obstructive pulmonary impairment, before he started working at Kingston, and that his doctors had attributed those conditions to smoking. [Wilkinson Dep. 110:17–111:3, 117:21–118:8.]

Rather than identifying the conditions that their medical providers have attributed to fly ash exposure, it appears that many Plaintiffs simply listed *all* of their current health problems, regardless of when they were first diagnosed, and regardless of what their physicians had told them about the cause(s) of those conditions. For example, despite having had gout for over 20 years, various pre-existing sinus problems, and high blood pressure at least seven years before he worked at the Site, Mr. Frankie Norris listed all of those conditions in answering questions regarding the conditions he attributes to fly ash exposure. [*See* Norris Dep. 177:9–178:15, 186:8–188:8.] Similarly, in responding to the same questions, Mr. Dan Cody listed high blood pressure, high blood sugar, and "heart problems," even though he was diagnosed with hypertension, hyperglycemia, coronary artery disease, and other heart issues by 2007, at the latest. [Cody Dep. 147:4–150:6.] And some Plaintiffs acknowledged that their list of medical providers was not current or that they had not yet sought medical treatment for their alleged health problems. [*See, e.g.*, Berry Dep. Ex. 139 at *4–5 ("I have not seen any doctors for these symptoms.").] Given the nature of the Plaintiffs' alleged conditions and the passage of time, those lists will likely need to

be updated again, particularly for individuals who have developed additional health issues since the responses were last updated.

*Dozens of additional depositions of individual Plaintiffs and other fact witnesses are also needed for any future proceedings.* There are approximately 70 Plaintiffs, and only 28 were deposed prior to the Phase I trial. The remaining 40 or so must still be deposed. Further, to the extent that the previously deposed individuals' alleged medical conditions have changed or progressed significantly, they need to be deposed again. Likewise, all of the Plaintiffs' treating physicians and medical providers—who will testify as to the Plaintiffs' medical conditions, diagnoses, and prior medical conditions and issues (which are critical to questions of causation)— need to be deposed. None have been deposed thus far. Moreover, witnesses with knowledge of the Plaintiffs' alleged conditions and damages must be deposed as well.

In addition, *the parties need to disclose, provide reports for, and depose experts*. Each individual Plaintiff must present expert proof establishing that he or she has the particular medical conditions alleged and that those conditions were caused by Jacobs' alleged actions (as opposed to something else). Plaintiffs did not even begin to address these issues in Phase I, but they will need to disclose multiple experts in each case to address this fundamental prerequisite to liability in Phase II.

In sum, substantial discovery is needed before any further proceedings in this case, including discovery regarding Plaintiffs' alleged conditions, specific causation, and damages.

3. <u>**Proposed Timing and Schedule.**</u>

If Jacobs' post-trial motions are denied, Jacobs intends to ask for leave to appeal and a stay pending appeal. In the event the Court orders a new trial, Jacobs proposes the schedule below, with fact discovery for each Plaintiff proceeding on a non-consolidated basis and then, at the close of fact discovery, bellwethers being selected as "test cases" for further proceedings. Alternatively,

Jacobs provides the following schedule for Phase II in the event the Court proceeds with Phase II, again with discovery proceeding on a non-consolidated basis and each case proceeding individually until bellwethers are selected:

- Plaintiffs are to provide updated disclosures regarding each of their alleged injuries and medical conditions purportedly attributable to Jacobs' actions and specify the nature, extent, and date of onset of each alleged injury and medical condition—***by February 28, 2019***.  Plaintiffs shall be precluded from introducing at trial any evidence regarding alleged injuries or medical conditions that are not disclosed by this deadline.

- Each Plaintiff shall identify all prior treating physicians, including the time period those physicians treated that Plaintiff and for what matters—***by February 28, 2019***.  Plaintiffs shall be precluded from introducing at trial: (1) the testimony of any treating physician who is not disclosed by this deadline and (2) any record evidencing or relating to treatment provided by any such physician.

- Plaintiffs shall identify any relevant treatment that they have received from any medical provider since records were last obtained through Records Acquisition Services, so that updated medical records can be timely requested—***by February 28, 2019***.  Plaintiffs shall supplement on an ongoing basis, to provide notice of any additional treatment within 30 days of receiving such treatment.  Plaintiffs shall be precluded from introducing at trial evidence regarding any treatment, and any related injuries or illnesses, for which they have not provided notice in accordance with this section.

- Fact discovery—including depositions of Plaintiffs, their treating physicians, and percipient witnesses, as well as written discovery (interrogatories, requests for production, and requests for admission)—to be completed ***by October 1, 2019***.

- Status conference, to be set at the Court's convenience, following ***October 1, 2019*** fact discovery cut-off date to discuss:

  - The selection of the Plaintiffs to serve as bellwether Plaintiffs for purposes of further proceedings;

  - The schedule by which further bellwether proceedings, involving expert discovery, bellwether summary judgment motions, and trial, shall proceed; and

  - The procedures that shall govern further bellwether proceedings.

4. **The Phase I Verdict, if It Remains, May Allow Stays to Be Lifted in Related Cases but Will Have No Other Impact.**

If the Court denies Jacobs' post-trial motions, three related cases—*Allen v. Jacobs Engineering Group, Inc.*, No. 3:18-cv-00153-TAV-HBG (E.D. Tenn. filed Apr. 17, 2018); *Muse v. Jacobs Engineering Group, Inc.*, No. 3:17-cv-00282-TAV-HBG (E.D. Tenn. filed June 29, 2017); and *Hemingway v. Jacobs Engineering Group, Inc.*, No. 3:17-cv-00547-TAV-HBG (E.D. Tenn. filed Dec. 22, 2017)—should have their stays lifted. *Allen*, *Muse*, and *Hemingway* were stayed pending resolution of phase one of *Adkisson*. [No. 3:18-cv-00153-TAV-HBG, Doc. 20; No. 3:17-cv-00282-TAV-HBG, Doc. 29.; No. 3:17-cv-00547-TAV-HBG, Doc. 20.] Jacobs believes the stays should be lifted in all three cases after the Court rules on the *Adkisson* post-trial motions. [*See, e.g.*, *Hemingway*, No. 3:17-cv-00547-TAV-HBG, Doc. 24.]

Beyond the stay requests, the Phase I verdict will have no substantive impact on these other matters. For instance, the plaintiffs in other cases will not be able to use the Phase I verdict for purposes of offensive issue preclusion. One of the four requirements that "must be met before issue preclusion applies" is that the "prior proceedings must have resulted in a final judgment on the merits." *Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (citation omitted). No final judgment has been entered in *Adkisson*, nor could it, for Plaintiffs still must, at a minimum, prove specific causation and damages.

5. **Mediation Is Not Appropriate at This Time.**

The parties previously addressed mediation in response to Plaintiffs' Motion for Reference of Consolidated Cases to Mediation and for Stay of Phase II Proceedings. [*See* Doc. 431, 441.] Mediation would be fruitful, if at all, only after further discovery has proceeded, dispositive motions have been decided, and the parties have completed a sufficient number of bellwether summary judgment motions and trials to inform their mediation posture.

6.	**Punitive Damages Are Unwarranted, but if They Are Tried, They Should Be Litigated for Each Individual Plaintiff Following a Damages Finding.**

If the Court orders a new trial or proceeds to Phase II, the jury in individual trials should examine the possibility of punitive damages for each Plaintiff only after it has determined (1) that the Plaintiff has proven his case by a preponderance of the evidence and should be awarded damages, and (2) that Jacobs' acts with respect to that Plaintiff were "malicious, intentional, fraudulent, or reckless."

First, Tennessee law requires that the same jury determine causation/compensatory damages as well as punitive damages—"the trier of fact in a bifurcated proceeding shall first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless," Tenn. Code Ann. § 29-39-104(a)(2) (emphasis added); *see also id.* § 29-39-104(a)(1) (requiring "clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently, or recklessly").  If a jury finds that the defendant "engaged in malicious, intentional, fraudulent, or reckless conduct, then the court shall promptly commence an evidentiary hearing in which the jury shall determine the amount of punitive damages, if any."  *Id.* § 29-39-104(a)(3).[3]

Second, the Due Process Clause requires a plaintiff-by-plaintiff examination of punitive damages, as such must be relative to the individual plaintiff's harm.  As the Supreme Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 580 (1996) (emphasis added), "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the ***actual harm inflicted on the plaintiff***."  Determining punitive

---

[3]  There are other requirements relating to punitive damages under Tennessee law that would apply as well, including rules relating to caps on punitive damages and other procedures.

damages is therefore an individualized inquiry: the court must examine the amount of harm suffered by each plaintiff and compare it to the award of punitive damages. *See Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007) (punitive damages must be tied to "*the plaintiff*" and the "case at hand" rather than to strangers or other potential victims (emphasis in original)).

Finally, the Seventh Amendment requires that the same jury that decides whether Jacobs' actions as to any individual plaintiff were "malicious, intentional, fraudulent, or reckless" also decide the amount of punitive damages, if any, because the two inquiries involve the same issue. Although Jacobs did not object to postponing the punitive damages inquiry from Phase I to Phase II, using multiple juries within Phase II would impermissibly allow two juries to examine questions that should be decided by one. *See Blyden v. Mancusi*, 186 F.3d 252, 267–69 (2d Cir. 1999).

<u>**CONCLUSION**</u>

For all of these reasons, and for the reasons stated in Jacobs' other recent filings, Jacobs respectfully requests that the Court:

(1)  Grant Jacobs' Motion for Judgment and enter judgment in its favor; or grant Jacobs' Motion for a New Trial, vacate the Phase I verdict findings, and order a new trial following the bellwether procedure proposed above; or

(2)  If Phase II is to proceed, order that the matters no longer be consolidated and the parties proceed per the schedule and procedure proposed above.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By: /s/ James F. Sanders
James F. Sanders        (No. 005267)
jsanders@nealharwell.com
J. Isaac Sanders        (No. 029372)
isanders@nealharwell.com
Marie T. Scott        (No. 032771)

mscott@nealharwell.com
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee  37203
Telephone:  (615) 244-1713
Facsimile:  (615) 726-0573


**GIBSON, DUNN & CRUTCHER LLP**

Theodore J. Boutrous, Jr. (*pro hac vice*)
tboutrous@gibsondunn.com
Theane Evangelis (*pro hac vice*)
tevangelis@gibsondunn.com
Jeremy S. Smith (*pro hac vice*)
jssmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:     (213) 229-7000
Facsimile:     (213) 229-7520

*Attorneys for Defendant*
*Jacobs Engineering Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of January, 2019, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/ James F. Sanders
