**No. _____**

---

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

*IN RE JACOBS ENGINEERING GROUP, INC.,
PETITIONER.*

---

**On Petition for Writ of Mandamus from the United States
District Court for the Eastern District of Tennessee at Knoxville
Case No. 3:13-CV-505; No. 3:13-CV-00666; No. 3:14-CV-00020; No.
3:15-CV-00017; No. 3:15-CV-00274; No. 3:15-CV-00420; No. 3:15-CV-
00460; No. 3:15-CV-00462; No. 3:16-CV-00635; No. 3:16-CV-00636
(consolidated)**

---

**PETITION FOR WRIT OF MANDAMUS**

---

| | |
|---|---|
| Theodore J. Boutrous, Jr.* | James F. Sanders |
| Theane Evangelis | J. Isaac Sanders |
| Jeremy S. Smith | NEAL & HARWELL, PC |
| Jessica Benvenisty | 1201 Demonbreun Street |
| GIBSON, DUNN & CRUTCHER LLP | Suite 1000 |
| 333 South Grand Avenue | Nashville, Tennessee 37203 |
| Los Angeles, California 90071-3197 | Telephone: (615) 244-1713 |
| Telephone: (213) 229-7000 | Facsimile: (615) 726-0573 |
| Facsimile: (213) 229-7520 | |

*Counsel for Jacobs Engineering Group, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____          Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

---

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

## 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

Page

INTRODUCTION & SUMMARY OF ARGUMENT.................................... 1

BACKGROUND ............................................................. 4

    A.   The Beginning of This Lawsuit ................................. 4
    B.   The Bifurcation and Phase I Trial ........................... 5
    C.   Jacobs' Post-Trial and Certification Motions.......................... 8

ISSUE PRESENTED ................................................... 10

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................ 10

LEGAL STANDARD ................................................... 10

WHY THE WRIT SHOULD ISSUE................................... 12

I.   Jacobs' Seventh Amendment Rights Will Be Violated If This Case Proceeds.................................................. 12

    A.   The Phase I Jury's Findings Are Too Vague to Be Used by the Phase II Juries. ................................. 13
    B.   The Only Solution That Will Not Result in a Violation of Jacobs' Seventh Amendment Rights Is to Vacate the Phase I Verdict. ......................................... 20

II.   Mandamus Relief Is Necessary and Appropriate to Preserve Jacobs' Seventh Amendment Rights............................. 31

CONCLUSION & RELIEF SOUGHT....................................... 38

i

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  790 F.3d 641 (6th Cir. 2015).................................................................5

*Ashwander v. Tennessee Valley Authority*,
  297 U.S. 288 (1936)....................................................................... 36, 37

*Bauman v. U.S. Dist. Ct.*,
  557 F.2d 650 (9th Cir. 1977)..............................................................11

*Beacon Theatres, Inc. v. Westover*,
  359 U.S. 500 (1959).................................4, 12, 29, 32, 33, 34, 35, 36, 37

*In re Bendectin Liability Litig.*,
  749 F.2d 300 (6th Cir. 1984)..............................................................11

*Bittinger v. Tecumseh Prods. Co.*,
  123 F.3d 877 (6th Cir. 1997)..............................................................17

*Black v. Boyd*,
  248 F.2d 156 (6th Cir. 1957)................................................... 4, 32, 34

*Blyden v. Mancusi*,
  186 F.3d 252 (2d Cir. 1999) .......................13, 15, 16, 17, 21, 23, 24, 30

*Carr v. Wal-Mart Stores, Inc.*,
  312 F.3d 667 (5th Cir. 2002)..............................................................27

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996)................................................................22

*In re Cty. of Orange*,
  784 F.3d 520 (9th Cir. 2015)..............................................................12

*Dairy Queen, Inc. v. Wood*,
  369 U.S. 469 (1962)................................................. 1, 3, 12, 31, 32, 34

ii

*Ennix v. Clay*,
    703 S.W.2d 137 (Tenn. 1986)............................................................. 26

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
    283 U.S. 494 (1931)........................................................................ 18

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994)................................................................... 29, 30

*John B. v. Goetz*,
    531 F.3d 448 (6th Cir. 2008)....................................................... 10, 38

*In re Lee Way Holding Co.*,
    1992 WL 44845 (6th Cir. Mar. 4, 1992)............................................ 34

*In re Lott*,
    424 F.3d 446 (6th Cir. 2005).......................................................... 11

*Loughridge v. Chiles Power Supply Co., Inc.*,
    431 F.3d 1268 (10th Cir. 2005)....................................................... 27

*Martin v. Behr Dayton Thermal Products LLC*,
    896 F.3d 405 (6th Cir. 2018)....................................................... 36, 37

*Mays v. Tenn. Valley Auth.*,
    699 F. Supp. 2d 991 (E.D. Tenn. 2010) ............................................. 5

*In re Metro. Gov't of Nashville*,
    606 F.3d 855 (6th Cir. 2010)........................................................... 11

*Overstreet v. Shoney's, Inc.*,
    4 S.W.3d 694 (Tenn. Ct. App. 1999) ................................................. 26

*Parsons v. Bedford*,
    28 U.S. 433 (1830)................................................................... 33, 37

*Reliance Ins. Co. v. Liberty Mut. Ins. Co.*,
    497 S.W.2d 885 (Tenn. 1973).......................................................... 26

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995)................................ 17, 20, 22, 24, 32, 33

iii

*In re Syncora Guar. Inc.*,
  757 F.3d 511 (6th Cir. 2014).....................................................11, 31

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)...............................................................17

*In re Union Nacional De Trabajadores*,
  502 F.2d 113 (1st Cir. 1974) ...................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................29

*Wilburn v. Maritrans GP Inc.*,
  139 F.3d 350 (3d Cir. 1998) ...................................14, 19, 23

*Yearsley v. W.A. Ross Construction Co.*,
  309 U.S. 18 (1940)..................................................................5

## Constitutional Provisions

U.S. Const. amend. V ...............................................................29

U.S. Const. amend. VII ...............................................21, 22, 28

## Statutes

28 U.S.C. § 1292 ..................................................................9, 34

28 U.S.C. § 2072 ...............................................................27, 29

Tenn. Code Ann. § 20-9-503 ..............................................25, 26

## Other Authorities

1 Dan B. Dobbs et al., The Law of Torts (2d ed. 2011)...........15

20 Fed. Prac. & Proc. Deskbook (2d ed.)................................28

Steven S. Gensler, *Bifurcation Unbound*,
  75 Wash. L. Rev. 705 (2000) ...............................................16

2 Tenn. Cir. Ct. Prac. (2018) .................................................26

iv

## INTRODUCTION & SUMMARY OF ARGUMENT

Without this Court's immediate intervention, Jacobs' Seventh Amendment rights will be violated.  Mandamus relief is therefore appropriate and "necessary to protect the constitutional right to trial by jury." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472 (1962).

The constitutional problems in this case stem from good intentions. The parties and the district court faced a complex case brought by over 70 plaintiffs who assert widely disparate claims of various medical conditions resulting from their work on the cleanup of an unprecedented coal ash spill at a Tennessee Valley Authority plant.  The parties and the court adopted a bifurcation plan to streamline the proceedings.  It called for a Phase I jury to decide, among other questions, whether Jacobs breached any duties it allegedly owed to Plaintiffs.  If the jury found a breach, different Phase II juries would determine whether that breach (or breaches) specifically caused each Plaintiff's injuries and assess each Plaintiff's damages, if any.

A cornerstone of the bifurcation plan was that the Phase II juries would rely on the Phase I jury's findings to determine specific causation and damages.  For example, if the Phase I jury determined that Jacobs

1

breached its alleged duty of care by failing to provide respirators to workers, that fact would be told to the Phase II juries. Those juries would then decide whether the failure to provide respirators specifically caused an individual Plaintiff's harm and, if so, damages.

But that plan fell apart. While the district court instructed the Phase I jury to find in favor of Plaintiffs if they proved any one of their six different theories of breach, it refused—over Jacobs' objection—to ask the Phase I jury *which* of Plaintiffs' six theories had been proven by a preponderance of the evidence. Instead, the verdict form asked generally whether Jacobs "failed to adhere to the terms of its contract with TVA" or the "Safety and Health Plan," and whether it "failed to exercise reasonable care." DE 408, Page ID #12316–12319.

Because the six theories were absent from the verdict form, the Phase II juries have no way to determine specific causation and damages without a resulting violation of Jacobs' Seventh Amendment rights. To decide whether certain conduct caused an injury, the juries need to know what that conduct is. And filling in the blanks of the Phase I verdict form—*i.e.*, attempting to determine which theories the Phase I jury believed were proven—will necessarily require a reexamination of issues

2

from Phase I, thereby violating Jacobs' Seventh Amendment rights.  The juries in Phase II cannot re-decide how Jacobs breached its duties to Plaintiffs, as that would violate the reexamination clause.  And the district court cannot tell the Phase II juries that Plaintiffs proved all six, or any subset, of their theories of wrongdoing because there is no factual basis for that assertion.  The district court in that scenario would be both acting as a fact-finder and reexamining facts found by the Phase I jury, again violating the Seventh Amendment, now in two ways.

The district court created this quandary by denying Jacobs' proposed Phase I verdict form, yet the court refused to vacate the Phase I verdict, finding that remedy premature because "[n]o Seventh Amendment violation has occurred *yet*, and one will *probably* not occur in the future."  DE 462, Page ID #15991 (emphasis added).

Waiting until Jacobs' Seventh Amendment rights actually have been violated—when there is the chance to stop that violation before it occurs and is in the offing—is exactly what the law abhors.  As the Supreme Court has made clear, and as this Court has recognized, courts must "grant mandamus where necessary to protect the constitutional right to trial by jury" *before* the violation occurs.  *Dairy Queen*, 369 U.S.

3

at 472; *see also, e.g.*, *Black v. Boyd*, 248 F.2d 156, 160 (6th Cir. 1957). It is plainly not enough for a district court to plow ahead because it believes a Seventh Amendment violation "will *probably* not occur in the future." DE 462, Page ID #15991 (emphasis added). "'[A]ny *seeming curtailment* of the right to a jury trial should be scrutinized with the utmost care.'" *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501, 511 (1959) (emphasis added).

The Court should grant this petition and vacate the verdict from the Phase I trial.

## BACKGROUND

### A.    The Beginning of This Lawsuit

In December 2008 a containment dike at the Tennessee Valley Authority's Kingston Fossil Fuel Plant burst, spilling over five million cubic yards of coal ash onto surrounding land and into the Emory River. In the immediate aftermath of the spill, the Environmental Protection Agency placed TVA in charge of the coal-ash cleanup. And in February 2009 TVA hired Jacobs Engineering Group, Inc. to assist with managing the recovery and remediation efforts. Pretrial Order, DE 355, Page ID # 11024.

4

Plaintiffs here—individuals who worked on the cleanup and some of their family members—did not bring an action against TVA, presumably because TVA had previously been found immune for conduct related to its remediation efforts. *See Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 1033 (E.D. Tenn. 2010). Instead, many brought workers' compensation claims against their actual employers, the contractors that conducted the cleanup. When that proved unsuccessful, Plaintiffs sued Jacobs.

Jacobs moved to dismiss under Rule 12(b)(1), contending it was entitled to government-contractor immunity. *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 645 (6th Cir. 2015). The district court agreed, and the decision was appealed to this Court. This Court held that government-contractor immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), is not jurisdictional and remanded. *Adkisson*, 790 F.3d at 646–47.

### B.    The Bifurcation and Phase I Trial

Following remand, the parties agreed to a plan that would bifurcate and partially consolidate the negligence claims of approximately 70 Plaintiffs. Specifically, the parties and the court decided that there

5

would be two phases.  In Phase I, a single jury would decide "(1) whether [Jacobs] owed plaintiffs a legal duty; (2) whether [Jacobs] breached that duty; and (3) whether [Jacobs'] breach was capable of causing plaintiffs' alleged injuries." Bifurcation Order, DE 136, Page ID #3555.  If Plaintiffs proved each of those elements, the case would proceed to Phase II, in which new juries would decide "(1) specific causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages." *Id.*  The district court left open the question whether any of the cases would be consolidated for Phase II. *Id.*

The Phase I trial lasted three weeks.  When it began, Plaintiffs were pursuing thirteen different theories of how Jacobs allegedly violated its TVA contract and breached its duties to Plaintiffs.  Parties' Proposed Final Pretrial Order, DE 346, Page ID #10895–10897.  But by the end of trial, the district court found that just six of those theories of wrongdoing could be presented to the jury:  (1) whether Jacobs manipulated personal air-monitoring results; (2) whether it failed to inform TVA safety officials about workers' complaints regarding health problems due to fly ash; (3) whether Jacobs failed to comply with the safety and health plan's

6

provisions regarding the voluntary use of dust masks; (4) whether it threatened workers who asked for dust masks or respirators; (5) whether Jacobs told workers that fly ash was safe to consume; or (6) whether it failed to train or warn workers about the dangers of excessive fly ash exposure.  14 Trial Transcript, DE 424, Page ID #15347, 15349.

The district court noted that it was up to the jury to decide "[i]f Plaintiffs [had] prove[n] any of these six acts or omissions by a preponderance of the evidence."  *Id.* Page ID #15350.  But over Jacobs' objection, DE 422, Page ID #14966, the court did not require the jury to make a *specific* determination.  Instead, the verdict form *generally* asked whether Jacobs "failed to adhere to the terms of its contract with TVA" or the "Safety and Health Plan" and "failed to exercise reasonable care." DE 408, Page ID #12316–12319.  So while the jury collectively found that Jacobs failed to follow the terms of its contract and failed to exercise reasonable care in carrying out its alleged duties to the Plaintiffs in some vague sense, DE 425, Page ID #15369, only individual jurors—who were dismissed back in November 2018—know *how* each of them believed Jacobs had done so (*i.e.*, which theory or theories Plaintiffs proved).

7

## C.    Jacobs' Post-Trial and Certification Motions

Jacobs moved for a new trial, arguing it was impossible to tell which of the six theories of wrongdoing had persuaded the Phase I jurors.  DE 440, Page ID #15628–15632.  Jacobs demonstrated this was a problem because it would require one of two alternative results—either of which would violate Jacobs' constitutional rights.  Either the Phase II juries would have to decide anew how Jacobs violated its duties, in violation of the reexamination clause.  *Id.*  Or the district court would need to infer which theories the first jury had relied on and inform the Phase II juries, in violation of Jacobs' right to a jury trial *and* the reexamination clause. *Id.* Page ID #15629, 15632–15633.

The district court denied the motion because "[n]o Seventh Amendment violation has occurred yet, and one will probably not occur in the future."  DE 462, Page ID #15991.  The apparent basis for the district court's belief that a violation would "probably not occur" is that Phase I and Phase II juries will not be "tasked with determining literally the exact same factual issue." *Id.* Page ID #15983, 15991.  In other words, because the Phase II juries "will not be instructed to determine what of Jacobs's conduct constituted a breach of its duties to plaintiffs," there will

8

be "no fatal factual overlap between the issues tried" in the separate phases of the litigation.  *Id.* Page ID #15983–15984.

Relatedly, the court dismissed Jacobs' concerns that a "Phase II jury could potentially *find specific causation and damages for* exposures attributable to conduct for which the Phase I jury did not find negligence." *Id.* Page ID #15986.  Any "implicit inconsistency" among the verdicts of different juries, so the court's theory goes, could somehow be "reconciled" and "resolved in favor of effectuating liability." *Id.* Page ID #15986–15987.

Jacobs moved the district court for certification of an order for interlocutory appeal under 28 U.S.C. section 1292(b), asserting that whether a court may avoid a Seventh Amendment violation by reconciling the verdicts of different juries to "effectuate liability" could "materially affect the outcome of the case" and there are substantial grounds for differences of opinion with the district court.  DE 464, Page ID #16018.  The district court denied the motion.  DE 471, Page ID #16090, 16094.  Although it acknowledged Jacobs' Seventh Amendment rights are at stake, the court determined that the question of intervention "now or later is merely [one] of timing rather than substance." *Id.* Page

9

ID #16091.  The court also clarified that it "did *not* hold that the Seventh Amendment permits 'reconcil[ing]' the findings of different juries to 'effectuate liability'" but only that "it was a *possibility*."  *Id.* Page ID #16093 (emphasis added).

## ISSUE PRESENTED

Is mandamus relief appropriate to avoid an impending violation of the Seventh Amendment caused by a barebones verdict form in a bifurcated case with separate juries deciding different elements of the same claim for negligence?

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Jacobs requests oral argument to assist the Court in deciding whether the Court should prevent an impending violation of Jacobs' Seventh Amendment rights.

## LEGAL STANDARD

Mandamus relief is "generally reserved for 'questions of unusual importance to the economical and efficient administration of justice' or 'important issues of first impression.'" *John B. v. Goetz*, 531 F.3d 448, 457 (6th Cir. 2008).  Petitioners must show that the district court has

10

clearly abused its discretion.  *In re Metro. Gov't of Nashville*, 606 F.3d 855, 863 (6th Cir. 2010).

When deciding whether to grant mandamus relief under the All Writs Act, 28 U.S.C. § 1651, this Court considers five factors:

> (1) whether the party seeking the writ has adequate other means to attain the desired relief, (2) whether the petitioner will be irreparably damaged or prejudiced if the writ is not granted, (3) whether the district court's order is clearly erroneous as a matter of law, (4) whether the district court's order incorporates an oft-repeated error or manifests a persistent disregard of the federal rules, and (5) whether the district court's order raises new and important problems, or issues of law of first impression.

*In re Syncora Guar. Inc.*, 757 F.3d 511, 515 (6th Cir. 2014).  But the Court has "'never required that every element be met in order for mandamus to issue.'" *Id.* (quoting *In re Lott*, 424 F.3d 446, 449 (6th Cir. 2005)).  "'Rarely if ever will a case arise where all the guidelines point in the same direction.'" *In re Bendectin Liability Litig.*, 749 F.2d 300, 304 (6th Cir. 1984) (quoting *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 655 (9th Cir. 1977)).

Moreover, because the Supreme Court has long recognized that mandamus relief is required to protect a party's Seventh Amendment

11

rights, *Dairy Queen,* 369 U.S. at 472; *Beacon Theatres*, 359 U.S. at 511, the Ninth Circuit has wisely done away with the five factors, and held that it will "grant mandamus where necessary to protect the constitutional right to trial by jury.  If the plaintiffs are entitled to a jury trial, their right to the writ is clear." *In re Cty. of Orange*, 784 F.3d 520, 526 (9th Cir. 2015).

## WHY THE WRIT SHOULD ISSUE

## I.    Jacobs' Seventh Amendment Rights Will Be Violated If This Case Proceeds.

The verdict form in this case did not ask the jury which of Plaintiffs' six theories of wrongdoing the jury believed had been proven by a preponderance of the evidence.  That fatal flaw renders the Phase I verdict useless for determining specific causation and damages—and ultimately, liability—in Phase II.  But the district court has made it clear that unless this Court intervenes by granting mandamus relief, it will forge ahead with empaneling new juries for Phase II, which will necessarily lead to a violation of the Seventh Amendment.  Mandamus relief is therefore appropriate and "necessary to protect the constitutional right to trial by jury." *Dairy Queen*, 369 U.S. at 472.

12

**A.    The Phase I Jury's Findings Are Too Vague to Be Used by the Phase II Juries.**

The barebones verdict form urged by Plaintiffs and adopted by the district court makes it impossible for the Phase II juries to decide specific causation.  Contrary to Plaintiffs' unsupported claims, the Phase II juries cannot be "left in the dark as to which actions toward which plaintiffs had been found to be" negligent and then "expect[]" the second jury to do the "unfathomable"—deduce whether that unknown wrongdoing caused a specific harm and assess the quantity of that harm. *Blyden v. Mancusi*, 186 F.3d 252, 267 (2d Cir. 1999).

1.    To prevail in this case, Plaintiffs must ultimately prove five separate elements:   (1) Jacobs breached its contract with the TVA; (2) Jacobs' breach (or breaches) also constituted a breach of the duty of care Jacobs owed to Plaintiffs; (3) that breach (or breaches) was capable of causing Plaintiffs' injuries; (4) that breach (or breaches) specifically caused each individual plaintiff's injuries; and (5) that breach (or breaches) caused damages.  DE 136, Page ID #3555; *see also* Plaintiffs' Proposed Jury Instructions, DE 353, Page ID #11005–11010.   As explained above, the Phase I jury was supposed to answer the first three

13

questions, while the Phase II juries would rely on the first jury's findings to determine the final two.

The Phase I verdict form *does* tell us the jury found that (1) Jacobs breached its contract with the TVA; (2) the breach constituted a breach of a duty of care Jacobs owed to Plaintiffs; and (3) the breach was capable of causing the Plaintiffs' injuries. But it is missing the all-important "how." Plaintiffs were only allowed to go to the jury on six discrete theories of liability. DE 424, Page ID #15347, 15349. As the court's instructions make crystal clear, the jury was *not* allowed to determine just that Jacobs was negligent in a general sense; it had to find that Jacobs had been negligent by committing one or more specific "six acts or omissions" listed. *Id.* Page ID #15347–15351.

Yet the district court's barebones verdict form makes it "impossible … to decide which theory [or theories] of liability persuaded the jury." *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 366 (3d Cir. 1998). The jury could have agreed with one of those six disparate theories, or all of them. There is simply no way to tell. Instead, the final verdict indicated only that Jacobs failed to exercise reasonable care in some unknown way. DE 408, Page ID #12316–12317. As a result, if the

14

litigation is allowed to proceed, the Phase II juries will be "left in the dark as to" which of the theories of wrongdoing have been proven by a preponderance of the evidence. *Blyden*, 186 F.3d at 267.

Because no one other than the dismissed Phase I jurors can know which of the Plaintiffs' theories they believed (assuming they even agreed on a single theory), the Phase I verdict is useless for deciding liability in the Phase II trials. Black-letter law and common sense dictate that in order to determine whether some wrongdoing specifically caused an injury, one must know what that wrongdoing was. *See* 1 Dan B. Dobbs et al., The Law of Torts § 183 (2d ed. 2011) ("The factual cause rule requires the plaintiff to prove that the defendant's *conduct* caused legally recognized damages." (emphasis added)); *id.* § 190 ("[T]he plaintiff's case on the negligence issue directly affects her case on the causal issue."). Without that crucial information—information absent from this verdict form—new juries would be left to do the "unfathomable": deduce whether *unknown* wrongdoing caused specific harm and assess the damages resulting from that *unknown* wrongdoing. *Blyden*, 186 F.3d at 267.

*Blyden* exemplifies the problem, and offers the remedy. There, the district court bifurcated the issues of liability and damages in a

15

constitutional tort case involving prison guards' actions after quelling a riot. *Id.* at 257–58. The court asked the first-phase jury to determine whether guards under a supervisor's control engaged in "reprisals" against the prisoners after retaking control of the prison. *Id.* at 259. But the verdict form did not ask that jury to indicate *which* reprisals plaintiffs proved. *Id.* at 260. So the court could not give the second-phase juries "a list of acts constituting 'reprisals'" and then ask them to "award damages to particular plaintiffs injured by" particular reprisals. *Id.* at 268. It was impossible for the second-phase juries to do their job, and a new trial was warranted. *See id.*

This is why in a bifurcated case with different juries like this one, the Second Circuit has held that the verdict form from the first phase of trial must "ask the jury to specify which acts were found to be [negligent] and which were not." *Id.* It is well established that in bifurcated cases with different juries, the "court must carefully craft the verdict form for the first jury so that the second jury knows what has been decided already." Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705, 736–37 (2000).

16

As the Seventh Circuit explained in a products liability class action, a "district judge must carve at the joint" in fashioning bifurcated proceedings. *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995). After all, when faced with the risk that a party's basic constitutional rights will be trampled by procedural shortcuts, the law mandates "'crisp rules with sharp corners.'" *Taylor v. Sturgell*, 553 U.S. 880, 901 (2008) (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 881 (6th Cir. 1997)).

Because the district court, over Jacobs' objection, failed to "ask the jury to specify which acts were found to be [negligent] and which were not," the Phase I verdict must be vacated. *Blyden*, 186 F.3d at 267.

2.    Plaintiffs argued, and the district court apparently agreed, that despite *Blyden, Rhone-Poulenc Rorer*, and Professor Gensler's guidance, the juries in the second phase do not need to know which of the six theories the first jury believed. According to Plaintiffs, the second-phase juries can just be told that Jacobs breached a duty because "[a]ny one (or all) of [Jacobs'] breaches resulted in Plaintiffs' exposure to potentially harmful levels of fly ash or constituent elements found in fly ash." Opposition to New Trial Motion, DE 451, Page ID #15702.

17

Plaintiffs proclaimed that "[t]here are *no facts* concerning immunity, breaches of duties, or general causation necessary for proof of specific causation and damages in Phase II." *Id.* Page ID #15701 (emphasis added).

But this argument defies common sense. Pick your favorite example. If a jury in a products liability action is asked to determine whether a defect in an automobile caused a crash, the jury needs to know what the defect is. Similarly, if a jury is asked to "fix the amount of damages" from a breach of contract, they need to know what the breach was—*i.e.*, how the opposing party breached the contract. *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 499–500 (1931).

Not surprisingly, the Phase II juries must also know the all-important *how* to determine specific causation and damages in this case. Specifically, they need to know *how* Jacobs breached its duties, not just that Jacobs breached some unspecified duty, as the cases of two of the Plaintiffs, Mr. Brewer and Mr. Wilkinson, vividly demonstrate. One of Plaintiffs' six theories of liability is that Jacobs failed to comply with the provisions of the safety and health plan regarding the voluntary use of dust masks. But it is undisputed that Mr. Brewer was allowed to wear a

18

dust mask while working on the cleanup, DE 414, Page ID #12963, and it is undisputed that Mr. Wilkinson's preexisting medical conditions *prevented* him from wearing a dust mask or respirator, DE 455, Page ID #15772. Put differently, regardless of whether Jacobs breached its duty with respect to the voluntary use of dust masks, Mr. Brewer was wearing one already, and Mr. Wilkinson could not wear one, so that breach could not have caused any of their injuries.

Yet it is entirely possible that the *only* theory of wrongdoing the Phase I jury decided was proven by a preponderance of the evidence was that Jacobs failed to allow the voluntary use of dust masks. In that scenario, *even if* Plaintiffs proved that Mr. Brewer and Mr. Wilkinson had diseases caused by fly ash exposure, they could not recover because the *only* breach found by the first jury—that Jacobs failed to allow voluntary use of dust masks—would not apply to them. If we knew that the only breach the Phase I jury found related to the voluntary use of dust masks, Jacobs could move for summary judgment against Mr. Brewer and Mr. Wilkinson. But it is "impossible" to know that case-decisive information because of the barebones verdict form. *Wilburn*, 139 F.3d at 366.

19

\*        \*        \*

The district court's bifurcation plan hinges on the ability of the Phase II juries to rely on the Phase I jury's breach, duty, and general causation findings to determine specific causation and harm.  In presenting a barebones verdict form to the Phase I jury, the court failed to "carve at the joint."  *Rhone-Poulenc Rorer*, 51 F.3d at 1302.  Reliance on the Phase I verdict is thus impossible.

## B.    The Only Solution That Will Not Result in a Violation of Jacobs' Seventh Amendment Rights Is to Vacate the Phase I Verdict.

That the Phase II juries will have no way to know which of the six negligence theories Plaintiffs proved in Phase I is an intractable problem.  No one—not the district court, not Jacobs, and certainly not Plaintiffs—has been able to propose a solution, short of the unrealistic option of impaneling the Phase I jury more than six months after it was excused, that would comply with the Seventh Amendment.

As explained below, if the Phase II juries are allowed to decide for themselves what Jacobs supposedly did wrong, that will violate the Seventh Amendment's reexamination clause.  If the district court steps in to decide for itself which theory of wrongdoing the first jury believed,

20

that would violate Jacobs' Seventh Amendment right to a jury trial as well as the reexamination clause.  And if the district court resurrects its plan to "reconcile" the verdicts of different juries, that would not only strip Jacobs of its right to a jury and violate the reexamination clause, but also violate Jacobs' due process rights and the Rules Enabling Act.

1.    The juries in Phase II cannot determine for themselves the necessary specifics of *how* Jacobs allegedly breached its duties of care because that would violate the Seventh Amendment.  Specifically, the district court cannot tell the juries in Phase II that they must assume Jacobs committed some wrongdoing capable of causing Plaintiffs' harms (given the Phase I verdict), and let the juries determine for themselves which of the six theories they believe.

This approach would run headlong into the Seventh Amendment, which provides that "no fact tried by a jury[] shall be otherwise reexamined in any Court of the United States."  U.S. Const. amend. VII.  It is, of course, permissible for "issues [to] be divided and tried separately" without violating the Seventh Amendment.  *Blyden*, 186 F.3d at 268.  "[B]ut a given issue may *not* be tried by different, successive juries."  *Id.* (emphasis added).  A fact found by a first jury cannot be "reexamined" by

21

a second fact-finder, whether judge or jury.  U.S. Const. amend. VII; *Rhone-Poulenc Rorer*, 51 F.3d at 1302–03; *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750–51 (5th Cir. 1996).  Rather, the findings of one jury must be clear and stand on their own so that a second (or subsequent) jury can rely upon them.

In *Rhone-Poulenc Rorer*, the Seventh Circuit granted mandamus relief to defendants in a products liability case involving 400 plaintiffs— before the first trial even got under way—to stop an impending violation of the reexamination clause.  The district court's procedure in that case would have instructed the first jury to examine foreseeability and proximate causation to determine negligence, while later juries would reexamine foreseeability and proximate causation to determine comparative negligence.  *Rhone-Poulenc Rorer*, 51 F.3d at 1303.  The Seventh Circuit held that plan was "inconsistent with the [Seventh Amendment] principle" that "the findings of one jury are not to be reexamined by a second, or third, or $n$th jury." *Id.*

The Second Circuit's decision in *Blyden* also illustrates the danger of allowing a later jury reexamine the findings of an earlier one.  The district court there asked the first-phase jury to determine whether

22

guards under the supervisor's control engaged in "reprisals," but the jury did not decide *which* reprisals the plaintiffs actually proved. *Blyden*, 186 F.3d at 269–70. Accordingly, while the second-phase jurors could be told "that there had been 'reprisals,'" they were "left free to determine whether any particular act constituted a 'reprisal' … without regard to how the [first-phase] jury viewed that particular act." *Id.* at 269. Reversing and ordering a new trial, the Second Circuit held that because the vague first-phase verdict form required the second-phase jury to determine again which reprisals occurred, "[t]his procedure clearly violated the Seventh Amendment." *Id.* at 268–69.

In sum, allowing the Phase II juries to decide how Jacobs breached its duties so they can determine specific causation and damages is no solution at all.

2.     Additionally, the district court cannot tell the Phase II juries that the first jury found that *all* or some portion of Plaintiffs' six theories had been proven by a preponderance of the evidence.

As an initial matter, it is "impossible" to decipher which theory or theories were proven. *Wilburn*, 139 F.3d at 366. The district court's instructions were clear: the Phase I jury could find that Plaintiffs proved

23

"by a preponderance of the evidence that *any* of" their six theories of wrongdoing "did, in fact, occur." DE 424, Page ID #15348 (emphasis added); *id.* Page ID #15350. Removing any doubt, those same instructions listed Plaintiffs' six theories of wrongdoing in the disjunctive, using the word "or." *Id.* Page ID #15347, 15349, 15351. Any "assumption[s]" about what the Phase I jury found would thus be "entirely conjectural" and inappropriate. *Blyden*, 186 F.3d at 267.

Worse still, if the district court concludes that Plaintiffs proved all six or some subset of the theories, it would violate the Seventh Amendment in *two* ways. The district court would become the de facto fact-finder, depriving Jacobs of its right to have a jury—not a judge—determine liability. In that scenario, the court would decide which of Plaintiffs' six theories had been proven by a preponderance of the evidence. Moreover, stepping into that fact-finding role would also violate the reexamination clause. Just as a second jury cannot reexamine fact findings of an earlier jury, neither can a judge. *Rhone-Poulenc Rorer*, 51 F.3d at 1303. Indeed, the constitutional violation "would be obvious if the second finder of fact were a judge." *Id.*

24

3.      Finally, what the district court now labels a "possibility" for purportedly solving these challenges cannot come to fruition without violating Jacobs' constitutional rights:  allowing the case to proceed to Phase II trials and using Tennessee's general verdict statute (Tenn. Code Ann. § 20-9-503) to reconcile the verdicts of different juries.  In denying Jacobs' new trial motion, the district court suggested that it could tell the Phase II juries that "Jacobs breached duties owed to plaintiffs, resulting in exposure that was capable of [causing] the alleged diseases" and ask those juries to decide "whether an individual plaintiff['s] exposure actually did cause the plaintiff['s] disease, and if so, the resulting damages."  DE 462, Page ID #15982.  According to the court, it could then "reconcile[]" the separate verdicts—by applying "Tennessee's general verdict statute" and asking whether "a reasonable Phase I jury could have found an accordant duty, breach, and general causation"—to "effectuate liability."  *Id.* Page ID #15987–15990.

The problems with this purported "solution" are myriad.  First, Tennessee's general verdict statute has no application to this case because the barebones verdict form was not a "general verdict" as the statute understands that term.  "A general verdict states who won a case

25

(and sometimes how much was won) but does not otherwise express the jury's specific fact findings." 2 Tenn. Cir. Ct. Prac. § 26:3 (2018); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 714 (Tenn. Ct. App. 1999). And only because a general verdict indicates that one party won conclusively does the law indulge the assumption that the jury found in its favor on "every issue." Tenn. Code Ann. § 20-9-503; *Reliance Ins. Co. v. Liberty Mut. Ins. Co.*, 497 S.W.2d 885, 887 (Tenn. 1973).

But here, the Phase I jury has not determined overall liability, and the Phase II juries will be asked only whether Plaintiffs have proven "(1) specific causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages." DE 462, Page ID #15981–15982. There will thus *never* be a single jury verdict indicating "who won" the case from which the court could extrapolate more specific findings.[1]

---

[1] Even if there were a general verdict in this case, it would be improper to apply Tennessee's general verdict statute to a bifurcated proceeding with two different juries when Tennessee requires "all issues of material fact in dispute [be] submitted to the *same jury*." 2 Tenn. Cir. Ct. Prac. § 26:3 (2018) (emphasis added); *see Ennix v. Clay*, 703 S.W.2d 137, 139 (Tenn. 1986).

26

Moreover, the idea that the district court can "reconcile" verdicts is a nonstarter because it is impossible to know what the jury in Phase I found. If the district court knew, for example, that the Phase I jury agreed with Plaintiffs' negligence theories #1 and #2, and a Phase II jury agreed with theories #2 and #3, perhaps a court could "reconcile" those and find liability on theory #2. But, again, we do not have the necessary information. There were no "special interrogatories" on what the Phase I jury found about Plaintiffs' six theories of liability that could be used to "reconcile" that verdict with what the Phase II juries may find. And it is well established that a court cannot create consistency through "nothing more than pure speculation." *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 674–75 (5th Cir. 2002); *see also Loughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1287 (10th Cir. 2005). To do so is "tantamount to a bench trial in violation of [the party's] right under the Seventh Amendment to a trial by jury." *Carr*, 312 F.3d at 675.

Worse, the district court's "possibility" of reconciling the findings of different juries would violate the Seventh Amendment, due process, and the Rules Enabling Act. The district court proposed that if a Phase II jury finds specific causation and damages based on any of Plaintiffs' six

27

theories, it would then ask whether "a reasonable Phase I jury *could have found* an accordant duty, breach, and general causation." DE 462, Page ID #15989–15990; *see also id.* Page ID #15988. To determine whether the jury "could have found" a given theory, the district court stated it would ask whether there is "a legally sufficient evidentiary basis" for a finding. *Id.*

But that proposal violates the Seventh Amendment jury right because *the court*, not the jury, would determine whether Plaintiffs proved duty, breach, and general causation with respect to the six theories of liability. Jacobs has a constitutional right to have a jury—not a judge—determine every element before liability is established. U.S. Const. amend. VII.

Moreover, in "reconcil[ing]" the verdicts the district court would also violate the Seventh Amendment by reexamining what the first jury found. Just because the jury "could have found" that one or more of Plaintiffs' theories had been proven does not mean it actually did. Far from it—that is why we have trials when summary judgment is denied. 20 Fed. Prac. & Proc. Deskbook § 105 (2d ed.).

28

The district court's proposal also violates the Due Process Clause and Rules Enabling Act because it lowers the burden of proof. Instead of asking whether Plaintiffs have proven by a preponderance of the evidence duty, breach, and general causation with respect to Plaintiffs' theories of liability, the district court proposes to examine only whether there is a "sufficient evidentiary basis" for each of those theories. DE 462, Page ID #15988. Yet Jacobs can be held liable only if Plaintiffs prove each and every element by a *preponderance of the evidence*. In an attempt to rectify the problem of a barebones verdict form in a bifurcated trial, the district court cannot reduce the burden of proof—thereby violating due process and the Rules Enabling Act—because no rule of procedure can "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), or deprive a party of its "defenses." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *see also Beacon Theatres*, 359 U.S. at 509–10 & n.16.

Trial courts are, of course, not categorically barred from developing novel procedures to meet the needs of a case. But the Supreme Court "has stated from its first due process cases, traditional practice provides a touchstone for constitutional analysis." *Honda Motor Co. v. Oberg*, 512

29

U.S. 415, 430 (1994). Experimental procedures that do away with longstanding safeguards must therefore provide "similar substitute … protection." *Id.* at 431. In *Honda*, for example, Oregon had done away with judicial review of punitive damages awards—a longstanding common-law protection against potential juror bias. *Id.* at 431–32. Oregon was permitted to do that, *so long as* it swapped in alternative safeguards. Because it had not, the absence of judicial review constituted a due process violation. *Id.* at 432. Likewise here, the district cannot lower the burden of proof to accommodate a novel attempt to save a barebones verdict form in a case with different juries deciding different elements of a negligence claim. To do so would violate due process.

*      *      *

Because the district court refused, over Jacobs' objection, to "ask the [Phase I] jury to specify which acts were found to be [negligent] and which were not," a violation of the Seventh Amendment is inevitable unless this Court intervenes and vacates the Phase I verdict. *Blyden*, 186 F.3d at 268.

30

## II.    Mandamus Relief Is Necessary and Appropriate to Preserve Jacobs' Seventh Amendment Rights.

Given the impending violation of the Seventh Amendment and the fact that Jacobs has "'no other adequate means'" to obtain relief, this Court should grant mandamus relief and vacate the Phase I verdict. *Syncora*, 757 F.3d at 516. Jacobs has done all it can to avoid this outcome. Before seeking a writ, it properly raised the impending violation of its constitutional right in a motion for a new trial, and when that was denied, it followed the "'better practice'" of promptly asking the district court to certify the order for interlocutory review. *Id.* at 516 n.2. That, too, was denied.

The only remaining remedy available to Jacobs is a writ of mandamus from this Court. As the Supreme Court has explained, mandamus relief is "necessary to protect the constitutional right to trial by jury." *Dairy Queen*, 369 U.S. at 472. And the district court's wait-and-see approach is contrary to a wealth of authority recognizing that relief is warranted *before* the violation occurs.

1.    The Supreme Court, this Court, and other circuits have long held that "the right to grant mandamus to require jury trial where it has

31

been improperly denied is settled." *Beacon Theatres*, 359 U.S. at 511; *Dairy Queen*, 369 U.S. at 472; *Black*, 248 F.2d at 160; *Rhone-Poulenc Rorer*, 51 F.3d at 1302–03.  Although an order violating a party's rights under the Seventh Amendment "is subject to appellate review" in the normal course "after a final judgment," the "right of trial by jury presents such an exceptional situation as to call for the issuance of a mandamus to review the ruling." *Black*, 248 F.2d at 159–60.

Even "when the decision whether [the jury] right exists is a close or complicated one," "there is no doubt that mandamus is appropriate if a jury trial is being wrongfully denied." *In re Union Nacional De Trabajadores*, 502 F.2d 113, 115–16 (1st Cir. 1974), *rev'd on other grounds*, 527 F.2d 602 (1st Cir. 1975).  This is because "'[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'" *Beacon Theatres*, 359 U.S. at 501.

As explained above, the barebones verdict form has resulted in an impending violation of the Seventh Amendment's reexamination clause or the right to a jury trial (or both).  Both of these provisions of the

32

Seventh Amendment fall squarely within the "traditional office of the writ of mandamus." *Rhone-Poulenc Rorer*, 51 F.3d at 1303.  Although there are certainly more cases about the core jury right, the Supreme Court explained long ago that the reexamination clause is even "more important" because it prevents courts from running roughshod over jury determinations. *Parsons v. Bedford*, 28 U.S. 433, 447–48 (1830).

Simply put, it is "settled" that the issues raised in this petition are the proper subject of mandamus review. *Beacon Theatres,* 359 U.S. at 511.

2.    Despite this well-settled precedent, the district court held that granting a new trial now to avoid an impending Seventh Amendment violation is "premature" because "[t]here is clearly no Reexamination Clause violation right now" and any potential violation "will more appropriately be analyzed on a fully developed record."  DE 462, Page ID #15973, 15981, 15983.

Although the district court also believes a violation of the Seventh Amendment "will probably not occur in the future," it has since retracted its view that the district court could "reconcile[]" findings of the different juries without violating the Seventh Amendment.  *Id.* Page ID #15987,

33

15991.  The district court made clear in its order denying certification for interlocutory review that it has not intervened because it believes "it [is] not prudent to decide that complex issue, without a complete record, and before it is necessary to do so"—*i.e.*, before the violation has occurred.  DE 471, Page ID #16093.

The district court's wait-and-see approach is contrary to over fifty years of Supreme Court and Sixth Circuit precedent.  In *Beacon Theatres*, the Supreme Court did not wait for a "complete record" showing the defendant had been stripped of his right to a jury trial.  It granted mandamus relief *before* the trial and *before* the violation of the Seventh Amendment.  *Beacon Theatres*, 359 U.S. at 501, 508.  Likewise in *Dairy Queen*, the Supreme Court granted mandamus relief *before* the trial and thus *before* the Seventh Amendment violation.  369 U.S. at 470, 472.  So too in this Court's decisions in *Black* and *In re Lee Way Holding Co.*  In both cases, this Court granted interlocutory relief *before* the trial and any Seventh Amendment violation.  *Black*, 248 F.2d at 158, 160 (mandamus); *In re Lee Way Holding Co.*, 1992 WL 44845, at *1 (6th Cir. Mar. 4, 1992) (on 28 U.S.C. § 1292(b) review).

34

*Beacon Theatres*, in particular, refutes the district court's wait-and-see approach. There, the district court decided it would hold a bench trial on "equitable issues" and hold a jury trial on legal claims under the Sherman Antitrust Act later. *Beacon Theatres*, 359 U.S. at 503–04. The "effect" of this procedure was the *potential* for "res judicata or collateral estoppel" "to limit the [defendant's] opportunity fully to try to a jury every issue," in the second trial. *Id.* Collateral estoppel and res judicata may not have ultimately affected the defendant's right in *Beacon Theatres*, if for example, the defendant won the first trial. But the Supreme Court *still* granted mandamus relief after the Court of Appeals had refused to because "[t]he right to trial by jury as declared by the Seventh Amendment … shall be preserved [] inviolate." *Id.* at 510.

Here, the district court indicated that the possibility that a violation of the Seventh Amendment will not occur warrants waiting to see what happens. But it has never explained how it believes a violation can be avoided other than its equivocal "proposal" to "reconcile" the verdicts. The district court also believes "[t]houghtful Phase II jury instructions and evidentiary rulings will likely prevent a Seventh Amendment violation." DE 462, Page ID #15981–15982. But no one—

35

not Plaintiffs, not the district court, nor Jacobs, for that matter—has any idea what "instructions and evidentiary rulings" could avoid that violation.  And even if the district court is right that an unearthed solution to this problem may exist, *Beacon Theatres* still instructs this Court to intervene in order to protect Jacobs' "inviolate" rights.  359 U.S. at 510.  Even the district court recognizes that there *is* a distinct possibility of a Seventh Amendment violation.  *See* DE 462, Page ID #15990–15991 (A "Seventh Amendment violation … *will probably not occur in the future.*" (emphasis added)).  In fact, it is a certainty given the court's rulings.

The district court's reliance on Justice Brandeis's concurrence in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936), and this Court's decision in *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018), further confirms that the district court has failed to properly examine this issue concerning Jacobs' constitutional rights.

Justice Brandeis's concurrence is about "refrain[ing] from passing upon the constitutionality of an act of Congress" because of the "great gravity and delicacy" involved in that endeavor.  *Ashwander*, 297 U.S. at

36

341, 345.  There are no concerns here about the separation of powers, nor is this a question of statutory interpretation.  The constitutional concern here strikes at the heart of the court's duty to ensure that a party's Seventh Amendment rights—"a fundamental guarantee of the rights and liberties of the people"—are respected through the trial procedures it adopts.  *Parsons*, 28 U.S. at 446.  And as *Beacon Theatres* makes clear, even the mere *possibility* of a Seventh Amendment violation warrants immediate relief.  359 U.S. at 508.  That is because, again, "[t]he trial by jury is justly dear to the American people" and "has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy."  *Parsons*, 28 U.S. at 434.  This is worlds away from navigating the "delica[te]" dance of three co-equal branches of government.  *Ashwander*, 297 U.S. at 345.

*Martin* also lends no support to the district court's wait-and-see-if-there-is-a-constitutional-violation approach.  There, the Sixth Circuit declined to reverse class certification based on concerns that the potential use of a "Special Master" would violate the defendant's jury trial right.  *Martin*, 896 F.3d at 410, 416–17.  But the district court had not "settled on a specific procedure":  the Special Master was just "one option."  *Id.* at

37

417. Here, in contrast, the district court has issued two orders explaining that this case *will proceed* to Phase II trials with new juries. Phase II trials are not an "option" anymore but an inevitability.

Indeed, mandamus relief is available for cases precisely like this one which raise "'questions of unusual importance'" and where "'the economical and efficient administration of justice'" is at stake. *John B. v. Goetz*, 531 F.3d 448, 457 (6th Cir. 2008). The parties should not be forced to embark on discovery, motion practice, and potentially dozens of Phase II trials only to see their efforts nullified because of an imminent, and eminently foreseeable, constitutional violation. Further, without knowing *what* breach or breaches the Phase I jury found, the parties will have to make their best guesses on how to fill in the blanks just to prepare for the Phase II jury trials. The time has come for this Court to intervene and vacate the Phase I verdict.

## CONCLUSION & RELIEF SOUGHT

Absent this Court's intervention, Jacobs' Seventh Amendment rights will be violated. The Court should grant this mandamus petition, and vacate the Phase I verdict.

38

Dated:  May 10, 2019                Respectfully submitted,

                                    /s/ Theodore J. Boutrous, Jr.
                                    Theodore J. Boutrous, Jr.
                                    Theane Evangelis
                                    Jeremy S. Smith
                                    Jessica Benvenisty
                                    GIBSON, DUNN & CRUTCHER LLP
                                    333 South Grand Avenue
                                    Los Angeles, California 90071-3197
                                    Telephone:  (213) 229-7000
                                    Facsimile:  (213) 229-7520
                                    Email:  TBoutrous@gibsondunn.com

                                    James F. Sanders
                                    J. Isaac Sanders
                                    NEAL & HARWELL, PC
                                    1201 Demonbreun Street
                                    Suite 1000
                                    Nashville, Tennessee 37203
                                    Telephone:  (615) 244-1713
                                    Facsimile:  (615) 726-0573

                                    *Counsel for Jacobs Engineering Group,
                                    Inc.*

39

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,742 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in New Century Schoolbook, size 14.


Dated:  May 10, 2019

40

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2019, the foregoing Petition and Record Materials Essential to Understand Matters Set Forth in the Petition were filed with the Clerk of Court.  A copy of the Petition and Record Materials will be served via electronic mail and overnight mail upon the following:

Gary A. Davis
DAVIS & WHITLOCK, PC
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone:  (828) 622-0044
Email:  gadavis@enviroattorney.com

James S. Whitlock
DAVIS & WHITLOCK, PC
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone:  (828) 622-0044
Email:  jwhitlock@enviroattorney.com

Jeff Friedman
FRIEDMAN, DAZZIO, ZULANAS & BOWLING, P.C.
3800 Corporate Woods Drive
P.O. Box 43219
Birmingham, AL 35242
Telephone:  (205) 278-7000
Email:  jfriedman@friedmanleak.com

Keith D. Stewart
Stewart Dupree, PA
625 Market Street, 14th Floor
Knoxville, TN 37902
Telephone: (865) 437-5081
Email: keithdstewart@gmail.com

John B. Dupree
BRIDGEFRONT LAW GROUP, PLLC
616 W. Hill Avenue, 2nd Floor
Knoxville, TN 37902
Telephone: (865) 223-5184
Email: johnbdupree14@gmail.com

John Tyler Roper
THE ROPER LAW FIRM
625 Market Street
Knoxville, TN 37902
Telephone: (865) 888-9995
Email: TylerRoperlaw@gmail.com

James K. Scott
JAMES K. SCOTT ASSOC., P.A.
713 Market Street
Knoxville, TN 37902
Telephone: (865) 254-8739
Email: jimscott264@gmail.com

Counsel for Plaintiffs in Case No. 3:13-CV-505; No. 3:13-CV-00666; No. 3:14-CV-00020; No. 3:15-CV-00017; No. 3:15-CV-00274; No. 3:15-CV-00420; No. 3:15-CV-00460; No. 3:15-CV-00462; No. 3:16-CV-00635; No. 3:16-CV-00636 (consolidated).

I further certify that a copy of the Petition and Record Materials

will be served via electronic mail and overnight mail upon:

>    Hon. Thomas A. Varlan
>    Howard H. Baker, Jr. United States Courthouse
>    800 Market Street, Suite 130
>    Knoxville, Tennessee 37902
>    Lori_Gibson@tned.uscourts.gov
>    Cason_Hewgley@tned.uscourts.gov

Dated:  May 10, 2019               Respectfully submitted,

                                   /s/ Daniel Rubin
                                   Daniel Rubin

43

No. _____

_____

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

## *IN RE JACOBS ENGINEERING GROUP, INC., PETITIONER.*

_____

**On Petition for Writ of Mandamus from the United States District Court for the Eastern District of Tennessee at Knoxville Case No. 3:13-CV-505; No. 3:13-CV-00666; No. 3:14-CV-00020; No. 3:15-CV-00017; No. 3:15-CV-00274; No. 3:15-CV-00420; No. 3:15-CV-00460; No. 3:15-CV-00462; No. 3:16-CV-00635; No. 3:16-CV-00636 (consolidated)**

_____

## RECORD MATERIAL ESSENTIAL TO UNDERSTAND MATTERS SET FORTH IN PETITION FOR WRIT OF MANDAMUS

_____

Theodore J. Boutrous, Jr.*
Theane Evangelis
Jeremy S. Smith
Jessica Benvenisty
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

James F. Sanders
J. Isaac Sanders
NEAL & HARWELL, PC
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573

*Counsel for Jacobs Engineering Group, Inc.*

**RECORD MATERIAL INDEX**

| Tab | Docket Entry Number | Document |
|:---:|:---:|:---|
| **A** | **462** | The District Court's Memorandum Opinion & Order Denying Jacobs' Post-Trial Motions |
| **B** | **471** | The District Court's Order Denying Jacobs' Motion for Certification of Interlocutory Appeal |
| **C** | **352** | Jacobs' Proposed Special Jury Instructions and Verdict Form |
| **D** | **424** | 14 Trial Transcript: The District Court's Final Jury Instructions |
| **E** | **408** | The Jury Verdict |

# TAB A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

GREG ADKISSON, et al.,                         )
      Plaintiffs,                          )
v.                                             )     No.:   3:13-CV-505-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
_____            )     *Lead case consolidated with*
KEVIN THOMPSON, et al.,                         )
      Plaintiffs,                          )
v.                                             )     No.:   3:13-CV-666-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
_____            )     *as consolidated with*
JOE CUNNINGHAM, et al.,                         )
      Plaintiffs,                          )
v.                                             )     No.:   3:14-CV-20-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
                                               )
_____

BILL ROSE,                                     )
      Plaintiff,                           )
v.                                             )     No.:   3:15-CV-17-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
_____            )
CRAIG WILKINSON, et al.,                        )
      Plaintiffs,                          )
v.                                             )     No.:   3:15-CV-274-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
_____            )
ANGIE SHELTON, as wife and next of kin  )
on behalf of Mike Shelton, et al.,              )
      Plaintiffs,                          )
v.                                             )     No.:   3:15-CV-420-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,                )
      Defendant.                           )
_____            )

JOHNNY CHURCH,                          )
     Plaintiff,                          )
v.                                      )        No.:    3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
     Defendant.                          )
_____ )
DONALD R. VANGUILDER, JR.,              )
     Plaintiff,                          )
v.                                      )        No.:    3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
     Defendant.                          )
_____ )
JUDY IVENS, as sister and next of kin,  )
on behalf of JEAN NANCE, deceased,      )
     Plaintiff,                          )
v.                                      )        No.:    3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
     Defendant.                          )
_____ )
PAUL RANDY FARROW,                      )
     Plaintiff,                          )
v.                                      )        No.:    3:16-CV-636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
     Defendant.                          )
_____ )

## <u>MEMORANDUM OPINION & ORDER</u>

A chess game between grandmasters Friedrich Sämisch and Aron Nimzowitsch, played in Copenhagen in 1923, is called the "Immortal Zugzwang Game." Zugzwang, a German word roughly translated as "compulsion to move," refers to a situation in chess where a player's obligation to move results in a serious and often decisive disadvantage, because each possible move puts the player in a worse position than the one occupied at the beginning of the turn.[1]

---

[1] Edward Winter, *Zugwang* (1997), http://www.chesshistory.com/winter/extra/zugzwang.html.

2

Defendant Jacobs Engineering Group (Jacobs) now argues, after a four-week Phase I jury trial, that it must receive a new one or else Phase II will eventually turn into exactly the kind of lose-lose situation epitomized by zugzwang. Jacobs's argument goes like this: either the Phase II juries reexamine the negligence of its conduct in violation of its Seventh Amendment rights, or else any potential judgment against Jacobs will be deficient as a matter of law for not establishing the required link between any plaintiffs' purported disease-causing exposure and Jacobs's negligent conduct. But Jacobs's Seventh Amendment reexamination concerns are overstated and avoidable by carefully structuring Phase II, and its speculation about what plaintiffs will have failed to prove after an eventual Phase II is premature. For these and other reasons Jacobs's motion for a new trial will be denied [Doc. 439].[2] Because Jacobs's other arguments—pertaining to its motion for judgment as a matter of law—are similarly unavailing, that motion will also be denied [Doc. 437].

## I.    Background

These consolidated cases are before the Court on Jacobs's two post-trial motions: one for judgment as a matter of law [Docs. 437, 438], and one for a new trial [Docs. 439, 440]. Plaintiffs have responded to each [Docs. 450 (JMOL), 451 (new trial)], and Jacobs has replied [Docs. 455 (new trial), 456 (JMOL)].

---

[2] All citations refer to the docket of *Adkisson et al. v. Jacobs Engineering Group, Inc.,* 3:13-cv-505-TAV-HBG.

3

The facts of these cases are well-known, but some brief background is warranted here. Jacobs was hired by the Tennessee Valley Authority (TVA) to manage cleanup and remediation efforts at the Kingston Fossil Fuel Plant following the December 2008 coal-ash spill. TVA and Jacobs entered into a contract, according to which Jacobs developed a comprehensive Site Wide Safety and Health Plan (SWSHP) governing the site. The plaintiffs here are individuals who worked on the remediation efforts, plus some of their spouses. The workers suffer from a variety of medical conditions, which they claim were caused by Jacobs's negligence with respect to air monitoring, dust control, the use of personal protective equipment, and worker training, all in violation of Jacobs's contract with TVA and the SWSHP.

In 2014 this Court dismissed plaintiffs' claims for lack of subject-matter jurisdiction, holding that, due to its contractual relationship with TVA, Jacobs was entitled to derivative immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). The Sixth Circuit reversed, holding that *Yearsley* immunity is not jurisdictional, and remanded with the following instruction about the scope of discretionary-function immunity (which informs the scope of *Yearsly* immunity):

> The district court, in holding that the discretionary-function exception applied, found that various regulations, contractual provisions, and the SWSHP all failed to prescribe a specific course of action that Jacobs had to follow. But just because certain conduct fails to be specifically mandated does not necessarily mean that the government contractor is protected from liability. Discretionary conduct may fall outside the protection of the discretionary-function exception if the conduct is not a "deliberate or necessary result of a discretionary general policy"; in other words, government conduct "does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy

4

provided the opportunity for the negligent act." *Bultema v. United States,* 359 F.3d 379, 383–85 (6th Cir. 2004) (holding that the prison staff's alleged failure to carry out the prison's bunk-pass-notification policy was not protected by the discretionary-function exception because, even if the policy allowed for discretion, the staff's alleged negligence was "not a necessary concomitant of the prison's notification policy").

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015).

On remand, this Court denied Jacobs's motion to dismiss, which was converted to one for summary judgment [Doc. 137]. The Court held that "there is a material question of fact as to whether Jacobs acted within the scope of its authority when performing the alleged acts that give rise to plaintiffs' claims," and explained as follows:

> Namely, there is evidence in the record that defendants would be acting contrary to the will of the government if it: (1) did not randomly select workers for mobile monitoring; (2) manipulated the monitoring results; (3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (4) did not honor prescriptions for dust masks or respirators; (5) communicated to workers that fly ash was safe to consume; and/or (6) threatened workers when they asked for dust masks or respirators.

[Doc. 137].

While the parties were litigating Jacobs's immunity this Court also granted Jacobs's motion to bifurcate the trial proceedings into two phases:

> **Phase I** will be a consolidated trial for all cases and will involve issues and evidence relating to: (1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries.

> **Phase II** will involve issues and evidence relating to: (1) specific causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages.

[Doc. 136]. The cases thus proceeded through discovery and made their way to trial.

5

Some time later Jacobs moved for summary judgment, this time on the issue of general causation. The Court denied that motion, too, mostly agreeing with plaintiffs' definition of general causation. The Court held, for Phase I purposes, that "it is enough for plaintiffs to show that the amount of toxic constituents generally present in the fly ash at the Kingston site was capable of causing the complained-of diseases," that plaintiffs "have done more than enough to demonstrate exposure sufficient to overcome summary judgment on general causation," and that there was a factual dispute about whether "the chemical constituents found in the Kingston fly ash are capable of causing most of the complained-of diseases" [Doc. 307].

The cases proceeded to trial on Phase I. During those four weeks, the jury heard evidence that, among other things, employees of Jacobs:[3]

- Manipulated monitoring results by watering down stationary monitors and taking readings only when wet or raining [Doc. 412, Tr. Vol II at 156:18–157:1][4];
- Tampered with personal dust monitors by "tapping out" the contents [Doc. 411, Tr. Vol I at 95:13–24]];
- Failed to provide decontamination stations for workers [Doc. 411, Tr. Vol I at 77:2];
- Did not allow workers to wear dust masks, threatening to fire those who did [Doc. 413, Tr. Vol. III at 391:9–15; 450:20–24; 459:11–23], taking dust masks away from employees who wore them [Doc. 414, Tr. Vol. IV at 561:23–24], and destroying dust masks that were available on the site [Doc 411, Tr. Vol. I at 85:7-13; 87:4–88:9];
- Did not warn workers about the dangers of exposure to fly ash [Doc. 411, Tr. Vol. 1 at 70:20–71:18; 72:3–16; 73:2–8; 74:13–15; Doc. 412, Tr. Vol. 2 151:4–152:5; 154:1–155:22; 189:5–19];

_____

[3] The posture of this case requires that the court view evidence in favor of the plaintiffs. _Monette v. AM-7-7 Baking Co._, 929 F.2d 276, 280 (6th Cir. 1991).

[4] Citations to the trial transcript use the pagination running consecutively through all volumes.

6

- Told workers that fly ash was safe to consume [Doc. 414, Tr. Vol IV at 701:11–702:22], which is not true [Tr. Vol. VIII at 1958:22–1960:9].

Also presented was testimony and evidence about the large amount of fly ash—even airborne clouds of it—present at the site [*e.g.*, Tr. Vol. III at 328:21-25; Pls. Exs. 334, 337, 328, 327]. And plaintiffs' expert witness, epidemiologist Dr. Paul Terry, testified that fly ash exposure is capable of causing the diseases from which plaintiffs claim to suffer [Doc. 421, Tr. Vol. 421, at 1482–1631].

Toward the end of the trial, Jacobs filed four written motions for judgment as a matter of law arguing that: (1) plaintiffs failed to prove breaches of professional standards of care [Doc. 388]; (2) plaintiffs failed to prove duty, breach, and causation [Doc. 389]; (3) plaintiffs failed to prove misrepresentations and reliance [Doc. 390]; and (4) plaintiffs failed to prove specific theories of negligence [Doc. 391]. At the close of proof Jacobs also orally moved for judgment as a matter of law on three additional grounds: plaintiffs' (1) failure to prove each plaintiff worked at the Kingston ash cleanup site; (2) failure to present evidence showing which plaintiff is claiming which medical condition; and (3) failure to establish plaintiff's spouses' claims for "take-home" ash exposure. [Doc. 420, Tr. Vol. XII at 2743–46]. The Court denied each of these motions for various reasons (except for the ones about misrepresentation and take-home exposure, which were granted as unopposed) [Doc. 406; Doc. 424, Tr. Vol. XIV at 2893–2913].

The Court then ruled on several matters relating to the jury instructions and verdict form. Earlier on, the parties had proposed radically different verdict forms. Plaintiffs asked the Court to give the jury a simple, two-question verdict form that did little more

7

than ask whether plaintiffs had met their burden to show that Jacobs had breached a duty, which was capable of causing plaintiffs' conditions. Jacobs's version was substantially more complex: spanning fourteen pages and twenty questions (several with multiple subsections), it asked the jury whether Jacobs breached its duty to plaintiffs with respect to air monitoring, dust control, the use of personal protective equipment, or worker training and education, and it then asked whether *each particular type of breach* was capable of causing each of the conditions from which plaintiffs claim to suffer. The disagreement was pointed: Jacobs argued that if the verdict form did not specify what conduct constituted a breach, subsequent Phase II juries would "be invited to reweigh [] and consider all ten [of plaintiffs' theories of breach]," which would effectively make Jacobs "strictly liable for the consequences of anything the plaintiffs claim we did wrong in this case," even though the jury "may have found in Jacobs' favor on nine of the ten [theories of breach]" [Doc.422]; plaintiffs argued that, due to its complexity, Jacobs's version risked confusing and misleading the jury and would have no impact on the proof in Phase II proceedings because "you can't tease out which [breach of] duty caused which exposure" [*Id.*].

After hearing argument on the competing proposals, the Court submitted to the jury a verdict form that asked: (1) whether Jacobs violated its contract with TVA; (2) whether Jacobs failed to exercise reasonable care in carrying out the duties owed to plaintiffs; and (3) whether that breach was capable of causing each of ten medical conditions [Doc. 408]. The jury answered "yes" to all and returned a verdict for plaintiffs [*Id.*].

8

Which brings this case to the present.  Shortly after trial plaintiffs filed a motion for reference to mediation, which Jacobs opposed in part due to the pending dispositive post-trial motions currently being considered.  The Court granted plaintiffs' motion at a January 11, 2019, status conference and memorialized that ruling in a January 18, 2019, order [Doc. 459].  The parties were given thirty days to select a mediator (or mediators), and the Court took the instant motions under advisement.  In a joint motion recently granted by the magistrate judge [Doc. 461], the parties stated that "they have been earnestly working together to identify a mediator or mediators they can agree upon and believe that with additional time they will be able to do so" [Doc. 460].  Because the post-trial motions will be denied, the parties can now engage in that and other parts of the mediation process unencumbered by looming post-trial litigation.

## II.    Motion for a New Trial

A jury's verdict cannot be set aside unless the trial court is left with a definite and firm conviction that a mistake resulting in plain injustice has been committed or the verdict is contrary to all reason.  *McCurdy v. Montgomery Cty., Ohio*, 240 F.3d 512, 517 (6th Cir. 2001).  A prejudicial error of law can require a new trial.  *See* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2805 (3d ed. 2012).  The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court.  *Clarksville–Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991).

9

As an initial matter, plaintiffs are correct that trial courts have vast discretion with respect to the form and contents of jury instructions and verdict forms. *See, e.g.*, *Pivnick v. White, Getgey & Meyer Co.*, 552 F.3d 479, 488 (6th Cir. 2009) ("[I]nquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion."); *Jarrett v. Epperly*, 896 F.2d 1013, 1020–21 (6th Cir. 1990) ("[Defendants] object to the form of the verdict submitted to the jury. They argue that it was error to use a general verdict form, rather than a special verdict in the form of interrogatories. However, the form of jury verdict is within the discretion of the trial judge, and is not ordinarily reviewable."). Jacobs's problem here, however, is not with the jury instructions and verdict form per se, but rather is that those items combined with the bifurcated trial plan will inevitably lead to a Seventh Amendment violation. And, of course, this Court (like all others) has no discretion to violate the Seventh Amendment.

Jacobs's argument is twofold. A new trial must be granted, so it goes, or else one of two things will happen: either the Phase II juries will reexamine what conduct by Jacobs constituted a breach of duty, or else plaintiffs will have failed to show—in either phase— that their disease-causing fly-ash exposures were attributable to Jacobs's negligent conduct, as opposed to its non-negligent conduct (or even to serendipity).

To the first argument, the Reexamination Clause of the Seventh Amendment is not, and likely will not be, violated in this case. The clause provides that "no fact tried by a jury[] shall be otherwise re-examined in any Court of the United States, than according to

10

the rules of the common law." U.S. Const. amend. VII. There is clearly no Reexamination Clause violation right now, because, even on Jacobs's theory, one would occur only after a Phase II jury reconsidered a factual finding of the Phase I jury.

There is Sixth Circuit precedent for not deciding this issue until the Seventh Amendment violation has, or at least clearly will, occur. In *Martin v. Behr Dayton Thermal Prod. LLC,* 896 F.3d 405 (6th Cir. 2018), defendant argued on appeal that the district court's class-certification decision, which "mentioned the possibility of using a Special Master to resolve the individualized issues remaining after the certified issues have been resolved by a jury," violated the Reexamination Clause. *Id.* at 416. The Sixth Circuit rejected the argument, noting that, "[a]t this stage, the district court has not formalized any procedures for resolving either the common issues or the remaining individualized inquiries," and that "because the district court has not settled on a specific procedure, no constitutional infirmities exist at this time." *Id.* at 417. So too here: although this trial has been bifurcated, nearly all of the nuts-and-bolts, logistical issues pertaining to Phase II have yet to be decided. Constitutionally infirm reexamination is thus by no means a certain consequence of the bifurcated proceedings in this case.

That said, the Court is confident that Phases I and II are sufficiently distinct that no reexamination will occur in the future, either. The bifurcation order makes plain what issues fall within each phase: Phase I addressed "(1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries," and Phase II will address : "(1) specific

11

causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages" [Doc. 136]. The Phase II jury will be instructed that the verdict of the Phase I jury—that Jacobs breached duties owed to plaintiffs, resulting in exposure that was capable of the alleged diseases—is binding. Put differently, Phase I dealt with Jacobs's conduct, and Phase II will deal with the effects of that conduct on individual plaintiffs. The task for the Phase II jury, then, will be determining whether an individual plaintiffs' exposure actually did cause the plaintiffs' disease, and if so, the resulting damages, which does not overlap with any Phase I issues.

This is true regardless of whether there might be some evidentiary overlap between Phase I and subsequent Phase II trials:

> The existence of common factual issues is to be distinguished from the existence of overlapping evidence. For purposes of the Seventh Amendment, the question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 n.21 (5th Cir. 1998). The Sixth Circuit has noted on more than one occasion that "if done properly, bifurcation will not raise any constitutional issues," *Martin*, 896 F.3d at 417 (quoting *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 n.6 (6th Cir. 2004)), and "[l]eading class action treatises agree," *id.* (citing 2 Newberg on Class Actions § 4:92 (5th ed. 2010)). Thoughtful Phase II jury instructions and evidentiary rulings will likely prevent a Seventh Amendment violation from ever occurring. And if, after all of that, Jacobs still contends that a violation has occurred, it

12

will more appropriately be analyzed on a fully developed record rather than the product of before-the-fact speculation.

Jacobs cites two main cases to the contrary but each is readily distinguishable. In *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999), a prison-litigation case under § 1983, the Second Circuit reversed the judgment of the district court following a classwide plaintiffs' verdict for liability and two individual plaintiffs' verdicts on damages. As "an alternative ground for reversal," the court concluded that "[t]he bifurcation ordered by the district court allowed the damages juries to reexamine issues decided by the liability jury and thereby violated the Seventh Amendment." *Id.* at 268. The Phase I jury there, which decided liability, was charged with determining whether certain acts constituted "reprisals," and the Phase II jury was also asked to "judg[e] whether any particular act was a reprisal." *Id.* at 269. According to the Second Circuit, "This of course created the real possibility—amounting to a probability—that acts found to be 'reprisals' by the liability jury were different from the acts found to be 'reprisals' by the damages juries." *Id.*

The situation here is far different, though. Unlike in *Blyden*, where the two juries were tasked with determining literally the exact same factual issue—whether certain acts counted as reprisals—here there is no fatal factual overlap between the issues tried in Phase I (duty, breach, and general causation) and those to be tried in Phase II (specific causation, injuries, and damages). Moreover, the Phase II jury instructions in *Blyden*, which made clear that the juries considered the same issue, were crucial to court's analysis there. *Id.* But the Phase II juries here (which, unlike in *Blyden*, have not been impaneled) will not be

13

instructed to determine what of Jacobs's conduct constituted a breach of its duties to plaintiffs, as Jacobs appears to suggest. Instead, proof in Phase II will consist primarily of medical evidence concerning individual plaintiffs' exposures and diagnoses, not Jacobs's conduct.[5] Thus, contrary to *Blyden*, where, after the district court's having gone through both phases of bifurcation, the Second Circuit could say that the procedure "clearly violated the Seventh Amendment," here it is far from clear that a constitutional violation will ever occur. *Blyden* therefore does not compel a new trial.

The circumstances of *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), the other case on which Jacobs heavily relies, are different enough from those here to make that case practically inapposite. There the district court partially certified a nationwide class of plaintiffs who alleged that they had become infected with HIV as a result of using a drug manufactured by the defendant. *Id.* at 1296. The district court planned to try the issue of the defendant's negligence to one jury, which was somehow to be instructed on the "merged" negligence standards of all fifty states and the District of Columbia. *Id.* at 1300. That verdict would then, via collateral estoppel, bind state and federal courts across the country, where individual class-member plaintiffs would file suit. *Id.* at 1297. Problems abounded: the Seventh Circuit's concerns with the district court's trial plan included, among others, the defendants' having "to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even

---

[5] Moreover, even proof of Jacobs's conduct would not violate the Reexamination Clause, so long as the Phase II jury was not charged with "decid[ing] a disputed issue" already decided in Phase I. *See Allison*, 151 F.3d at 423 n.21 (quoted at length *supra*).

14

if they have no legal liability," with the jury charged with "a legal standard that does not actually exist anywhere in the world," especially when "preliminary indications [were] that the defendants [were] not liable." *Id.* at 1299.   But the main problem, as far as the Reexamination Clause is concerned, was that each subsequent jury, in addition to damages, was also to try the issues of comparative negligence and proximate causation, which, as a matter of basic tort law, "overlap the issue of the defendants' negligence" determined by the first jury. *Id.* at 1303.   Because, as explained above, there will be no issue overlap vis-à-vis the juries in this case, the Seventh Amendment analysis of *Rhone-Poulenc* is of limited relevance here.

That leaves Jacobs's second argument, which is that "Plaintiffs cannot possibly satisfy" their Phase II burden of "showing their exposures and illnesses and showing that acts or omissions by Defendant actually did cause those illnesses," without "telling the jury what Jacobs did that was allegedly negligent" [Doc. 455].   In other words, because "the essence of tort liability" is "a finding that the defendant is to blame for the plaintiff's harm," so Jacobs argues, and because the Phase I verdict form will leave subsequent Phase II juries "in the dark" about what of Jacobs's conduct was negligent, without proof of negligence in Phase II, plaintiffs will have failed to establish the requisite "link" between Jacobs's negligent conduct (Phase I) and plaintiffs' injury-causing exposures (Phase II). *Id.*   Put one more way, Jacobs argues that because the "initial jury verdict form is so vague . . . that subsequent juries must determine for themselves factual issues already adjudicated, the

15

combination of the bifurcation procedure and the deficient verdict form clearly violates the Seventh Amendment" (internal quotations omitted). *Id.*

Jacobs's concerns do not equate to a Reexamination Clause problem. According to Jacobs, the Phase II juries, "to make their own findings . . . will be forced to decide again: How did Jacobs breach the contract or violate the Safety and Health Plan? How did Jacobs fail to exercise reasonable care? And which act was capable of causing those ten medical conditions?" [Doc. 440]. But this is not correct. As stated above, the Phase II juries will not be charged with making any of those determinations, so strictly speaking, no factual finding of the Phase I jury will be reexamined by any other jury. And just because the possibility remains that a second or subsequent Phase II jury could potentially *find specific causation and damages for* exposures attributable to conduct for which the Phase I jury did not find negligence, does not necessarily mean that Jacobs *will be held liable for* said non-negligent conduct. This is because, of course, specific causation and damages do not equate to liability, but are merely part of defendant's liability (recall that the other parts were decided in plaintiffs' favor in Phase I). So, even assuming that there could be some (implicit) inconsistency between verdicts—a Phase II jury's finding specific causation and damages for conduct not found negligent by the Phase I jury—the Reexamination Clause would not be violated because the Phase I and Phase II issues do not overlap at all.[6]

---

[6] If it were not for the Reexamination Clause, this would not even be an issue because Phase II juries could simply reconsider the negligence of Jacobs's conduct. But just because, in this limited sense, the Reexamination Clause creates this conundrum, does not mean that the Reexamination Clause will be violated. It will not.

16

If, after a hypothetical Phase II, defendant still thinks it has been held liable for conduct that the Phase I jury did not find negligent and moves for relief on that basis, the inconsistency between verdicts will need to be reconciled. The parties have not cited, and the Court has not found, any cases addressing the issue that would then be presented: implied inconsistency—but not outright conflict—between two jury verdicts in a bifurcated case. When the verdict of a single jury, in an ordinary case, is inconsistent, the rule is straightforward: courts are "constitutionally required under the Seventh Amendment to adopt a view of the case that makes the jury's answers consistent," *Hiltgen v. Sumrall*, 47 F.3d 695, 701 (5th Cir. 1995) (citing *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963)), which means that, "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way," *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). The Court sees no reason to follow a different rule here. Thus, rather than dooming the Phase I verdict, right now the Seventh Amendment appears to suggest exactly the opposite: that any speculative, implicit inconsistency between the Phase I verdict and any hypothetical Phase II plaintiffs' verdict be resolved in favor of effectuating liability where a reasonable juror could have so found. This competing Seventh Amendment interest—giving effect to the Phase I plaintiffs' verdict—weighs in favor of not granting a new trial now and thus proceeding to Phase II.

In this way, Jacobs's stated concern can also be viewed as a failure-of-proof or sufficiency-of-the-evidence argument with respect to this disputed aspect of its tort

17

liability: the so-called "link" between the negligent conduct of Jacobs and plaintiffs' disease-causing exposures to fly ash. And the standard governing such an argument is familiar: relief is granted where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1). Moreover, in Tennessee, a general verdict like the one returned in Phase I, even if there is lack of material evidence to support one or more claims, "is nevertheless held to embrace every issue," so long as the record contains material evidence supporting at least one of the claims. Tenn. Code Ann. §§ 20-9-502 & 20-9-503; *Adkins v. Ford Motor Co.*, 446 F.2d 1105, 1108 (6th Cir. 1971). How these two standards apply —particularly in the context of this complex, bifurcated case that is (at most) halfway finished—is unclear. But the Court does not think it fruitful to, through speculation, consider these standards with a less-than-complete evidentiary record; rather, they are best considered if at all, on a full record after entry of judgment.

Jacobs's hypothetical, which supposedly "illustrate[s] the error in Plaintiffs' reasoning" [Doc. 455], s unavailing. Highlighting the cases of plaintiffs Brewer, who was allowed to wear a dust mask while working, and Wilkinson, whose preexisting medical conditions prevented him from wearing a dust mask or respirator while working, Jacobs contends that proceeding to Phase II risks its being held (essentially) strictly liable for any and all fly-ash exposure at the Kingston site. According to Jacobs:

> [F]or all we know, the Phase I jury decided that the only theory it believed was that Jacobs "failed to comply with the provisions of the safety and health plan with respect to the voluntary use of dust masks" (Theory #3). [Doc. 424, 14 Trial Tr. at 3022, 3024.] Under that scenario, Plaintiffs Brewer and

18

> Wilkinson cannot prevail against Jacobs even if it is true that "[a]ny one (or all) of [Jacobs'] breaches resulted in Plaintiffs' exposure to potentially harmful levels of fly ash or constituent elements found in fly ash," and even if medical evidence presented in Phase II establishes generally that "exposure to fly ash was a substantial factor in bringing about one or more of the diseases [of Plaintiffs Brewer and Wilkinson] for which general causation was found in Phase I." After all, the only thing Jacobs supposedly did wrong in this potential scenario was related to preventing workers from wearing masks. But Mr. Brewer was allowed to wear a dust mask, and Mr. Wilkinson could not wear a dust mask no matter what. Yet under Plaintiffs' purported theory of causation, both would be allowed to recover.

[Doc. 455]. But again, this concern is premature (if it even exists). First of all, Jacobs's liability is not "strict" as that term is normally understood. Recall that the Phase I jury returned a verdict, albeit a general one, finding a lot of what establishes negligence: that Jacobs breached duties that it owed to plaintiffs, which were capable of causing several diseases. Combined with a potential Phase II plaintiffs' verdict, Jacobs's liability, if ever imposed, would be anything but strict.[7] Second, Jacobs is potentially liable to plaintiffs Bewer and Wilkinson if and only if they are able to show disease-causing exposures to fly ash in Phase II (which is far from given). If, given that, Jacobs's parade-of-horribles scenario materializes, it can of course challenge the Phase II verdict for any number of reasons and can also challenge plaintiffs' ultimate burden of proof on their negligence claims on a full evidentiary record. In that scenario, Tennessee's general-verdict statute would apply, which states, "A general verdict, although it may not in terms answer every issue joined, is nevertheless held to embrace every issue," Tenn. Code Ann. § 20-9-503.

---

[7] Strict liability, of course, is "liability imposed without regard to the defendant's negligence or intent to cause harm." Restatement (Third) of Torts: Phys. & Emot. Harm (2010), at ch. 4 (scope note).

19

That would appear to effectuate liability if a Phase II jury *does find* specific causation and damages, and where a reasonable Phase I jury *could have found* an accordant duty, breach, and general causation.[8]  As explained above, those issues are best dealt with, if at all, on a full record, so the Court expresses no opinion on the merits of either.

An additional consideration weighs in favor of denying Jacobs's motion.  Jacobs wanted the verdict form to list out each theory of breach because it maintains that, during Phase II, plaintiffs must allocate how much of their disease-causing exposures were attributable to which of Jacobs's breaches of duty.   According to plaintiffs this is impossible:

> Jacobs argues that each Phase II plaintiff [] should have to prove which specific breach of Jacobs' duties caused his or her specific harm, as if their exposure to fly ash can possibly be allocated to each type of Jacobs' negligent conduct or as if their heart attack or leukemia comes labeled with Jacobs' specific breach of duty. This was never contemplated by the bifurcation order and would place an impossible burden on Plaintiffs. Any one (or all) of Defendant's breaches resulted in Plaintiffs' exposure to potentially harmful levels of fly ash or constituent elements found in fly ash.

[Doc. 451].  Plaintiffs' position is perhaps a bit overstated: there are scientists who can possibly make such estimates.  *See generally* Joseph V. Rodricks, Reference Guide on Exposure Science, *in* Reference Manual on Scientific Evidence 636 (Federal Judicial

---

[8] To the extent that Jacobs's motion can be construed as an as-applied Seventh Amendment challenge to Tennessee's general-verdict statue, the Court declines to address it at this time.  *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) (cautioning courts from "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it").

20

Center 3d ed. 2011).  But whatever else the Seventh Amendment might do in this case, it does not impose a de facto requirement for such complex, cutting-edge expert proof.

No Seventh Amendment violation has occurred yet, and one will probably not occur in the future.  Accordingly, Jacobs has not borne its burden of demonstrating that a manifest injustice will occur without a new trial, as is required for this Court to exercise its discretion to grant one.  *See Clarksville–Montgomery Co. Sch. Sys.*, 925 F.2d at 1002.  This motion will be denied.

## III.    Renewed Motion for Judgment as a Matter of Law

Under Rule 50, a court should grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  The same standard applies to a renewed motion under Rule 50(b).  *See Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 157 (6th Cir. 1997) ("The standard for granting JNOV requires a finding that "viewing the admissible evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." (quoting *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983))).

Judgment as a matter of law is appropriate "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party," *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009); *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000).  A court must, however, give weight to "evidence supporting the moving party that is uncontradicted and

21

unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  But as to disputed facts, "[t]he court should neither weigh the evidence, evaluate the credibility of the witnesses, nor substitute its judgment for that of the jury." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994), *cert. denied*, 514 U.S. 1127 (1995).  "Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict." *Id.*

Because federal jurisdiction here is based on diversity of citizenship, Tennessee law applies.  *K&T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 176 (6th Cir. 1996).  The state-law standard is not meaningfully different from those just described:

> [a] post-trial motion for the entry of judgment in accordance with a motion for directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts. Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the [opponent of the motion], allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Cansler v. Grove Mfg. Co.,* 826 F.2d 1507, 1510 (6th Cir. 1987) (quoting *Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn. 1977) (emphasis added).  Thus, even when there are disputed facts a case must not be taken away from the jury if reasonable people could come to different conclusions.  *Upshaw v. Sunrise Cmty. of Tenn., Inc.,* 2017 WL 3525368 at *7 (Tenn. Ct. App. Aug. 16, 2017).

The ship has already sailed on Jacobs's first argument in support of this motion— that it is entitled to derivative governmental immunity—due primarily to the law of the

22

case doctrine.  Jacobs is entitled to immunity-writ-large, so its argument goes, because its contract with TVA and the SWSHP afforded it discretion about exactly how to carry out its air-monitoring and safety obligations.  But, and as Jacobs concedes, the lodestone for governmental-contractor liability is whether the contractor exceeded its delegated authority, *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21 (1940), or put differently, Jacobs is entitled to immunity "only if [it] executed the will of the government and did not exceed its authority."  *Chesney*, 782 F. Supp. 2d at 582 (citing *Yearsley*, 309 U.S. at 20– 21).  And this Court has explicitly held that:

> Namely, there is evidence in the record that defendants would be acting contrary to the will of the government if it: (1) did not randomly select workers for mobile monitoring; (2) manipulated the monitoring results; (3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (4) did not honor prescriptions for dust masks or respirators; (5) communicated to workers that fly ash was safe to consume; and/or (6) threatened workers when they asked for dust masks or respirators.

[Doc. 137].  In accordance with that ruling, the Court charged the jury with the following instruction (which was modified slightly to better conform with the evidence presented at trial):

> I have ruled that Defendant would be acting contrary to the will of the government and is not immune from suit if Defendant:
>
> (A)  Deliberately manipulated or tampered with any monitoring results or processes;
> (B)  Did not inform TVA safety officials or repeated complaints regarding health problems due to fly ash;
> (C)  Failed to comply with the provisions of the Safety and Health Plan with respect to voluntary use of dust masks;
> (D)  Threatened workers when they asked for dust masks or respirators;

23

> (E)     Communicated to workers that fly ash was safe to consume; or
>
> (F)     Otherwise failed to train or warn workers about the dangers of excessive fly-ash exposure.
>
> Again, Defendant is not entitled to immunity for any of these acts or omissions, which would be contrary to the will of the government and in violation of its obligations to TVA. Defendant is therefore potentially liable to Plaintiffs for any such violations, if you find by a preponderance of the evidence that any of them did, in fact, occur.

Doc. 424, Tr. Vol. XIV at 3022–23.

Jacobs did not object to this instruction [Doc 422, Tr. Vol. XII at 2832–33; Doc. 424, Tr. Vol. XIV at 3035], and has therefore forfeited any opposition to it.  *See United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) ("A party's failure to make a 'timely objection' to a jury instruction results in the forfeiture of his right to challenge that instruction." (quoting *United States v. Jones*, 108 F.3d 668, 672 (6th Cir.1997))). Moreover, even if the argument were preserved it would fail because the prior ruling remains the law of the case, and under it the conduct at issue falls outside the discretionary-function exception.[9]  As the Supreme Court has explained, "[C]ourts should be loathe" to depart from the law-of-the-case doctrine "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).  Such circumstances are not present here.

---

[9] Which again informs the scope of Jacobs's immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).  *See Adkisson*, 790 F.3d 641.

24

And the law-of-the-case doctrine aside,[10] Jacobs's argument does not get the discretionary-function exception quite right.  Immunity under that doctrine requires two things: "First, the conduct must be 'discretionary,' not 'controlled by mandatory statutes or regulations.'"  *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364 (6th Cir. 2014) (citing *United States v. Gaubert*, 499 U.S. 315, 328 (1991)).  The rulings cited above were based on this principle; Jacobs did not have discretion to violate the terms of its contract with TVA, so to the extent that it did, it is not shielded from liability.

But if the conduct *is* discretionary, the inquiry does not stop, like Jacobs appears to suggest.  "Second, the exercise of discretion must be 'the kind that the discretionary function exception was designed to shield;' *i.e.*, it must be 'susceptible to policy analysis.'"  *Id.* at 365 (citing *Gaubert*, 499 U.S. at 325).[11]  Jacobs appears to agree that it would be liable for negligent or non-performance of conduct specifically mandated by the Jacobs-TVA contract, but not for any other conduct, all of which is assertedly discretionary and thus shielded from liability.  But this understanding reads the second prong of *Gaubert* out of existence.  Under that case there is of course a third category: discretionary (i.e., non-mandatory) conduct that is not susceptible to public-policy analysis.  This is not only true

---

[10] The Court recognizes that, "At the trial court level, the doctrine of the law of the case is little more than a management practice to permit logical progression toward judgment. Prejudgment orders remain interlocutory and can be reconsidered at any time." *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589 (6th Cir. 1995).

[11] When conduct is discretionary under the first step, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Gaubert*, 499 U.S. at 324.  For the reasons that follow, this presumption is overcome here.

25

as a matter of logic, but was also spelled out very clearly in the Sixth Circuit's decision in this very case:

> The district court, in holding that the discretionary-function exception applied, found that various regulations, contractual provisions, and the SWSHP all failed to prescribe a specific course of action that Jacobs had to follow. But just because certain conduct fails to be specifically mandated does not necessarily mean that the government contractor is protected from liability. Discretionary conduct may fall outside the protection of the discretionary-function exception if the conduct is not a "deliberate or necessary result of a discretionary general policy"; in other words, government conduct "does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act."

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015).[12]

This must be so. Holding otherwise would give governmental contractors carte blanche to be negligent for all non-mandatory conduct, rather than carry out the goal of the discretionary-function exception: to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through . . . tort." *Gaubert*, 499 U.S. at 323. Such protection from liability is clear "[w]here a particular government action is a deliberate or necessary result of a discretionary general policy, such that a tort suit based on the particular act or omission would amount to a challenge to the protected across-the-board policy." *Bultema v. United States*, 359 F.3d 379, 383 (6th Cir.

---

[12] Although the law-of-the-case doctrine is technically discretionary with respect to this Court's decisions, *see supra* note 10, the same is not true for decisions of the Sixth Circuit (and especially in this case). "Determinations of the court of appeals of issues of law are binding on both the district court on remand and the court of appeals upon subsequent appeal." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (citing *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994)); *see also Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992), *cert. denied*, 506 U.S. 841 (explaining that "the trial court may consider those issues not decided expressly or impliedly by the appellate court or a previous trial court").

26

2004).  On the other hand, "where a particular government action is not a necessary result of such a general policy, the act does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act."  *Id.*  The Sixth Circuit went on to explain:

> Thus the United States can be liable for the Coast Guard's negligent maintenance of a navigational aid, even though the decision to employ such aids was an exercise of a discretionary function. *Indian Towing*, 350 U.S. at 69, 76 S.Ct. 122.  Negligence in maintaining the aid is not a necessary concomitant of the decision to employ such aids. *A fortiori*, if a particular act violates a governmental policy, the act cannot be protected under the discretionary function exception by the fact that the violated policy itself was an exercise of a discretionary function.

*Bultema*, 359 F.3d at 383.  In other words, the exception shields negligence whenever it was the result of, or part and parcel with, a decision that that is susceptible to public-policy analysis.

Whatever decisions that may have preceded the conduct at issue here were not.[13] Even if the conduct at issue was in fact discretionary under the first step of *Gaubert*, the Court nevertheless has no trouble concluding that it is not "the kind that the discretionary function exception was designed to shield," because it is not "susceptible to policy analysis."   Indeed, it is hard to fathom what kind of "policy analysis," as this Court understands that term, would be relevant to, or implicated in, the categories of conduct submitted to the jury, on the basis of which it was permitted to find Jacobs non-immune. *See* Doc. 424, Tr. Vol. XIV at 3022–23 (quoted in full above).

---

[13]  Because Jacobs's immunity is derivative of TVA's the Court need not decide, between those two entities, *whose* policy-based decision is at issue here.

27

Case law confirms this understanding.  As the Sixth Circuit recounted in the prior appeal in this case, *Bultema* held "that the prison staff's alleged failure to carry out the prison's bunk-pass-notification policy was not protected by the discretionary-function exception because, even if the policy allowed for discretion, the staff's alleged negligence was 'not a necessary concomitant of the prison's notification policy.'"  *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 649 (6th Cir. 2015).  So too here, and if anything this is a far clearer case because Jacobs's conduct (as portrayed by plaintiffs) was actively detrimental to the purported policy aim of safety.[14]  In contrast, the exception was properly applied to the failure of the FAA to inspect a particular aircraft because of the FAA's spot-check policy, *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 819–20 (1984), to the failure of Coast Guard maintenance personnel to adequately inspect electrical equipment in a lighthouse, *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955), to a particular failure of the Forest Service to mark an off-road-vehicle trail as closed, based on a policy of only marking open trials, *Reetz v. United States*, 224 F.3d

---

[14] Nor should the immunity of Jacobs be "analyzed with the SWSHP's broad safety goals in mind," because doing so would allow the discretionary-function exception to swallow the rule of waiving liability.  As Justice Scalia noted, writing separately in *Gaubert*, every action or inaction is, at some level of generality, susceptible to policy analysis: "[I]t is universally acknowledged that the discretionary function exception never protects against liability for the negligence of a vehicle driver," even though "[t]he need for expedition vs. the need for safety may well represent a policy choice, . . . the Government does not expect its drivers to make that choice on a case-by-case basis."  *Gaubert*, 499 U.S. at 336 (Scalia, J., concurring).  Holding otherwise would "not only eviscerate the second step of the analysis set out in *Berkovitz* and *Gaubert*, but it would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity."  *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995).  The pertinent question, then, is not whether there is any discretion at all, but whether the discretion is "grounded in the policy of the regulatory regime."  *Gaubert*, 499 U.S. at 325.  And for the reasons explained in the main text, here it was not.

28

794, 795 (6th Cir. 2000), and to a Forest Service decision to not placing protective railings around campground fire pits, *Rosebush v. United States*, 119 F.3d 438, 443–44 (6th Cir. 1997). Each of those acts or omissions was at least ostensibly connected to an asserted policy consideration; the conduct at issue here was not.

Jacobs also argues that there was a failure of proof with respect to three of plaintiffs' theories of negligence. First Jacobs asserts that "Plaintiffs did not prove Jacobs violated any contract provision regarding the voluntary use of dust masks" [Doc. 438, at 5–6]. But the contract provided that "[r]espirator use is encouraged, even when exposures are below the exposure limit, to provide an additional level of comfort and protection for workers," [Pls. Ex. 5f, at Att. C-2-1], and there was evidence that Jacobs did the following things arguably to the contrary: threatening to discharge workers who wanted to wear masks [Doc. 413, Tr. Vol. III at 391:9–15; 450:20–24; 459:11–23], taking dust masks away from employees who wore them [Doc. 414, Tr. Vol. IV at 561:23–24], and destroying dust masks that were available on the site [Doc. 411, Tr. Vol. I at 85:7–13; 87:4–88:9]. Jacobs is not immune for negligence based on that conduct.

Jacobs also maintains that "Plaintiffs could not have proven that Jacobs violated any contract provision by failing to train or warn workers about the dangers of excessive fly ash" [Doc. 438, at 6–7]. However, the SWSHP lists among the "required elements of the information and training program" that Jacobs must communicate "an understanding of the health hazards of hazardous chemicals in the work area" and "how to recognize the symptoms of overexposure and how to protect against it" [Pls. Ex. 3c at 12-1]. There is

29

plenty of evidence in the record suggesting that Jacobs did not do that, at least with respect to fly ash [Doc. 411, Tr. Vol. 1 at 70:20–71:18; 72:3–16; 73:2-8; 74:13–15; Doc. 412, Tr. Vol. 2 151:4–152:5; 154:1–155:22; 189:5–19]. Jacobs (wisely) does not appear to dispute that the SWSHP required training about on-site hazards, but argues that it is immune because "the specific content of that training is not prescribed" in those documents. This argument misses the mark because the relevant policy-based decision (to which discretionary-function immunity would attach) was *whether* to warn of hazards on the site—a decision that was made in the SWSHP.[15] Jacobs did not have discretion to avoid that obligation by not training workers about the dangers of fly ash.

For a similar reason, Jacobs's argument that plaintiffs "could not have proven that Jacobs violated any contract provisions when an employee suggested that fly ash was safe to consume" [Doc. 438, at 7–8], also fails. Instead of providing workers with "an understanding of the health hazards of hazardous chemicals in the work area," as the SWSHP required [Pls. Ex. 3c at 12-1], Jacobs told them that it was safe to eat a pound of fly ash per day, something that Jacobs safety manager Sean Healey admitted was inaccurate and wrong [Doc. 413, Tr. Vol. VIII at 1958:22–1960:9]. And as the Court previously ruled,

---

[15] For this reason too *Rosebush*, 119 F.3d at 443, a case cited by Jacobs, is not instructive here. That case dealt with a failure by the Forest Service to equip a campsite's firepit with adequate protections. Unlike there, where "there [were] no regulations requiring the Forest Service to warn of the dangers of a fire pit," *id.* at 442, here the SWSHP clearly required Jacobs to warn of dangers, and as explained above there was evidence presented at trial that they did not meaningfully attempt to do that.

30

plaintiffs' failure to prove reliance does not prevent this conduct from being negligence, rather than a misrepresentation [Doc. 424, Tr. Vol XIV at 2907].

Jacobs's remaining arguments are also foreclosed by the law-of-the-case doctrine. First, Jacobs's argument that "Plaintiffs Could Not Prove That Jacobs Owed a Legal Duty to Protect Them Against All Exposure to Fly Ash" [Doc. 438, at 9–10], fails. It is axiomatic that duty is a question of law for the Court rather than something plaintiffs must prove. *Burroughs v. Magee*, 118 S.W.3d 323, 327 (Tenn. 2003). Accordingly, at trial the Court held as follows:

> [T]he Court has concluded and states for the record a finding that Defendant owed a duty of care to the plaintiffs in rendering certain professional services that were intended to prevent the workers at the Kingston site from being exposed to potentially harmful levels of fly ash or any constituent element found in fly ash
> Those obligations included, as provided in the contract and the safety and health plan, air monitoring dust control, the use of personal protective equipment at the site, and worker training.

[Doc. 424, Tr. Vol XIV at 2893]. That holding was reflected in the jury instructions [*Id.* at 3023]. Jacobs has not explicitly challenged that instruction in this motion and in any event has forfeited any right to do so by not objecting. *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) ("A party's failure to make a 'timely objection' to a jury instruction results in the forfeiture of his right to challenge that instruction." (quoting *United States v. Jones*, 108 F.3d 668, 672 (6th Cir.1997))). Moreover, plaintiffs have never contended that Jacobs is liable for all exposures, only excessive ones. Given the proof at trial and the adverse-inference instruction given to the jury, Jacobs is no longer entitled to avoid liability by invoking things like permissible exposure limits.

31

Second, as the court ruled at trial, [Doc. 424, Tr. Vol XIV at 2901–02], the argument that "Plaintiffs Failed to Offer the Necessary Expert Testimony to Prove That Jacobs Breached Any Duty It Legally Owed to Plaintiffs" [Doc. 438, at 10–13], is unavailing because the conduct at issue here is an obvious breach of the professional standard of care, and thus the common-knowledge exception applies.  In Tennessee "expert testimony regarding the applicable standard of care and the breach thereof may be dispensed with when the acts of professional negligence are so obvious that they come within the common knowledge of lay persons." *Martin v. Sizemore*, 78 S.W.3d 249, 272–73 (Tenn. Ct. App. 2001); *see also Murphy v. Schwartz*, 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986) (holding that the negligence must be so obvious that "all mankind knows that such things are not done absent negligence").  Such negligence "must be 'as plain as a fly floating in a bowl of buttermilk' to trigger the common knowledge exception." *Id.* (quoting *German v. Nichopoulos*, 577 S.W.2d 197, 202–03 (Tenn. Ct. App. 1978)).  The conduct at issue here falls under that exception.

Third, the argument that "Plaintiffs Failed to Offer Any Legally Relevant Proof Regarding General Causation" [Doc. 438, at 13–17], confuses general causation with specific and conflicts with this Court's summary judgment decision.  Jacobs maintains that "Plaintiffs presented no evidence connecting any of Jacobs's alleged misconduct to Plaintiffs' alleged injuries" [Doc. 438, at 13], but that is of course part of specific causation, where plaintiffs must show that Jacobs's conduct actually caused their injuries.  Here, Dr. Terry testified about exactly what this Court held that plaintiffs were required to show: that

32

"the amount of toxic constituents generally present in the fly ash at the Kingston site was capable of causing the complained-of diseases" [Doc. 307].

Finally, Jacobs has raised two more arguments that are also unavailing. Jacobs argues that, if judgment is not entered in its favor, these same arguments at least warrant a new trial because "this jury reached a 'seriously erroneous' result on each of the elements of Plaintiffs' negligence claims presented during the Phase I trial" [Doc. 456]. Of course, it is true that a new trial requires a lesser showing than judgment as a matter of law. *Compare Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (judgment as a matter of law is warranted when "viewing the evidence in the light most favorable to the nonmoving party. . . reasonable minds could come to but one conclusion, in favor of the moving party"), *with Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996) (a new trial is warranted when "the verdict [is] against the weight of the evidence"). But, for the same reasons stated above, Jacobs has not met the lesser new-trial standard, either. Jacobs also maintains that, because "[i]t is impossible to tell from the Phase I verdict form which of Plaintiffs' six disparate theories of wrongdoing the jury believed," if judgment as a matter of law is granted with respect to any one of plaintiffs' theories of breach, the Court must also order a new trial "because there would be no way for anyone to know whether that particular theory provided the sole basis for the Phase I jury's decision and thus the sole impermissible reason to proceed to Phase II" [Doc. 456]. But because none of Jacobs's judgment-as-a-matter-of-law arguments succeeds, this contingent argument is inapposite.

33

**IV.    Conclusion**

For the reasons explained, Jacobs's post-trial motions, one for judgment as a matter

of law [Doc. 437], and one for a new trial [Doc. 439], are hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

34

# TAB B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| GREG ADKISSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.:  3:13-CV-505-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | *Lead case consolidated with* |
| KEVIN THOMPSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.:  3:13-CV-666-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | *as consolidated with* |
| JOE CUNNINGHAM, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.:  3:14-CV-20-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| BILL ROSE, | ) | |
|     Plaintiff, | ) | |
| v. | ) | No.:  3:15-CV-17-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| CRAIG WILKINSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.:  3:15-CV-274-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| ANGIE SHELTON, as wife and next of kin | ) | |
| on behalf of Mike Shelton, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.:  3:15-CV-420-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |

JOHNNY CHURCH,                          )
      Plaintiff,                        )
                         )
v.                                      )     No.:   3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
      Defendant.                        )
_____)
DONALD R. VANGUILDER, JR.,              )
      Plaintiff,                        )
                         )
v.                                      )     No.:   3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
      Defendant.                        )
_____)
JUDY IVENS, as sister and next of kin,  )
on behalf of JEAN NANCE, deceased,      )
      Plaintiff,                        )
                         )
v.                                      )     No.:   3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
      Defendant.                        )
_____)
PAUL RANDY FARROW,                      )
      Plaintiff,                        )
                         )
v.                                      )     No.:   3:16-CV-636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
      Defendant.                        )
_____)

## **ORDER**

The old legalism "time is of the essence" rarely holds true in appellate practice. Subject to a few exceptions, litigants must await a final judgment before taking an appeal. Seeking to take advantage of one such exception, Jacobs Engineering Group, Inc., has moved for a certificate of appealability for interlocutory appeal under 28 U.S.C. § 1292(b) [Docs. 463; 464 (memorandum)]. Plaintiffs responded [Doc. 467], and Jacobs replied [Doc. 468]. For the reasons that follow, the Court will not grant leave for an interlocutory appeal, and Jacobs's request for a hearing on this motion will be denied as moot.

2

Under 28 U.S.C. § 1292(b), interlocutory appeal of an order is available only if that order: (1) involves a controlling question of law for which there is (2) substantial grounds for difference of opinion, and (3) an immediate appeal of the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). All three criteria must be met. *See In re City of Memphis*, 293 F.3d 345, 350–51 (6th Cir. 2002). The party seeking interlocutory review—here, Jacobs—bears the burden of demonstrating that these criteria are satisfied. *See Novacor Chemicals Inc. v. GAF Corp.*, 164 F.R.D. 640, 644 (E.D. Tenn. 1996). Interlocutory appeals are the exception, not the rule; the Sixth Circuit has stated that "[r]eview under § 1292(b) is granted sparingly and only in exceptional cases." *In re City of Memphis*, 293 F.3d at 350.

Interlocutory review of the first question presented—"when should a Court intervene to avoid a violation of the Seventh Amendment" [Doc. 464, at 3]—is not warranted because this is not a controlling question of law. "A legal issue is controlling if it could materially affect the outcome of the case." *In re City of Memphis*, 293 F.3d at 351 (citing *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992)). Whether this Court should intervene now or later is merely a question of timing rather than substance. At what time Jacobs might get relief for a hypothetical Seventh Amendment violation does not affect the outcome, i.e., whether such a violation occurred and thus whether plaintiffs can recover, at all, not to mention materially.

Jacobs also seeks interlocutory review of "whether a violation of the Seventh Amendment can be avoided by the Court 'effectuat[ing] liability' by 'reconcil[ing]' the

3

findings of two different juries" [Doc. 464, at 3]. Even assuming that this is a controlling question of law with substantial grounds for difference of opinion, allowing the Sixth Circuit to answer it now will not materially advance the ultimate termination of the litigation.[1] "When litigation will be conducted in substantially the same manner regardless of [this Court's] decision, the appeal cannot be said to materially advance the ultimate termination of the litigation*." In re City of Memphis*, 293 F.3d at 351. *See also EEOC v. Dolgencorp, LLC*, 206 F. Supp. 3d 1309, 1317 (E.D. Tenn. 2016). Moreover, the benefit of interlocutory appeal is greatly diminished where large expenditures have already been made, *see Kelley v. Apria Healthcare, LLC*, 232 F. Supp. 3d 983, 1005 (E.D. Tenn. 2017), such as here, where these cases have already been through years of litigation, numerous motions, and a four-week Phase I trial.

Jacobs's proposed course of action does not promise a speedy resolution. Jacobs seeks to have the Phase I verdict vacated and trial proceedings began anew, except this time Jacobs maintains that every issue should be tried to a single jury in each individual case [Doc. 464 at 2–3, 11–12]. Even ignoring the significant amount of time an interlocutory appeal would consume, it is difficult to see how this proposal would save time, given that the Phase I trial, and the limited issues tried in it, took nearly four weeks. In contrast, proceeding to Phase II trials as planned will allow Jacobs to appeal any judgment once it is entered. And at that point the Sixth Circuit can decide whether there

---

[1] This same reasoning applies to the previous question too, if somehow it is a controlling question of law under the meaning of 28 U.S.C. § 1292(b).

4

was a constitutional violation based on a developed record rather than speculation. Moreover, given that both parties have proposed either Phase II bellwether trials or something similar [Doc. 453, at 4–5; Doc. 454, at 11–12], there need not necessarily be multiple Phase II trials before Jacobs can take an appeal of this issue; rather, it could possibly appeal the first adverse judgment, if one ever occurs.

Finally, Jacobs maintains that, at the very least, interlocutory appeal is appropriate because resolution of this issue will "significantly [a]ffect trial preparation and settlement negotiations" [Doc. 464, at 11 (citing *Russell v. Atlantic & Gulf Stevedores*, 1980 A.M.C. 2922, 2927 (5th Cir. 1980))]. But surely that is true nearly every time an interlocutory appeal is sought. Therefore this statement, and the quote on which it is based (at least as a condition sufficient for interlocutory appeal), is inconsistent with the final-judgment rule and 28 U.S.C. § 1292(b), which establish interlocutory review as an exception, not the rule. *See In re City of Memphis*, 293 F.3d at 350.

One last point deserves emphasis. This Court did not hold that the Seventh Amendment permits "reconcil[ing]" the findings of different juries to "effectuate liability," as Jacobs repeatedly quotes in its instant motion [*E.g.*, Doc. 464, at 2]. Rather, the Court remarked that it was a possibility but ultimately held that it was not prudent to decide that complex issue, without a complete record, and before it is necessary to do so:

> How [Fed. R. Civ. P. 50(a)(1) and Tenn. Code Ann. §§ 20-9-502 & 20-9-503] apply—particularly in the context of this complex, bifurcated case that is (at most) halfway finished—is unclear. But the Court does not think it fruitful to, through speculation, consider these standards with a less-than-complete evidentiary record; rather, they are best considered if at all, on a full record after entry of judgment.

5

[Doc. 462, at 17–18].  This approach is consistent with standard judicial practice.  Long ago Justice Brandeis explained, "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'"  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Commissioners*, 113 U.S. 33, 39 (1885)).  And, "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."  *Id.* at 347 (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)).  Finally, federal courts "have no power to give advisory opinions," *id.* (citing *Hayburn's Case*, 2 U.S. 408 (2 Dall. 409) (1792)), which an unnecessary opinion here could be.  The Court thinks it best in this litigation to adhere to these well-settled principles.

For these reasons Jacobs's motion for certificate of appealability for interlocutory appeal under 28 U.S.C. § 1292(b) is **DENIED** [Doc. 463].  Jacobs's related motion for a hearing and oral argument is **DENIED** as moot [Doc. 469].

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

# TAB C

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

GREG ADKISSON, et al.,           )
    Plaintiffs,              )
v.                                )   No. 3:13-CV-00505-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )   *Lead case consolidated with*
                               )
KEVIN THOMPSON, et al.,          )
    Plaintiffs,              )
v.                                )   No. 3:13-CV-00666-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )
                               )
JOE CUNNINGHAM, et al.,          )   *as consolidated with*
    Plaintiffs,              )
v.                                )   No. 3:14-CV-00020-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )
                               )
BILL ROSE,                       )
    Plaintiff,               )
v.                                )   No. 3:15-CV-00017-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )
                               )
CRAIG WILKINSON, et al.,         )
    Plaintiffs,              )
v.                                )   No.: 3:15-CV-00274-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )
                               )
ANGIE SHELTON, as wife and next of kin )
on behalf of Mike Shelton, et al., )
    Plaintiffs,              )
v.                                )   No.: 3:15-CV-00420-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )
                               )
JOHNNY CHURCH,                   )
    Plaintiff,               )
v.                                )   No.: 3:15-CV-00460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,  )
    Defendant.               )

| | |
|---|---|
| _____ ) | |
| DONALD R. VANGUILDER, JR., ) | |
|      Plaintiff, ) | |
| v. ) | No. 3:15-CV-00462-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., ) | |
|      Defendant. ) | |
| _____ ) | |
| JUDY IVENS, as sister and next of kin, ) | |
| on behalf of JEAN NANCE, deceased, ) | |
|      Plaintiff, ) | |
| v. ) | No. 3:16-CV-00635-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., ) | |
|      Defendant. ) | |
| _____ ) | |
| PAUL RANDY FARROW, ) | |
|      Plaintiff, ) | |
| v. ) | No. 3:16-CV-00636-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., ) | |
|      Defendant. ) | |
| _____ ) | |

## DEFENDANT JACOBS ENGINEERING GROUP, INC.'S
## PROPOSED SPECIAL JURY INSTRUCTIONS AND VERDICT FORM

Jacobs Engineering Group, Inc. ("Jacobs") respectfully submits the following proposed

special jury instructions and verdict form.

1

## SPECIAL INSTRUCTION NO. 1 –
## <u>CORPORATION NOT TO BE PREJUDICED</u>

The fact that a corporation is a party must not influence you in your deliberations or in your verdict. Corporations and persons are equal in the eyes of the law. Both are entitled to the same fair and impartial treatment and to justice by the same legal standards.

**Authority:**     Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 1.04 (2018 ed.).

2

**SPECIAL INSTRUCTION NO. 2 –**
**ABSENCE OF PREJUDICE OR SYMPATHY**

      It is your duty to find the facts from all the evidence in the case. After you determine the

facts, you must apply the law that has been given to you, whether you agree with it or not. You

must not be influenced by any personal likes or dislikes, prejudice or sympathy. You must decide

the case solely on the evidence before you and according to the law given to you.


**Authority:**     Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 15.01 (2018 ed.).

3

## SPECIAL INSTRUCTION NO. 3 – <u>PHYSICAL LAWS, FACTS</u>

You should consider all of the surrounding circumstances at the time of an event or occurrence when weighing the testimony of a witness.  A statement of fact should be disregarded if you find the statement is inherently impossible or contrary to universally recognized physical laws or well established physical facts.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 2.25 (2018 ed.) (modified).

### SPECIAL INSTRUCTION NO. 4 –
### <u>ISSUES TO BE DECIDED</u>

These lawsuits have been bifurcated, or divided, into two phases.  We are currently in Phase I.  In this phase, you must determine: (1) whether Jacobs breached any duty owed to the Plaintiffs; and (2) whether any such breach of duty was capable of causing the Plaintiffs' alleged injuries.  I will discuss the standards that should guide your determination of these issues momentarily.

If you conclude that any breach of duty by Jacobs was capable of causing the injuries the Plaintiffs have alleged, these cases will proceed to Phase II, in which additional issues, including whether individual Plaintiffs are entitled to damages, will be addressed.  However, you need not concern yourselves with those issues.  You are only being asked to decide the specific issues identified in these instructions.

**Authority:**     [Doc. 136, at 7.]

5

## SPECIAL INSTRUCTION NO. 5 –
## PLAINTIFFS' CLAIMS AGAINST JACOBS[1]

The plaintiffs have alleged that the defendant breached the duties of care that it owed to the plaintiffs through two different types of misconduct.

First, the Plaintiffs have alleged that Jacobs breached the duty it owed to the plaintiffs by negligently, intentionally, or recklessly failing to exercise reasonable care in rendering certain professional services at the Kingston Fossil Plant in Kingston, Tennessee ("the Kingston Site").

---

[1] Jacobs respectfully submits that this type of instruction will only be necessary in the event that Plaintiffs' misrepresentation claims are to be tried in Phase I. The instruction would be necessary because, as referenced *infra*, at 18-23, the elements of a negligence claim involving an exposure to an unreasonable risk of harm are different than the elements of an intentional or negligent misrepresentation claim.

However, Jacobs submits that Plaintiffs' misrepresentation claims are not appropriate for Phase I. The Tennessee Supreme Court has held, in addressing class certification, that fraud and misrepresentation claims based upon oral communications are inappropriate for class treatment, "because of the highly individualized nature of the statements . . . ." *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). Without hearing from each class member, it is unknowable whether the individuals heard the statements at issue, or whether such individuals reasonably relied upon such representations. *Id.* at 312-13; *see also Boynton v. Headwaters, Inc.*, 564 F. App'x 803, 818 (6th Cir. 2014)

The same considerations are at issue in these consolidated cases. If these claims were addressed in Phase I, the jury would be asked to determine whether Jacobs' alleged misrepresentations were relied upon by the Plaintiffs, collectively, such that the Plaintiffs were exposed to conditions capable of causing their injuries. As further addressed *infra*, at 18-23, reasonable reliance must be proven to establish liability for any type of misrepresentation. Absent reliance, there would be no way for a jury to determine whether the statements had any effect at all, let alone that the Plaintiffs' reliance caused them to be exposed to conditions capable of causing their alleged injuries. In these cases, as in *Walker*, it would be impossible to establish liability without proof as to what each individual heard and when they heard it, and proof addressing whether each individual reasonably relied upon the statements at issue. *See id.*; *see also Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012). Moreover, because Plaintiffs' misrepresentation claims are derivative of their claims that Jacobs was responsible for their exposure to conditions at Kingston capable of causing their injuries, the misrepresentation claims can more easily be resolved in Phase II, once the issue of whether they were, as a group, exposed to such conditions has been decided.

6

The Plaintiffs have alleged that such failures caused them to be exposed to unreasonably dangerous conditions at the Kingston Site.

Second, the Plaintiffs have alleged that the defendant breached the duty it owed to the Plaintiffs by misrepresenting certain material information to the Plaintiffs regarding the conditions at the Kingston Site and the dangers associated with fly ash exposure.  The Plaintiffs have alleged that their reliance on the alleged misrepresentations caused them to be exposed to unreasonably dangerous conditions at the Kingston Site.

These claims and the factual allegations upon which they are based are disputed by the defendant.  The Plaintiffs bear the burden of proving each element of these claims, as described in these instructions, by a preponderance of the evidence.

**Authority:**     [Doc. 136, at 7; Doc. 59 ¶¶ 70-115.]

## SPECIAL INSTRUCTION NO. 6 –
## <u>JACOBS' OBLIGATIONS TO THE GOVERNMENT</u>

The Plaintiffs' claims against Jacobs relate to professional services that Jacobs agreed to provide to the Tennessee Valley Authority ("TVA"), a quasi-governmental agency.

In rendering the services at issue, Jacobs was required to comply with the requirements established in the contract between Jacobs and TVA ("the Contract") and in the Site Wide Safety and Health Plan for the Kingston Site ("Safety and Health Plan"). Jacobs was not permitted to deviate from the requirements in the Safety and Health Plan without express approval from TVA and the Environmental Protection Agency.

The first issue you will be asked to decide is whether particular conduct by Jacobs adhered to the terms of the Contract and the Safety and Health Plan.

**Authority:**     [Doc. 137, at 29 (quoting *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014); *Chesney v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 572 (E.D. Tenn. 2011));] *see also* 16 U.S.C. §§ 831, *et seq.*; *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016); *Filarsky v. Delia*, 132 S. Ct. 1657 (2012); *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18 (1940); *Hill v. U.S. Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 998, 1016-22 (E.D. Tenn. 2010); [*see* Doc. 335, Jacobs' Trial Brief, at 4-6.]

8

### SPECIAL INSTRUCTION NO. 7 –
### DUTIES OF CARE OWED BY JACOBS TO THE PLAINTIFFS

Jacobs also owed a duty of care to the plaintiffs in rendering certain professional services that were intended to prevent the workers at the Kingston Site from being exposed to potentially harmful levels of fly ash or any constituent element found in fly ash.[2]  Specifically, Jacobs was obligated, under its contract with TVA, to render certain services that were intended to reduce the risk of exposures at the Kingston Site to levels of fly ash, or the constituent elements found in fly ash, that exceeded the permissible exposure limits established in the Health and Safety Plan.  Those professional services included:

1. [*insert description of service as to which the Court determines a duty was owed*][3];

2. [*insert description of service as to which the Court determines a duty was owed*];

3. [*insert description of service as to which the Court determines a duty was owed*]; and

4. [*insert description of service as to which the Court determines a duty was owed*].

Jacobs owed a duty to the Plaintiffs to exercise reasonable care in providing these services, as required under the Contract and the Health and Safety Plan, to protect against unreasonable risks that the Plaintiffs would be exposed to levels of fly ash, or any constituent found in fly ash, that exceeded the permissible limits established in the Health and Safety Plan.

---

[2] All of Plaintiffs' alleged injuries relate to fly ash exposure.

[3] As discussed in Jacobs' Trial Brief, the Court will decide whether Jacobs owed a duty to Plaintiffs in rendering the particular professional services that are at issue.  Jacobs will further address the duties owed and the scope of those duties at trial and at the direction of the Court.  However, at this time, Jacobs respectfully submits that the Plaintiffs have alleged, and proof will show, that Jacobs owed certain duties in rendering certain professional services relating to: (1) air monitoring; (2) dust control; (3) the use of personal protective equipment at the Site; and (4) worker training and education.  [Doc. 59 ¶¶ 70-115.]

9

You must decide whether Jacobs breached the duty that it owed to the Plaintiffs in rendering each of these services.  The standards that you must apply in determining whether Jacobs breached any duty that was owed are addressed in the following instructions.

**Authority:**     Restatement (Second) of Torts § 324A (1965) (modified); *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017); *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 n.12 (Tenn. 2016); *Downs ex rel. Downs v. Bush,* 263 S.W.3d 812, 819 (Tenn.2008); *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007); *Collins v. Arnold*, 2007 WL 4146025, at *14 (Tenn. Ct. App. Nov. 20, 2007); *see also Fair v. CV Underground, LLC*, 798 S.E.2d 358, 364 (Ga. App. 2017), *cert. denied* (Aug. 28, 2017) (citation omitted); *Thomas v. Tennessee Valley Auth.*, 769 F.2d 367, 370–71 (6th Cir. 1985); [Doc. 39, Page ID# 796 and Doc. 137, Page ID# 3563 (. . . TVA engaged Jacobs to provide "professional services associated with management of the fly ash recovery project."); *see* Doc. 335, Jacobs' Trial Brief, at 6-20.]

## SPECIAL INSTRUCTION NO. 8 –
## <u>DEFINITION OF NEGLIGENCE</u>

Negligence is the failure to use ordinary or reasonable care.  It is either doing something that a reasonably careful person would not do, or the failure to do something that a reasonably careful person would do, under all of the circumstances in this case. The mere happening of an injury or accident does not, in and of itself, prove negligence.

A person may assume that every other person will use reasonable care, unless a reasonably careful person has cause for thinking otherwise.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 3.05 (2018 ed.).

11

## SPECIAL INSTRUCTION NO. 9 –
## PROFESSIONAL FAULT

A person who undertakes to perform professional services that were necessary for the protection of a third person must use reasonable care in performing such services, to avoid causing injury to the third person.[4]  The knowledge and care required of the professional is the same as other reputable professionals practicing in the same or a similar community and under similar circumstances. A professional not only must have that degree of learning and skill ordinarily possessed by other reputable professionals but also must use the care and skill ordinarily used in like cases.  In applying that skill and learning, a professional is required to use reasonable diligence and best judgment in an effort to accomplish the purpose of the employment.

A failure to have and use such knowledge and skill is negligence.

**Authority:**     Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 6.01 (2018 ed.) (modified); Restatement (Second) of Torts § 324A (1965) (modified); *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017); *Chapman v. Bearfield*, 207 S.W.3d 736, 741 (Tenn. 2006); *Atkinson v. State*, 337 S.W.3d 199, 205 (Tenn. Ct. App. 2010); *Martin v. Sizemore*, 78 S.W.3d 249, 274 (Tenn. Ct. App. 2001); *Jennings v. Case*, 10 S.W.3d 625, 627–28 (Tenn. Ct. App. 1999); *Seavers v. Methodist Med. Ctr.,* 9 S.W.3d 86, 92 (Tenn. 1999); *Cleckner v. Dale,* 719 S.W.2d 535, 540 (Tenn. Ct. App.1986); *Murphy v. Schwartz,* 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986); *German v. Nichopoulos,* 577 S.W.2d 197, 202–03 (Tenn. Ct. App. 1978); *see also Zander v. Katz, Sapper & Miller, LLP*, 25 F. Supp. 3d 1055, 1067 (M.D. Tenn. 2014); *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F. Supp. 3d 835, 854 (M.D. Tenn. 2015); *Miltier v. Holly & Holly, PLLC*, 2013 WL 2635275, at *7 (E.D. Tenn. June 12, 2013); *Scott v. Miller*, 206 F. App'x 516, 519 (6th Cir. 2006); *compare Gulley v. Fishing Holdings, LLC*, 2017 WL 3911604, at *2 (W.D. Tenn. Sept. 6, 2017); *Big G Express, Inc. v. Leviton Mfg. Co.*, 2009 WL 690814, at *3 (M.D. Tenn. Mar. 10, 2009); [*see* Doc. 335, Jacobs' Trial Brief, at 21-24; Doc. 308, Jacobs' motion *in limine* regarding professional standards of care.]

---

[4] The first sentence in this proposed instruction has been modified to combine TPI-Civil 6.01 and the standard found in the Restatement (Second) of Torts § 324A.  The remainder of this instruction is found in TPI-Civil 6.01.

**SPECIAL INSTRUCTION NO. 10 –**
**PROFESSIONAL PERFECTION NOT REQUIRED**

A professional is not negligent merely because of an unsuccessful result or an error in

judgment. It is negligence, however, if the error of judgment or lack of success is due to the failure

to use the required care and skill as defined in these instructions.

**Authority:**     Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 6.03 (2018 ed.).

13

**SPECIAL INSTRUCTION NO. 11 –**
**STANDARD OF PROFESSIONAL CARE DETERMINED BY EXPERT TESTIMONY**

[Except as expressly provided in the following instruction, professional standards of care and any breach(es) of those standards must be established through the testimony of expert witnesses.][5] To determine the standard of professional learning, skill and care that was required of the defendant in performing the particular services at issue, you must consider only the opinions of the professionals who have testified as expert witnesses as to that standard.

You must consider the opinion of each expert witness and the reasons given for the opinion, as well as the qualifications of each witness. Give each opinion the weight you believe it should have.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 6.05 (2018 ed.) (modified); *Martin v. Sizemore*, 78 S.W.3d 249, 274 (Tenn. Ct. App. 2001); *Seavers v. Methodist Med. Ctr.,* 9 S.W.3d 86, 92 (Tenn. 1999); *Cleckner v. Dale,* 719 S.W.2d 535, 540 (Tenn. Ct. App. 1986); *Murphy v. Schwartz,* 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986); *German v. Nichopoulos,* 577 S.W.2d 197, 202–03 (Tenn. Ct. App. 1978); *see also Zander v. Katz, Sapper & Miller, LLP,* 25 F. Supp. 3d 1055, 1067 (M.D. Tenn. 2014); *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.,* 93 F. Supp. 3d 835, 854 (M.D. Tenn. 2015); *Miltier v. Holly & Holly, PLLC,* 2013 WL 2635275, at *7 (E.D. Tenn. June 12, 2013); *Scott v. Miller,* 206 F. App'x 516, 519 (6th Cir. 2006); *compare Gulley v. Fishing Holdings, LLC,* 2017 WL 3911604, at *2 (W.D. Tenn. Sept. 6, 2017); *Big G Express, Inc. v. Leviton Mfg. Co.,* 2009 WL 690814, at *3 (M.D. Tenn. Mar. 10, 2009); [*see Doc.* 335, Jacobs' Trial Brief, at 21-24.]

---

[5] As further discussed in Jacobs' Trial Brief, the Court must determine the applicability of the common knowledge exception to the requirement that professional standards of care must be proven through expert testimony. The bracketed provision in this instruction and Special Instruction No. 12, below, will only be necessary if the Court determines that particular alleged conduct falls within the common knowledge exception. The remainder of this instruction is found in TPI-Civil 6.05. [Doc. 335, Jacobs' Trial Brief, at 21-24.]

14

**SPECIAL INSTRUCTION NO. 12 –**
**STANDARD OF PROFESSIONAL CARE DETERMINED BY EXPERT TESTIMONY –**
**COMMON KNOWLEDGE EXCEPTION**

Expert testimony addressing the applicable professional standards of care is not required where the alleged act of professional negligence is obvious.  In these cases, the Plaintiffs have alleged that Jacobs engaged in certain conduct that, if proven, would fit within that exception.  Such conduct includes the plaintiffs' allegation(s) that:

(1) [*insert description of action or inaction that falls within the common knowledge exception, as determined by the Court*];

(2) [*insert description of action or inaction that falls within the common knowledge exception, as determined by the Court*]; and

(3) [*insert description of action or inaction that falls within the common knowledge exception, as determined by the Court*].

If you conclude that Plaintiffs have proven, by a preponderance of the evidence, that Jacobs engaged in such conduct, you may presume that such conduct did not comply with the applicable professional standard(s) of care.


**Authority:**     *Martin v. Sizemore*, 78 S.W.3d 249, 274 (Tenn. Ct. App. 2001); *Seavers v. Methodist Med. Ctr.,* 9 S.W.3d 86, 92 (Tenn. 1999); *Cleckner v. Dale,* 719 S.W.2d 535, 540 (Tenn. Ct. App. 1986); *Murphy v. Schwartz,* 739 S.W.2d 777, 778 (Tenn. Ct. App. 1986); *German v. Nichopoulos,* 577 S.W.2d 197, 202–03 (Tenn. Ct. App. 1978); [*see* Doc. 335, Jacobs' Trial Brief, at 21-24.]

15

## SPECIAL INSTRUCTION NO. 13 –
## RIGHT TO ASSUME OTHER'S NORMAL FACULTIES

In the absence of reasonable cause for thinking otherwise, a person who is using ordinary care has a right to assume that other persons are ordinarily intelligent and possess normal sight and hearing.

**Authority:**     Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 3.06 (2018 ed.);

16

## SPECIAL INSTRUCTION NO. 14 –
## <u>NEGLIGENCE *PER SE*</u>

A person who violates a statute or ordinance is negligent. However, Jacobs is not at fault for any violation of any statute or ordinance unless you also find that the violation increased the Plaintiffs' risk of the types of injuries they have alleged.[6]

**Authority:** Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 3.09 (2018 ed.) (modified); Restatement (Second) of Torts § 324A (1965); *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017); *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 n.12 (Tenn. 2016); *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008); *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007); *Collins v. Arnold*, 2007 WL 4146025, at *14 (Tenn. Ct. App. Nov. 20, 2007); *see also Fair v. CV Underground, LLC*, 798 S.E.2d 358, 364 (Ga. App. 2017), *cert. denied* (Aug. 28, 2017) (citation omitted); *Thomas v. Tennessee Valley Auth.*, 769 F.2d 367, 370–71 (6th Cir. 1985); [Doc. 136, at 7.]

---

[6] The second sentence in the standard negligence *per se* instruction must be modified because it addresses legal causation. The language Jacobs has proposed contains the language found in Restatement (Second) of Torts § 324A and *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017). This instruction tracks the language Jacobs has also proposed in Special Instruction No. 15.

17

## SPECIAL INSTRUCTION NO. 15 –
## BREACH OF DUTY - FAILURE TO EXERCISE REASONABLE CARE IN PROVIDING PROFESSIONAL SERVICES

Jacobs breached the duty of care it owed to the Plaintiffs if: (1) Jacobs failed to exercise reasonable care in performing the professional services at issue; and (2) the failure to exercise reasonable care increased the Plaintiffs' risk of the types of injuries they have alleged.

The Plaintiffs have the burden of proving both of these elements by a preponderance of the evidence.

**Authority:**    Restatement (Second) of Torts § 324A (1965); *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017); *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 n.12 (Tenn. 2016); *Downs ex rel. Downs v. Bush,* 263 S.W.3d 812, 819 (Tenn. 2008); *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007); *Collins v. Arnold*, 2007 WL 4146025, at *14 (Tenn. Ct. App. Nov. 20, 2007); *see also Fair v. CV Underground, LLC*, 798 S.E.2d 358, 364 (Ga. App. 2017), *cert. denied* (Aug. 28, 2017) (citation omitted); *Thomas v. Tennessee Valley Auth.*, 769 F.2d 367, 370–71 (6th Cir. 1985).

## SPECIAL INSTRUCTION NO. 16 –
## BREACH OF DUTY- NEGLIGENT MISREPRESENTATION[7]

In order to establish liability based upon an alleged negligent misrepresentation, the Plaintiffs must prove each of the following elements:

1.    Jacobs was acting in the course of providing the professional services it agreed to provide to TVA; and

2.    Jacobs negligently supplied false information to the Plaintiffs; and

3.    Jacobs intended the information to guide the Plaintiffs in deciding whether and under what conditions they would agree to continue working at the Kingston Site; and

4.    The Plaintiffs justifiably relied upon the false information; and

5.    As a result of their reliance upon the truth of the representation, the Plaintiffs were exposed to an unreasonable risk of physical harm.

---

[7] While Plaintiffs refer to Jacobs' misrepresentations as "negligent" in their Amended Complaint in at least one instance, Jacobs disputes that Plaintiffs are entitled to recover under a theory of negligent misrepresentation.  In Tennessee, negligent misrepresentation claims are based upon Restatement (Second) of Torts, § 552, which addresses "business transactions," and only provides for recovery of *financial* losses.  *See Robinson v. Omer*, 952 S.W.2d 423, 424 (Tenn. 1997); *Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592 (Tenn. 1991); *Keller v. W.-Morr Inv'rs, Ltd.*, 770 S.W.2d 543, 547 (Tenn. Ct. App. 1988); Restatement (Second) of Torts, § 552. This framework is also reflected in T.P.I. – Civil 8.43 and 8.44, which provide that a plaintiff can only recover for financial harm caused by his or her reliance upon a negligent misrepresentation, in connection with a business transaction.

In these cases, Plaintiffs have not alleged that they relied upon Jacobs' expertise in a business transaction, and have not alleged financial harm resulting from such a transaction.  Therefore, Plaintiffs will not be able  to prove any claim for negligent misrepresentation under Tennessee law, and the Court should not instruct the jury on negligent misrepresentations.  However, to the extent that the Court determines that such a claim is permissible, Jacobs respectfully submits that T.P.I. – Civil 8.43 and 844 should be modified as set forth herein.

Moreover, for the reasons stated, *supra*, Jacobs submits that negligent and intentional misrepresentation claims are not appropriate issues for Phase I, unless Plaintiffs are each required to prove individual reliance.  *See Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

19

The Plaintiffs have the burden of proving all of these elements by a preponderance of the evidence.

Plaintiffs may prove that defendant negligently supplied false information by proving that (a) in obtaining information about the matters at issue, Jacobs failed to exercise the reasonable care or competence required of professionals in Jacobs' field, or that (b) in communicating that information, Jacobs failed to exercise reasonable care or competence required of professionals in the Jacobs' field.

To prove liability for any negligent misrepresentations, the Plaintiffs must have been the persons, or members of a limited group of persons, that Jacobs intended to benefit or guide with the information Jacobs supplied, and the plaintiff must have relied on the information in making decisions that the defendant intended to influence.

The Plaintiffs may also establish liability if the Plaintiffs received the information from another person whom the defendant knew intended to transmit the information to a similar group of persons, and if the Plaintiffs relied on the information in a transaction Jacobs intended to influence.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 8.43, 8.44 (2018 ed.) (modified); Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 6.01 (2018 ed.) (modified); Restatement (Second) of Torts § 324A (1965) (modified); *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017); *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 n.12 (Tenn. 2016); *Downs ex rel. Downs v. Bush,* 263 S.W.3d 812, 819 (Tenn. 2008); *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007); *Collins v. Arnold*, 2007 WL 4146025, at *14 (Tenn. Ct. App. Nov. 20, 2007); *see also Fair v. CV Underground, LLC*, 798 S.E.2d 358, 364 (Ga. App. 2017), *cert. denied* (Aug. 28, 2017) (citation omitted); *Thomas v. Tennessee Valley Auth.*, 769 F.2d 367, 370–71 (6th Cir. 1985).

**SPECIAL INSTRUCTION NO. 17 –**
**BREACH OF DUTY- INTENTIONAL/RECKLESS MISREPRESENTATION[8]**

In order to establish liability based upon an alleged intentional or reckless misrepresentation, the Plaintiffs must prove each of the following elements:

1. Jacobs made a representation of a present or past material fact; and

2. The representation was false; and

3. Jacobs knew that the representation was false when it was made, or Jacobs made the representation recklessly without knowing whether it was true or false; and

4. Jacobs intended that the Plaintiffs rely upon the representation and act or not act in reliance on it; and

5. The Plaintiffs did not know that the representation was false and were justified in relying upon the truth of the representation; and

6. As a result of the Plaintiffs' reliance upon the truth of the representation, the Plaintiffs were exposed to an unreasonable risk of physical harm.

The Plaintiffs have the burden of proving all of these elements by a preponderance of the evidence.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 8.36 (2018 ed.) (modified); *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

---

[8] As stated, Jacobs submits that negligent and intentional misrepresentation claims are not appropriate issues for Phase I unless Plaintiffs are each required prove individual reliance, for the reasons discussed, *supra*.  *See Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

## SPECIAL INSTRUCTION NO. 18 –
### RELIANCE

A party seeking recovery for intentional misrepresentation must have relied upon the representation. In other words, the Plaintiffs would not have acted as they did without the representation.  You must determine whether reliance upon the representation substantially influenced the Plaintiffs' actions, even though other influences operated as well.

Reliance upon a representation may be shown by direct evidence or may be inferred from the circumstances.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 8.46 (2018 ed.); *Farley v. Clayton*, 928 S.W.2d 931 (Tenn. App. 1996); *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729 (Tenn. App. 1996).

## SPECIAL INSTRUCTION NO. 19 –
## <u>RIGHT TO RELY</u>

A person claiming to have been damaged by a false representation must not only have acted in reliance on the representation but must have been justified in that reliance. That is, it must be reasonable for the person, in the light of the circumstances and that person's intelligence, experience, and knowledge, to accept the representation without making an independent inquiry or investigation.  Reliance is not reasonable when a party is provided information, invited to inquire, and does not make full inquiry.

**Authority:**    Tenn. Prac. Pattern Jury Instr., T.P.I. – Civil 8.47 (2018 ed.) (modified); *id*. at "USE NOTE"; *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119 (Tenn. App. 2001).

## SPECIAL INSTRUCTION NO. 20 –
## <u>MATERIALITY</u>

Reliance upon an intentional or reckless misrepresentation is not justifiable unless the matter misrepresented is material. The matter is material if:

(a)     a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question; or

(b)     the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his or her choice of action, although a reasonable person would not so regard it.

**Authority:**     Restatement (Second) of Torts § 538 (1977) (modified).

## SPECIAL INSTRUCTION NO. 21 –
## <u>GENERAL CAUSATION</u>[9]

If you determine that Jacobs breached a duty of care owed to the Plaintiffs, you must determine next whether that breach of duty was capable of causing the injuries the Plaintiffs have alleged.  This is known as general causation.

**Authority:**     [*See* Doc. 302, at 6-27.]

---

[9] This instruction is intended to conform to the Court's September 18, 2018 Memorandum Opinion and Order, in which the Court decided issues raised in Jacobs' prior summary judgment briefing. [Docs. 237, 267, 302.]

25

## PROPOSED VERDICT FORM

1. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to adhere to the terms of its contract with TVA, and the requirements set forth in the Site Wide Safety and Health Plan for the Kingston Site, in [*insert the Court's description of the professional services Jacobs was obligated to provide relating to air monitoring*[10]]?

   YES:  _____

   NO   _____

   *If your answer to question no. 1 is "NO," proceed to question no. 5.  If your answer to question no. 1 is "YES," proceed to question 2.*

2. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to exercise reasonable care in [*insert the Court's description of the Jacobs' duty or duties to Plaintiffs relating to air monitoring*]?

   YES:  _____

   NO   _____

   *If your answer to question no. 2 is "NO," proceed to question no. 5.  If your answer to question no. 2 is "YES," proceed to question 3.*

---

[10] Again, as discussed in Jacobs' Trial Brief, the Court will decide whether Jacobs owed a duty to Plaintiffs in rendering the particular professional services that are at issue.  At this time, Jacobs respectfully submits that the Plaintiffs have alleged, and proof will show, that Jacobs owed certain duties in rendering certain professional services relating to: (1) air monitoring; (2) dust control; (3) the use of personal protective equipment at the Site; and (4) worker training and education.  Questions 1 through 16 in this proposed verdict form address the questions of immunity, duty, and breach of duty as to those four areas.

3. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' failure to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to air monitoring*] increased the Plaintiffs' risk of the types of injuries they have alleged?

        YES:   _____

        NO     _____

*If your answer to question no. 3 is "NO," proceed to question no. 5. If your answer to question no. 3 is "YES," proceed to question 4.*

4. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' breach of duty in [*insert the Court's description Jacobs' duty or duties to Plaintiffs relating to air monitoring*] was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

    a.  Coronary artery disease:

        YES:   _____

        NO     _____

    b.  Lung cancer:

        YES:   _____

        NO     _____

    c.  Leukemia:

        YES:   _____

        NO     _____

    d.  Skin cancer:

        YES:   _____

        NO     _____

    e.   Allergic contact dermatitis:

        YES:   _____

        NO    _____

    f.   Peripheral neuropathy:

        YES:   _____

        NO    _____

    g.   Asthma:

        YES:   _____

        NO    _____

    h.   Chronic Obstructive Pulmonary Disease:

        YES:   _____

        NO    _____

    i.   Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

        YES:   _____

        NO    _____

5.   Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to adhere to the terms of its contract with TVA, and the requirements set forth in the Site Wide Safety and Health Plan for the Kingston Site, in [*insert the Court's description of the professional services Jacobs was obligated to provide relating to dust control/suppression*]?

        YES:   _____

        NO    _____

*If your answer to question no. 5 is "NO," proceed to question no. 9.  If your answer to question no. 5 is "YES," proceed to question 6.*

6.  Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to dust control/suppression*]?

        YES:  _____

        NO  _____

*If your answer to question no. 6 is "NO," proceed to question no. 9.  If your answer to question no. 6 is "YES," proceed to question 7.*

7.  Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' failure to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to dust control/suppression*] increased the Plaintiffs' risk of the types of injuries they have alleged?

        YES:  _____

        NO  _____

*If your answer to question no. 7 is "NO," proceed to question no. 9.  If your answer to question no. 7 is "YES," proceed to question 8.*

8.  Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' breach of duty in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to dust control/suppression*] was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

    a.  Coronary artery disease:

        YES:  _____

        NO  _____

b.  Lung cancer:

YES:  _____

NO  _____

c.  Leukemia:

YES:  _____

NO  _____

d.  Skin cancer:

YES:  _____

NO  _____

e.  Allergic contact dermatitis:

YES:  _____

NO  _____

f.  Peripheral neuropathy:

YES:  _____

NO  _____

g.  Asthma:

YES:  _____

NO  _____

h.  Chronic Obstructive Pulmonary Disease:

YES:  _____

NO  _____

30

      i.   Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

        YES:   _____

        NO     _____

9. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to adhere to the terms of its contract with TVA, and the requirements set forth in the Site Wide Safety and Health Plan for the Kingston Site, in [*insert the Court's description of the professional services Jacobs was obligated to provide relating to the use of personal protective equipment*]?

        YES:   _____

        NO     _____

*If your answer to question no. 9 is "NO," proceed to question no. 13.  If your answer to question no. 9 is "YES," proceed to question 10.*

10. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to the use of personal protective equipment*]?

        YES:   _____

        NO     _____

*If your answer to question no. 10 is "NO," proceed to question no. 13.  If your answer to question no. 10 is "YES," proceed to question 11.*

11. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' failure to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to the use of personal protective equipment*] increased the Plaintiffs' risk of the types of injuries they have alleged?

> YES:    _____

> NO    _____

> *If your answer to question no. 11 is "NO," proceed to question no. 13.  If your answer to question no. 11 is "YES," proceed to question 12.*

12. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' breach of duty in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to the use of personal protective equipment*] was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

> a.  Coronary artery disease:

> > YES:    _____

> > NO    _____

> b.  Lung cancer:

> > YES:    _____

> > NO    _____

> c.  Leukemia:

> > YES:    _____

> > NO    _____

> d.  Skin cancer:

> > YES:    _____

> > NO    _____

32

e.  Allergic contact dermatitis:

YES:  _____

NO    _____

f.  Peripheral neuropathy:

YES:  _____

NO    _____

g.  Asthma:

YES:  _____

NO    _____

h.  Chronic Obstructive Pulmonary Disease:

YES:  _____

NO    _____

i.  Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

YES:  _____

NO    _____

13. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to adhere to the terms of its contract with TVA, and the requirements set forth in the Site Wide Safety and Health Plan for the Kingston Site, in [*insert the Court's description of the professional services Jacobs was obligated to provide relating to worker training and education*]?

YES:  _____

NO    _____

*If your answer to question no. 13 is "NO," proceed to question no. 17. If your answer to question no. 13 is "YES," proceed to question 14.*

14. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs failed to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to worker training and education*]?

        YES:   _____

        NO      _____

*If your answer to question no. 14 is "NO," proceed to question no. 17. If your answer to question no. 14 is "YES," proceed to question 15.*

15. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' failure to exercise reasonable care in [*insert the Court's description of Jacobs' duty or duties to Plaintiffs relating to worker training and education*] increased the Plaintiffs' risk of the types of injuries they have alleged?

        YES:   _____

        NO      _____

*If your answer to question no. 15 is "NO," proceed to question no. 17. If your answer to question no. 15 is "YES," proceed to question 16.*

16. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs' breach of duty in [*insert the Court's description of the Jacobs' duty or duties to Plaintiffs relating to worker training and education*] was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

      a.   Coronary artery disease:

        YES:   _____

        NO      _____

    b.  Lung cancer:

        YES:   _____

        NO   _____

    c.  Leukemia:

        YES:   _____

        NO   _____

    d.  Skin cancer:

        YES:   _____

        NO   _____

    e.  Allergic contact dermatitis:

        YES:   _____

        NO   _____

    f.  Peripheral neuropathy:

        YES:   _____

        NO   _____

    g.  Asthma:

        YES:   _____

        NO   _____

    h.  Chronic Obstructive Pulmonary Disease:

        YES:   _____

        NO   _____

     i.   Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

        YES:    _____

        NO     _____

17. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs breached the duty of care that it owed to the Plaintiffs by making negligent misrepresentations[11] to the Plaintiffs?[12]

        YES:    _____

        NO     _____

*If your answer to question no. 17 is "No," proceed to question no. 19.  If your answer to question no. 17 is "YES," proceed to question 18.*

18. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that the Plaintiffs' reliance upon Jacobs' negligent misrepresentations was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

     a.   Coronary artery disease:

        YES:    _____

        NO     _____

---

[11] For the reasons stated, Jacobs disputes that Plaintiffs are entitled to pursue any claim for negligent misrepresentation, given the absence of any business transaction or allegation of financial harm.

[12] For the reasons stated, Plaintiffs' misrepresentation claims should not be addressed in Phase I of these cases.  Therefore, the Court should conclude that question nos. 17-20 are unnecessary.

b.  Lung cancer:

     YES:   _____

     NO    _____

c.  Leukemia:

     YES:   _____

     NO    _____

d.  Skin cancer:

     YES:   _____

     NO    _____

e.  Allergic contact dermatitis:

     YES:   _____

     NO    _____

f.  Peripheral neuropathy:

     YES:   _____

     NO    _____

g.  Asthma:

     YES:   _____

     NO    _____

h.  Chronic Obstructive Pulmonary Disease:

     YES:   _____

     NO    _____

      i.   Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

         YES:   _____

         NO     _____

19. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that Jacobs breached the duty of care that it owed to the Plaintiffs by making intentional or reckless misrepresentations to the plaintiffs?

         YES:   _____

         NO     _____

*If your answer to question no. 19 is "No," stop here, sign this form and return it to the Court.  If your answer to question no. 19 is "YES," proceed to question 20.*

20. Do you find that the Plaintiffs have proved, by a preponderance of the evidence, that the Plaintiffs' reliance upon Jacobs' intentional or reckless misrepresentations was capable of causing the following injuries or illnesses alleged by the Plaintiffs?

      a.   Coronary artery disease:

         YES:   _____

         NO     _____

      b.   Lung cancer:

         YES:   _____

         NO     _____

      c.   Leukemia:

         YES:   _____

         NO     _____

d.  Skin cancer:

    YES:    _____

    NO    _____

e.  Allergic contact dermatitis:

    YES:    _____

    NO    _____

f.  Peripheral neuropathy:

    YES:    _____

    NO    _____

g.  Asthma:

    YES:    _____

    NO    _____

h.  Chronic Obstructive Pulmonary Disease:

    YES:    _____

    NO    _____

i.  Respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema:

    YES:    _____

    NO    _____

Respectfully submitted,

**NEAL & HARWELL, PLC**


By:  /s/ James F. Sanders
       James F. Sanders     No. 005267
       jsanders@nealharwell.com
       J. Isaac Sanders    No. 029372
       isanders@nealharwell.com
       Marie T. Scott     No. 032771
       mscott@nealharwell.com
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee  37203
Telephone:  (615) 244-1713
Facsimile:  (615) 726-0573

SMITH CASHION & ORR, PLC
Jefferson C. Orr     (No. 12743)
jorr@smithcashion.com
S. Joe Welborn     (No. 21747)
jwelborn@smithcashion.com
Joshua K. Chesser   (No. 27993)
jchesser@smithcashion.com
231 Third Avenue North
Nashville, Tennessee  37201
Telephone:   (615) 742-8555
Facsimile:   (615) 742-8556

*Attorney for Defendant*
*Jacobs Engineering Group, Inc.*

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 5th day of October, 2018, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

      /s/ James F. Sanders

41

# TAB D

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TENNESSEE
 2                  AT KNOXVILLE, TENNESSEE

 3    _____)
                                         )
      GREG ADKISSON, et al.,             )
 4          Plaintiffs,                  )  Case No. 3:13-cv-505
      vs.                                )
 5    JACOBS ENGINEERING GROUP, INC.,)     Lead Case Consolidated
            Defendant.                   )  with
 6    _____)
                                         )
 7    KEVIN THOMPSON, et al.,            )
            Plaintiffs,                  )  Case No. 3:13-cv-666
 8    vs.                                )
      JACOBS ENGINEERING GROUP, INC.,)     as consolidated with:
 9          Defendant.                   )
      _____)
10                                       )
      JOE CUNNINGHAM, et al.,            )
11          Plaintiffs,                  )
      vs.                                )  Case No. 3:14-cv-20
12    JACOBS ENGINEERING GROUP, INC.,)
            Defendant.                   )
13    _____)
                                         )
14    BILL ROSE, et al.,                 )
            Plaintiffs,                  )
15    vs.                                )  Case No. 3:15-cv-17
      JACOBS ENGINEERING GROUP, INC.,)
16          Defendant.                   )
      _____)
17                                       )
      CRAIG WILKINSON, et al.,           )
18          Plaintiffs,                  )
      vs.                                )  Case No. 3:15-cv-274
19    JACOBS ENGINEERING GROUP, INC.,)
            Defendant.                   )
20    _____)

21

22

23
      REPORTED BY:
24    Teresa S. Grandchamp, RMR, CRR
      P.O. Box 1362
25    Knoxville, Tennessee 37901
      (865) 244-0454
```

```
                                                              2891
 1   ANGIE SHELTON, as wife and Next)
     of Kin on Behalf of MIKE        )
 2   SHELTON, et al.,                )
              Plaintiffs,            ) Case No. 3:15-cv-420
 3   vs.                             )
     JACOBS ENGINEERING GROUP, INC.,)
 4        Defendant.                 )
     _____)
 5                                   )
     JOHNNY CHURCH, et al.,          )
 6        Plaintiffs,                )
     vs.                             ) Case No. 3:15-cv-460
 7   JACOBS ENGINEERING GROUP, INC.,)
          Defendant.                 )
 8   _____)
                                     )
 9   DONALD R. VAN GUILDER, JR., et )
     al.,                            )
10        Plaintiffs,                )
     vs.                             ) Case No. 3:15-cv-462
11   JACOBS ENGINEERING GROUP, INC.,)
          Defendant.                 )
12   _____)
                                     )
13   JUDY IVENS, as Sister and Next )
     of Kin, on behalf of JEAN       )
14   NANCE, deceased,                )
              Plaintiff,             ) Case No. 3:16-cv-635
15   vs.                             )
     JACOBS ENGINEERING GROUP, INC.,)
16        Defendant.                 )
     _____)
17                                   )
     PAUL RANDY FARROW, et al.,      )
18        Plaintiffs,                )
     vs.                             ) Case No. 3:16-cv-636
19   JACOBS ENGINEERING GROUP, INC.,)
          Defendant.                 )
20   _____)
```

21                     **TRIAL PROCEEDINGS BEFORE**
                  **THE HONORABLE THOMAS A. VARLAN**
22                         **VOLUME XIV**

23                  **Tuesday, November 6, 2018**
                    **8:33 a.m. to 5:03 p.m.**
24

25

3006

1    hour, your deliberations have not yet begun.  So just

2    put things aside, enjoy lunch.  The storms are passed.

3    And we'll see you back here around 1:15.

4         The jury is excused.

5      (Jurors excused from the courtroom.)

6         THE COURTROOM DEPUTY:  This honorable court

7    should stand in recess until 1:15.

8      (A luncheon recess was taken at 11:41 a.m. and

9        resumed at the hour of 1:30 p.m. as follows:)

10

11                   **AFTERNOON SESSION**
                           (P.M.)

12         THE COURTROOM DEPUTY:  All rise.

13         THE COURT:  All right.  Thank you, everyone.

14   Slightly delayed, but we're ready to bring our jury in

15   to receive the charge at this time.

16      (Whereupon the following report of proceedings was

17        had within the presence and hearing of

18        the jury:)

19         THE COURT:  All right.  Thank you.  Everyone

01:30PM 20   may be seated, and welcome back to our members of the

21   jury.

22         Now, as I stated right before the lunch recess,

23   it's time for me to instruct you about the law that you

24   must follow in deciding this case.

25         I'll start by explaining your duties and the

3007

1    general rules that apply in every civil case. Then

2    I'll explain the elements or parts of Plaintiffs'

3    claims. Then I'll explain some rules you must use in

4    evaluating particular testimony and evidence, and last,

5    I'll explain the rules you must follow during your

6    deliberations in the jury room and the possible

7    verdicts you may return.

8        Please listen very carefully to everything I

9    say. But, remember, you will have a copy of these

01:31PM  10    instructions with you during the deliberations.

11        You have two main duties as jurors. The first

12    is to decide what the facts are from the evidence that

13    you saw and heard here in court. Deciding what the

14    facts are is your job, not mine, and nothing I've said

15    or done during this trial was meant to influence your

16    decision about the facts in any way.

17        Your second duty is to take the law I give you,

18    apply it to the facts, and decide if Plaintiffs have

19    proven their claims by a preponderance of the evidence.

01:31PM  20        It is my job to instruct you about the law, and

21    you're bound by the oath you took at the beginning of

22    the trial to follow the instructions I give you, even

23    if you personally disagree with them. This includes

24    the instructions I gave you before and during the

25    trial, as well as these instructions. All of these

3008

1    instructions are important and you should consider them

2    together as a whole.

3        The lawyers for the parties may have talked

4    about the law during their arguments, but if what they

5    said is different from what I say, you must follow what

6    I say.  What I say about the law controls.

7        Perform these duties fairly.  Do not let any

8    bias, sympathy or prejudice you may feel towards one

9    side or the other influence your decision in any way.

01:32PM   10        Now, the issues for you to determine in this

11   case are, one, whether Defendant adhered to the terms

12   of its contract with the Tennessee Valley Authority and

13   the requirements set forth in the Site Wide Safety and

14   Health Plan for the Kingston site.  Two, whether

15   Defendant breached any legal duty that I it owed to the

16   Plaintiffs.  And, three, whether Defendant's breach, if

17   any, was capable of causing Plaintiffs' alleged

18   injuries, which I will refer to as general causation.

19   I'll instruct you further about each of these issues

01:32PM   20   shortly.

21       In this action, unless I instruct you

22   otherwise, Plaintiffs have the burden of establishing

23   by a preponderance of the evidence all of the facts

24   necessary to prove the following elements of their

25   negligence claims:  Duty, breach and general causation.

3009

I'll further instruct you about each of these elements momentarily.

The term preponderance of the evidence means an amount of evidence that causes you to conclude that an allegation is probably true.

To prove an allegation by a preponderance of the evidence, a party must convince you that the allegation is more likely true than not true. To put it differently, if you were to put Plaintiffs' evidence and Defendant's evidence on opposite sides of a set of scales, Plaintiffs' evidence would have to make the scales tip somewhat on their side.

If Plaintiffs fail to meet this burden as to their claims, then your verdict on their claim must be for the Defendant.

In deciding whether any fact has been proven by a preponderance of the evidence, you may consider the testimony of all the witnesses regardless of who may have called them and all the exhibits entered into evidence regardless of who may have produced them.

If the evidence on a particular issue is equally balanced, that issue has not been proven by a preponderance of the evidence and the party with the burden of proving that issue has failed to meet its burden.

3010

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions or anything else that you may have seen or heard outside the Court, including any written, electronic or other media influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits I allowed into evidence, and the stipulations, any stipulations the parties may have agreed to.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The lawyers' questions and objections are also not evidence.  My legal rulings are not evidence and my comments and questions are not evidence.

During the trial I may not have let you hear the answers to some of the questions the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may have ordered you to disregard things that you saw or heard or I may have struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what

3011

1    an exhibit might have shown.  These things are not

2    evidence, and you're bound by your oath not to let them

3    influence your decision in any way.  Make your decision

4    based only on the evidence as I've defined it here and

5    nothing else.

6         You should use your common sense in weighing

7    the evidence.  Consider it in light of your everyday

8    experiences and observations with people and events and

9    give it whatever weight you believe it deserves.

01:35PM 10        If your experience tells you that certain

11   evidence reasonably leads to a conclusion, you're free

12   to reach that conclusion.

13        In arriving at your verdict, you are to

14   consider only the evidence in the case.  When you are

15   considering the evidence, however, you are not limited

16   solely to the statements of the witnesses.  You are

17   permitted to draw from the facts you find have been

18   proved any inferences or conclusions that reason and

19   common sense lead you to make.

01:35PM 20        Now, some of you may have heard the terms

21   direct evidence and circumstantial evidence.  Direct

22   evidence is simply evidence like the testimony of an

23   eyewitness that, if you believe it, directly proves a

24   fact.  If a witness testified he saw it raining outside

25   and you believed him, that would be direct evidence

3012

1    that it was raining.

2        Circumstantial evidence is simply a chain of

3    circumstances that indirectly proves a fact.   If

4    someone walked into the courtroom wearing a raincoat

5    covered with drops of water and carrying a wet

6    umbrella, that would be circumstantial evidence from

7    which you could conclude that it was raining.

8        It is your job to decide how much weight to

9    give the direct and circumstantial evidence.   The law

01:36PM   10    makes no distinction between the weight you should give

11    to either one and does not say that one is any better

12    evidence than the other.   You should consider all the

13    evidence, both direct and circumstantial, and give it

14    whatever weight you believe it deserves.

15        Another part of your job as jurors is to decide

16    how credible or believable each witness was.   This is

17    your job, not mine.   It is up to you to decide if a

18    witness's testimony was believable and how much weight

19    you think it deserves.   You are free to believe

01:36PM   20    everything a witness said or only part of it or none of

21    it at all.   But you should act reasonably and carefully

22    in making these decisions.

23        Let me suggest some things for you to consider

24    in evaluating each witness's testimony.   Ask yourself

25    if the witness was able to clearly see or hear the

3013

events.  Sometimes even an honest witness may not have

been able to see or hear what was happening and may

make a mistake.

Ask yourself how good the witness's memory

seemed to be.  Did the witness seem able to accurately

remember what happened?  Ask yourself if there was

anything else that may have interfered with the

witness's ability to perceive or remember the events.

Ask yourself how the witness acted while

testifying.  Did the witness appear honest or did the

witness appear to be lying?  Ask yourself if the

witness had any relationship to the Plaintiff or to the

Defendant or anything to gain or lose from the case

that might influence the witness's testimony.

Ask yourself if the witness had any bias,

prejudice or reason for testifying that might cause the

witness to lie or to slant the testimony in favor of

one side or the other.

Ask yourself if the witness testified

inconsistently while on the witness stand or if the

witness said or did something or failed to say or do

something at any other time inconsistent with what the

witness said while testifying.

If you believe that the witness was

inconsistent, ask yourself if this makes the witness's

3014

testimony less believable.  Sometimes it may; other

times it may not.  Consider whether the inconsistency

was about something important or about some unimportant

detail.  Ask yourself if it seemed like an innocent

mistake or if it seemed deliberate, and ask yourself

how believable the witness's testimony was in light of

all the other evidence.  Was the witness's testimony

supported or contradicted by other evidence you found

believable?

01:38PM        If you believe that a witness's testimony was

contradicted by other evidence, remember that people

sometimes forget things and that even two honest people

who witnessed the same event may not describe it

exactly the same way.  These are only some of the

things you may consider in deciding how believable each

witness was.

        You may also consider other things you think

shed some light on the witness's believability.  Use

your common sense and your everyday experience in

01:39PM  dealing with other people, and then decide what

testimony you believe and how much weight you think it

deserves.

        You have heard in this case the testimony of

Dr. Paul Terry, Dr. Scott Phillips, and Dr. David Hoel

who each testified -- who each testified as an opinion

1    witness in this case.

2        Usually witnesses are not permitted to testify

3    about their opinions or conclusions; however, a witness

4    who has scientific, technical or other specialized

5    knowledge, skill, experience, training, or education

6    may be permitted to give testimony in the form of an

7    opinion.  These witnesses are often referred to as

8    expert witnesses.

9        This term does not, however, necessarily imply

01:39PM  10   that you should credit the testimony of any of these

11   witnesses.  You should determine the weight that should

12   be given to each expert's opinion.  In doing so, you

13   should consider the education, qualifications and

14   experience of the witnesses, the credibility of the

15   witnesses, the facts relied upon by the witnesses to

16   support the opinion, and the reasoning used by the

17   witnesses to arrive at the opinion.

18       You alone decide how much of a witness's

19   testimony to believe and how much weight it deserves.

01:40PM  20   You should, therefore, consider each expert opinion and

21   give it the weight, if any, that you think it deserves.

22   Again, you are not required to accept the opinion of

23   any expert.

24       As explained in this previous instruction,

25   certain witnesses often called expert or opinion

3016

witnesses have been permitted to give testimony in the

form of an opinion based on their scientific, technical

or other specialized knowledge, skill, experience,

training, or education.

Dr. Paul Terry, Dr. Scott Phillips and

Dr. David Hoel are the only expert witnesses in this

case. Other witnesses are not permitted to give

testimony about opinions they hold if those opinions

are based on their scientific, technical or other

specialized knowledge, even if the witness does, in

fact, possess such knowledge.

You, therefore, must disregard any opinion

based on scientific, technical or other specialized

knowledge that was not given by Dr. Paul Terry,

Dr. Scott Phillips, or Dr. David Hoel.

There may be discrepancies or differences

within a particular witness's testimony or between the

testimony of different witnesses. This does not

necessarily mean that a witness should be disbelieved.

Sometimes when two people observe an event, they will

see or hear it differently. Sometimes a witness may

have an innocent lapse of memory. Witnesses may

testify honestly but simply may be wrong about what

they thought they saw or remembered.

You should consider whether the discrepancy

3017

1    relates to an important fact or only to an unimportant

2    detail.

3         One more point about the witnesses:  Sometimes

4    jurors wonder if the number of witnesses who testified

5    makes any difference.  Do not make any decisions based

6    only on the number of witnesses who testified.  What is

7    more important is how believable the witnesses were and

8    how much weight you think their testimony deserves.

9    Concentrate on that, not the number of witnesses.

01:42PM   10    Both sides may have objected to some of the

11   things that were said or done during the course of this

12   trial.  Do not hold that against either side.  The

13   lawyers have a duty to object whenever they think that

14   something is not permitted by the Rules of Evidence.

15   The rules are designed to make sure that both sides

16   receive a fair trial.

17        And do not interpret my rulings on any

18   objections as any indication of how I think the case

19   should be decided.  My rulings were based on the Rules

01:42PM   20   of Evidence, not on how I may feel about the case.

21   Remember, your decision must be based only on the

22   evidence that you saw and heard here in court.

23        Now, the Defendant in this case, Defendant

24   Jacobs, is a corporation.  A corporation may act only

25   through natural persons as its agents or employees.

3018

1          In general, any agents or employees of a

2     corporation may bind the corporation by their acts and

3     declarations made while acting within the scope of

4     their authority delegated to them by the corporation or

5     within the scope -- or within the scope of their duties

6     as employees of the corporation.

7          This case should be considered and decided by

8     you as an action between persons of equal standing in

9     the community, of equal worth, and holding the same or

01:43PM   10     similar stations in life.

11          The fact that Defendant Jacobs Engineering is a

12     corporation must not influence you in your

13     deliberations or in your verdict.  Corporations and

14     persons are equal in the eyes of the law.  Thus, all

15     persons, including corporations, are to be dealt with

16     as equals in a court of justice.  Both are entitled to

17     the same fair and impartial treatment and to justice by

18     the same legal standards.

19          It is your duty to find the facts from all the

01:43PM   20     evidence in the case.  After you determine the facts,

21     you must apply the law that has been given to you,

22     whether you agree with it or not.

23          You must not be influenced by any personal

24     likes or dislikes, prejudice or sympathy.  You must

25     decide the case solely on the evidence before you and

3019

1    according to the law given to you.

2        You should consider all the surrounding

3    circumstances at the time of an event or occurrence

4    when weighing the testimony of a witness.

5        A statement of facts should be disregarded if

6    you find the statement is inherently impossible or

7    contrary to either universally-recognized physical laws

8    or well-established physical facts.

9        As I told you at the beginning of this trial,

01:44PM  10    the Court has consolidated 10 separately-filed cases

11    with a total of 70 Plaintiffs for purposes of this

12    trial in which you must decide general issues common to

13    all these 10 cases and these 70 Plaintiffs.

14        As mentioned earlier, the issues are, one,

15    whether Defendant adhered to the terms of its contract

16    with TVA and the requirements set forth in the Site

17    Wide Safety and Health Plan for the Kingston site.

18    Two, whether the Defendant has breached any duties it

19    owes to all the Plaintiffs.  And, three, general

01:45PM  20    causation or whether any breach of duty was capable of

21    causing Plaintiffs' alleged injuries.

22        I'll explain these general issues further in a

23    moment discussing the standards that should guide your

24    determinations.

25        If you conclude that any breach of duty by

3020

1  Defendant was capable of causing the injuries the

2  Plaintiffs have alleged, these cases will proceed to

3  another phase which will focus on specific -- which

4  will focus on specific issues for individual

5  Plaintiffs, including proof of individual illnesses,

6  specific causation, and monetary damages, if any.

7          You must not concern yourselves with any of

8  those issues.  You are only being asked to decide the

9  specific issues identified in these instructions.

01:45PM 10         Any subsequent trial or trials will involve a

11  different jury or juries at a time in the future yet to

12  be determined.  You will not be called back to serve on

13  a jury in any Phase II or subsequent phase.  If you

14  decide against the Plaintiffs on these general issues

15  in Phase I, then none of the Plaintiffs would proceed.

16          To reiterate, whether any individual Plaintiff

17  was injured by defendant's conduct is not relevant to

18  the issues in this trial.  While individual Plaintiffs

19  have testified in this trial and evidence was presented

01:46PM 20  by Defendant about these Plaintiffs' individual

21  employment at the Kingston coal fly ash cleanup site,

22  this evidence was not presented for the purpose of

23  determining whether these testifying Plaintiffs were

24  injured by Defendant's conduct.

25          You should not base your decisions in this

3021

1    trial on whether Defendant's conduct caused any

2    individual Plaintiff's injuries.

3         Plaintiffs' claims in this case are for

4    negligence which is the failure to use ordinary or

5    reasonable care.  It is either doing something that a

6    reasonably careful person would not do or the failure

7    to do something that a reasonably careful person would

8    do under all the circumstances in this case.

9         In other words, one can be negligent through

01:47PM  10    either acts or omissions.  The mere happening of an

11    injury or accident does not in and of itself prove

12    negligence.

13         A person may assume that every other person

14    will use reasonable care unless a reasonably careful

15    person has cause for thinking otherwise.

16         Plaintiffs' negligence claims against Defendant

17    relate to professional services that Defendant agreed

18    to provide to the TVA, Tennessee Valley Authority,

19    which is a quasi governmental agency and like the

01:47PM  20    federal government is entitled to certain immunities

21    from suit.

22         In rendering the services at issue, Defendant

23    was required to comply with the requirements

24    established in the contract between Defendant and TVA,

25    which I will refer to as the contract, and in the Site

3022

1   Wide Safety and Health Plan for the Kingston site,

2   which I will refer to as the safety and health plan.

3       Defendant was not permitted to deviate from the

4   requirements in the safety and health plan without

5   express approval from TVA and the Environmental

6   Protection Agency.

7       Defendant is not immune from suit for such

8   deviations.  I have ruled that Defendant would be

9   acting contrary to the will of the government and is

10  not immune from suit if Defendant, A, deliberately

11  manipulated or tampered with any monitoring results or

12  processes, B, did not inform TVA safety officials of

13  repeated complaints regarding health problems due to

14  fly ash, C, failed to comply with the provisions of the

15  safety and health plan with respect to the voluntary

16  use of dust masks, D, threatened workers when they

17  asked for dust masks or respirators, E, communicated to

18  workers that fly ash was safe to consume, or, F,

19  otherwise failed to train or warn workers about the

20  dangers of excessive fly ash exposure.

21      Again, Defendant is not entitled to immunity

22  for any of these acts or omissions which would be

23  contrary to the will of the government and in violation

24  of its obligations to TVA.

25      Defendant is, therefore, potentially liable to

3023

1    Plaintiffs for any such violations if you find by a

2    preponderance of the evidence that any of them did, in

3    fact, occur.

4        Accordingly, the first issue you will be asked

5    to decide is whether particular conduct by Defendant

6    adhered to the terms of the contract and the safety and

7    health plan.

8        Defendant owed a duty of care to the Plaintiffs

9    in rendering certain professional services that were

10   intended to prevent the workers at the Kingston site

11   from being exposed to potentially harmful levels of fly

12   ash or any constituent element found in fly ash.

13       These obligations included, as provided in the

14   contract and the safety and health plan, one, air

15   monitoring, two, dust control, three, the use of

16   personal protective equipment at the site, and, four,

17   worker training.

18       Defendant owed a duty to the Plaintiffs to

19   exercise reasonable care in providing these services as

20   required under the contract and the safety and health

21   plan.

22       You must decide whether Defendant breached any

23   of these duties owed to the Plaintiffs in rendering

24   each of these services.

25       Under Tennessee law, in order to prevail on a

01:49PM (next to line 10)

01:50PM (next to line 20)

3024

claim of negligence, a plaintiff must first establish, one, a duty of care owed by the Defendant to the Plaintiffs, and, two, conduct by the Defendant falling below the applicable standard of care that amounts to a breach of duty.

In this case, and as explained in the previous instruction, Defendant owed a duty of care to the Plaintiffs in rendering certain professional services that were intended to prevent the workers at the Kingston site from being exposed to potentially harmful levels of fly ash or any constituent element found in the fly ash.

As previously stated, Defendant can potentially be held liable if you find that it, A, deliberately manipulated or tampered with any monitoring results or processes, B, did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash, C, failed to comply with the provisions of the safety and health plan with respect to the -- with respect to the voluntary use of dust masks, D, threatened workers when they asked for dust masks or respirators, E, communicated to workers that fly ash was safe to consume, or, F, otherwise failed to train or warn workers about the dangers of excessive fly ash exposure.

3025

1    If Plaintiffs prove any of these six acts or

2    omissions by a preponderance of the evidence, you must

3    then decide whether each amounts to a breach of

4    Defendant's duty of reasonable care.

5    In other words, you do not have to find that

6    any of these acts or omissions, if any, in fact, did

7    occur, necessarily amount to a breach of any of the

8    duties that I have previously discussed.

9    The standards that you must apply in making

01:51PM    10    this determination of whether Defendant breached any

11    duty that was owed are addressed in the following

12    instructions:  The standard of care for professional

13    services and any breaches of those standards normally

14    must be established through the testimony of expert

15    witnesses.  No such expert witnesses testified in this

16    trial in that regard.  Such expert testimony is not

17    required, however, where the alleged act of

18    professional negligence is obvious.

19    In these cases, the Plaintiffs have alleged

01:52PM    20    certain acts or omissions that, if proven, would fit

21    within that exception.  These are allegations that the

22    Defendant, A, deliberately manipulated or tampered with

23    any monitoring results or processes, B, did not inform

24    TVA safety officials of repeated complaints regarding

25    health problems due to fly ash, C, failed to comply

3026

with the provisions of the health and safety plan with

respect to the voluntary use of dust masks, D,

threatened workers when they asked for dust masks or

respirators, E, communicated to workers that fly ash

was safe to consume, or, F, otherwise failed to train

or warn workers about the dangers of excessive fly ash

exposure.

If you conclude that Plaintiffs have proven by

a preponderance of the evidence that Defendant was

responsible for any of these acts or omissions, you may

presume that such conduct did not comply with the

applicable professional standards of care.

In the absence of reasonable cause for thinking

otherwise, a person who is using ordinary care has a

right to assume that other persons are ordinarily

intelligent and possess normal sight and hearing.

Now, I've instructed on the duties the

Defendant owed to the Plaintiffs and on specific acts

that, if proven, would constitute breaches of the duty

Defendant owes to Plaintiffs.

If you find that Defendant has breached any

duty to Plaintiffs, you must then decide whether any

such breach -- whether any such breach was capable of

causing Plaintiffs' alleged injuries.

Plaintiffs have alleged that coal fly ash and

3027

its ingredients which Plaintiffs complain they were

exposed to in their employment are capable of causing

certain illnesses from which Plaintiffs claim to

suffer.  This is called general causation which

requires proof that a toxic substance is capable of

causing the Plaintiffs' alleged injuries.

In contrast, specific causation requires proof

that the toxic substance actually did cause an

individual Plaintiffs' alleged injury.  Only general

causation is at issue here.

To prove general causation, Plaintiffs need not

show any one individual Plaintiffs' exposure level

because general causation does not require

individualized proof; rather, at this stage of

litigation, it is enough for Plaintiffs to show that

the amount of toxic constituents generally present in

the coal fly ash at the Kingston site was capable of

causing the complained-of diseases.

For general causation purposes, proof of

exposure may entail relatively straightforward

historical facts, such as the presence of coal fly ash

and its constituents in Plaintiffs' workplace.

If you believe that Defendant destroyed or

tampered with any air monitoring samples or results and

that any such destruction or tampering was done

3028

1    intentionally, knowingly, or negligently, or, in other

2    words, that it was caused by the unjustified or

3    careless actions or inactions of Defendant or its

4    employees, then you may infer, but you are not required

5    to infer, that such evidence, if it were available or

6    unmanipulated, would have been favorable to the

7    Plaintiffs and adverse to the Defendant.

8         That concludes the part of my instructions

9    explaining the rules for considering some of the

01:55PM   10    testimony in evidence.

11         Now let me finish up by explaining some of the

12    things about your deliberations in the jury room and

13    your possible verdicts.

14         The first thing you should do in the jury room

15    is to choose someone to be your foreperson.  This

16    person will help to guide your discussions and will

17    speak for you here in court.

18         Once you start deliberating, do not talk to

19    anyone else except each other about the case.  If you

01:56PM   20    have any questions or messages, you must write them

21    down on a piece of paper, sign them, and then give them

22    to me through the courtroom deputy or the court

23    security officer.

24         The courtroom deputy, Ms. Norwood, will then

25    give them to me and I'll respond as soon as I can.

3029

1          Keep in mind, if you do submit any questions,

2     I, as a matter of law, have to talk to the parties

3     about what you've asked.  So it may take me some time

4     to get back to you.  Any questions or messages normally

5     should be sent to me through your foreperson.

6          One more thing about messages:  Do not ever

7     write down or tell anyone, other than among yourselves,

8     how you stand on your votes.  For example, do not write

9     down or tell anyone that you are split or whatever your

01:56PM  10   vote happens to be.  That should stay secret until you

11    are finished.

12         Exhibits that were admitted into evidence will

13    be sent into the jury room with you.  This Court uses

14    the Jury Evidence Recording System, also known as JERS,

15    J-E-R-S, which is a recently-developed system which

16    makes evidence electronically accessible in the jury

17    deliberation room.

18         To the extent possible, the evidence presented

19    during trial has been captured electronically.  Once it

01:57PM  20   is released to you, you can view the evidence in the

21    deliberation room through the use of a touch-screen

22    computer.

23         Any evidence that could not be captured by JERS

24    will be physically sent into the jury deliberation

25    room, as will any other evidence the Court finds should

3030

1    be physically sent into the jury deliberation room.

2           If you need assistance with the JERS equipment,

3    please let Ms. Norwood know.

4           Remember, you must make your decision based

5    only on the evidence you saw and heard here during

6    court.  During your deliberations you must not

7    communicate with or provide any information to anyone

8    about any means about the case.  You may not use any

9    electronic device or media, such as a telephone, cell

01:57PM  10   phone, Smartphone, iPhone or computer, the Internet,

11   any Internet service, or any text or instant messaging

12   service, any Internet chat room, blog or website, such

13   as Facebook, Instagram, LinkedIn, YouTube or Twitter,

14   to communicate to anyone any information about this

15   case or to conduct any research about this case until I

16   accept your verdict.

17          In other words, you cannot talk to anyone on

18   the phone, correspond with anyone, or electronically

19   communicate with anyone about the case.  You can only

01:58PM  20   discuss the case in the jury room with your fellow

21   jurors during your deliberations.

22          Certainly while I do not expect any issues in

23   that regard, we always ask that the Court be informed

24   as soon as possible if you become aware of any

25   violation of these instructions.

3031

1          You may not use these electronic means to

2   investigate or communicate about the case because it is

3   important that you decide this case based solely on the

4   evidence presented in the courtroom.

5          Information on the Internet or available

6   through social media might be wrong, incomplete or

7   inaccurate.  You are only permitted to discuss the case

8   with your fellow jurors during deliberations because

9   they have seen and heard the same evidence that you

01:58PM  10   have.

11          In our judicial system it is important that you

12   are not influenced by anything or anyone outside of

13   this courtroom.  Otherwise, your decision may be based

14   on information known only to you -- known only by you

15   and not your fellow jurors or the parties in the case.

16   This would unfairly and adversely impact the judicial

17   process, and as you can surmise, a juror who violates

18   these restrictions jeopardizes the fairness of these

19   proceedings and a mistrial could result which would

01:59PM  20   require the entire trial process to start over.

21          Your verdict in this case must be unanimous.

22   To find Defendant liable on the claims raised by the

23   Plaintiffs, every one of you must agree that the

24   Plaintiffs have proven their claims by a preponderance

25   of the evidence.

3032

1    To find the Defendant not liable on the claims

2    raised by the Plaintiffs, every one of you must agree

3    that the Plaintiffs have failed to prove their claims

4    by a preponderance of the evidence.

5    Either way, liable or not liable, your verdict

6    must be unanimous on the claims by the Plaintiffs.

7    Now that all the evidence is in and the

8    arguments are completed, you are free to talk about the

9    case in the jury room.  In fact, it is your duty to

01:59PM  10    talk with each other about the evidence and to make

11    every reasonable effort you can to reach a unanimous

12    agreement.

13    Talk with each other, listen carefully and

14    respectfully to each other's views and keep an open

15    mind as you listen to what your fellow jurors have to

16    say.  Try your best to work out your differences.  Do

17    not hesitate to change your mind if you are convinced

18    that other jurors are right and that your original

19    position was wrong.  But do not ever change your mind

02:00PM  20    just because other jurors see things differently or

21    just to get the case over with.

22    In the end, your vote must be exactly that,

23    your own vote.  It is important for you to reach a

24    unanimous agreement but only if you can do so honestly

25    and in good conscience.

3033

1    No one will be allowed to hear your discussions

2    in the jury room and no record will be made of what you

3    say.  So you should all feel free to speak your minds.

4    Listen carefully to what the other jurors have

5    to say and then decide for yourself if Plaintiffs have

6    proven their claims by a preponderance of the evidence.

7    Now, I've prepared a special verdict form that

8    you should use to record your verdict, and it should be

9    self-explanatory.  If you decide the Plaintiffs have

02:01PM   10    proven their claims by a preponderance of the evidence,

11    say so by having your foreperson mark the appropriate

12    places on the verdict form.

13    If you decide the Plaintiffs have not proven

14    their claims by a preponderance of the evidence, say so

15    by having your foreperson mark the appropriate places

16    on the verdict form.

17    Again, you'll find the verdict form is a

18    roadmap.  After each question, it will direct you

19    either to the next question or a different place on the

02:01PM   20    verdict form, depending on your answer to a particular

21    question.

22    Once you've made your decisions and marked them

23    on the verdict form, your foreperson should then sign

24    the form, put the date on it, and have it returned to

25    me.

3034

1    Remember, if you were elected to take notes

2    during the trial, your notes should be used only as

3    memory aids.  You should not give your notes greater

4    weight than your independent recollection of the

5    evidence.  You should rely upon your own independent

6    recollection of the evidence or lack of evidence and

7    you should not be unduly influenced by the notes of

8    other jurors.  Notes are not entitled to any more

9    weight than the memory or impression of each juror.

02:02PM  10    Whether you took notes or not, each of you must form

11    and express your own opinion as to the facts of the

12    case.

13    And let me finish up by repeating something

14    that I said to you earlier.  Nothing that I have said

15    or done during this trial was meant to influence your

16    decision in any way.  You must decide for yourselves if

17    Plaintiffs have proven their claims by a preponderance

18    of the evidence.

19    That concludes my instructions, and I'll now

02:02PM  20    excuse you to go back to the jury room to begin your

21    deliberations consistent with these instructions.

22    Thank you.

23    (Jurors excused from the courtroom to

24    deliberate at 2:03 p.m. on Tuesday,

25    November 6, 2018.)

# TAB E

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| GREG ADKISSON, et al.,<br>　　　Plaintiffs,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:13-CV-505-TAV-HBG<br><br>*Lead case consolidated with* |
| KEVIN THOMPSON, et al.,<br>　　　Plaintiffs,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:13-CV-666-TAV-HBG<br><br>*as consolidated with* |
| JOE CUNNINGHAM, et al.,<br>　　　Plaintiffs,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:14-CV-20-TAV-HBG |
| BILL ROSE,<br>　　　Plaintiff,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:15-CV-17-TAV-HBG |
| CRAIG WILKINSON, et al.,<br>　　　Plaintiffs,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:15-CV-274-TAV-HBG |
| ANGIE SHELTON, as wife and next of kin<br>on behalf of Mike Shelton, et al.,<br>　　　Plaintiffs,<br>v.<br>JACOBS ENGINEERING GROUP, INC.,<br>　　　Defendant. | No.:   3:15-CV-420-TAV-HBG |

JOHNNY CHURCH,                          )
    Plaintiff,                          )
v.                                      )    No.:   3:15-CV-460-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
    Defendant.                          )
_____ )
DONALD R. VANGUILDER, JR.,              )
    Plaintiff,                          )
v.                                      )    No.:   3:15-CV-462-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
    Defendant.                          )
_____ )
JUDY IVENS, as sister and next of kin,  )
on behalf of JEAN NANCE, deceased,      )
    Plaintiff,                          )
v.                                      )    No.:   3:16-CV-635-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
    Defendant.                          )
_____ )
PAUL RANDY FARROW,                      )
    Plaintiff,                          )
v.                                      )    No.:   3:16-CV-636-TAV-HBG
JACOBS ENGINEERING GROUP, INC.,         )
    Defendant.                          )
_____ )

## **VERDICT FORM**

1.    DO YOU FIND THAT THE PLAINTIFFS HAVE PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANT FAILED TO ADHERE TO THE TERMS OF ITS CONTRACT WITH TVA, OR THE REQUIREMENTS SET FORTH IN THE SITE WIDE SAFETY AND HEALTH PLAN FOR THE KINGSTON SITE?

        YES: __✓__

        NO _____

2

*IF YOUR ANSWER TO QUESTION NO. 1 IS "YES," PROCEED TO QUESTION 2. IF YOUR ANSWER TO QUESTION NO. 1 IS "NO," YOU ARE FINISHED. THE FOREPERSON SHOULD SIGN AND DATE THIS VERDICT FORM AND NOTIFY THE COURT OFFICER THAT YOU HAVE REACHED A VERDICT.*

2. DO YOU FIND THAT THE PLAINTIFFS HAVE PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANT FAILED TO EXERCISE REASONABLE CARE IN CARRYING OUT THE DUTIES THAT IT OWED TO THE PLAINTIFFS?

YES: ✓

NO _____

*IF YOUR ANSWER TO QUESTION NO. 2 IS "YES," PROCEED TO QUESTION 3. IF YOUR ANSWER TO QUESTION NO. 2 IS "NO," YOU ARE FINISHED. THE FOREPERSON SHOULD SIGN AND DATE THIS VERDICT FORM AND NOTIFY THE COURT OFFICER THAT YOU HAVE REACHED A VERDICT.*

3. DO YOU FIND THAT THE PLAINTIFFS HAVE PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANT'S BREACH OF DUTY WAS CAPABLE OF CAUSING THE FOLLOWING INJURIES OR ILLNESSES ALLEGED BY THE PLAINTIFFS?

a. HYPERTENSION:

YES: ✓

NO _____

3

b.   CORONARY ARTERY DISEASE:

      YES: __✓__

      NO _____

c.   LUNG CANCER:

      YES: __✓__

      NO _____

d.   LEUKEMIA AND OTHER HEMATOLOGIC MALIGNANCIES:

      YES: __✓__

      NO _____

e.   SKIN CANCER:

      YES: __✓__

      NO _____

f.   ALLERGIC CONTACT DERMATITIS:

      YES: __✓__

      NO _____

g.   PERIPHERAL NEUROPATHY:

      YES: __✓__

      NO _____

h.   ASTHMA:

      YES: __✓__

      NO _____

4

i.     CHRONIC OBSTRUCTIVE PULMONARY DISEASE:

        YES: ✓

        NO   _____

j.     RESPIRATORY CONDITIONS, INCLUDING COUGH, SORE THROAT, DYSPNEA ON EXERTION, CHEST PAIN OR DISCOMFORT, BRONCHITIS AND EMPHYSEMA:

        YES: ✓

        NO   _____

YOUR DELIBERATIONS ARE AT AN END. THE FOREPERSON SHOULD SIGN AND DATE THIS VERDICT FORM AND NOTIFY THE COURT OFFICER THAT YOU HAVE REACHED A VERDICT.

**SIGNATURE REDACTED**

_____

Signature of FOREPERSON

11-7-18
_____

Date

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt       POTTER STEWART U.S. COURTHOUSE       Tel. (513) 564-7000

Clerk       CINCINNATI, OHIO 45202-3988       www.ca6.uscourts.gov

Filed:  May 13, 2019

Mr. Theodore J. Boutrous, Jr.
Gibson Dunn
333 S. Grand Avenue
Los Angeles, CA 90071

Re:  Case No. 19-5508, *In re: Jacobs Engineering Group, Inc*
Originating Case No. : 3:13-cv-00505 : 3:13-cv-00666 : 3:14-cv-00020 : 3:15-cv-00017 :
3:15-cv-00274 : 3:15-cv-00420 : 3:15-cv-00460 : 3:15-cv-00462 : 3:16-cv-00635 : 3:16-cv-00636

Dear Counsel:

The petition for writ of mandamus has been docketed as case number **19-5508** with the caption listed above.  If you have not already done so, you must mail a copy of the petition to the lower court judge and counsel for all the other parties.

The filing fee for the petition is $500, which is payable to the Clerk, Sixth Circuit Court of Appeals.  If you wish to seek a waiver of the filing fee, a motion for pauper status with a completed financial affidavit is due by **May 28, 2019**.  The financial affidavit is available at www.ca6.uscourts.gov.

Counsel for petitioner must file an Appearance of Counsel form and, if not admitted, apply for admission to the 6th Circuit Bar by **May 28, 2019**.  The forms are available on the court's website.

The district court judge to whom this petition refers has been served with this letter.

Sincerely yours,

s/Karen S. Fultz
Case Manager
Direct Dial No. 513-564-7036

cc:  Mr. John L. Medearis