| | | |
|---|---|---|
| GREG ADKISSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-00505-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | *Lead case consolidated with* |
| _____ | ) | |
| KEVIN THOMPSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No. 3:13-CV-00666-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| JOE CUNNINGHAM, et al., | ) | *as consolidated with* |
|     Plaintiffs, | ) | |
| v. | ) | No. 3:14-CV-00020-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| BILL ROSE, | ) | |
|     Plaintiff, | ) | |
| v. | ) | No. 3:15-CV-00017-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| CRAIG WILKINSON, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-00274-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| ANGIE SHELTON, as wife and next of kin on behalf of Mike Shelton, et al., | ) | |
|     Plaintiffs, | ) | |
| v. | ) | No.: 3:15-CV-00420-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| JOHNNY CHURCH, | ) | |
|     Plaintiff, | ) | |
| v. | ) | No.: 3:15-CV-00460-TAV-HBG |
| JACOBS ENGINEERING GROUP, INC., | ) | |
|     Defendant. | ) | |

| | |
|---|---|
| DONALD R. VANGUILDER, JR., )<br>    Plaintiff, )<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>    Defendant. )<br>_____ ) | No. 3:15-CV-00462-TAV-HBG |
| JUDY IVENS, as sister and next of kin, )<br>on behalf of JEAN NANCE, deceased, )<br>    Plaintiff, )<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>    Defendant. )<br>_____ ) | No. 3:16-CV-00635-TAV-HBG |
| PAUL RANDY FARROW, )<br>    Plaintiff, )<br>v. )<br>JACOBS ENGINEERING GROUP, INC., )<br>    Defendant. )<br>_____ ) | No. 3:16-CV-00636-TAV-HBG |

**JACOBS ENGINEERING GROUP INC.'S**
**BRIEF REGARDING PHASE II PROCEDURES**

## TABLE OF CONTENTS

|      |                                                                                                                                                  | Page |
|------|--------------------------------------------------------------------------------------------------------------------------------------------------|------|
| I.   | Introduction......................................................................................................................................... | 1    |
| II.  | The *Adkisson* Cases Should Proceed on an Individual Basis in Phase II. ........................... | 1    |
| III. | Substantial Fact Discovery Is Still Required Across Individual Cases. ............................. | 7    |
| IV.  | The Parties Should Select 15 Bellwethers for Expert Disclosure, Summary Judgment, and, if Necessary, Trial.............................................. | 7    |
| V.   | If Punitive Damages Are Tried, They Too Should Be Litigated for Each Individual Plaintiff Following a Damages Finding............................... | 9    |
| VI.  | Proposed Updated Schedule for Phase II.......................................................................... | 10   |

# I. Introduction

In accordance with the Court's recent orders, Jacobs provides below its "recommendations for how th[e] Court should conduct the Phase II proceedings." Doc. 489 at 2; *see also* Doc. 474 at 3.

Jacobs has not changed its view on how Phase II should proceed since its last brief on this subject. *See generally* Doc. 454. Jacobs continues to believe that each of the individual cases must be tried on an individual basis. Plaintiffs' proposed grouping by medical condition, Docs. 453 at 5; 490 at 6–7, would be highly prejudicial and would violate both Rule 42 of the Federal Rules of Civil Procedure and Jacobs' rights under the Constitution.

However, Jacobs recognizes that the need for 52 individual trials[1] poses an enormous burden on the Court. To ease that burden, Jacobs reiterates its proposal to use individual bellwethers. Specifically, Jacobs proposes that the parties proceed to fact discovery across all the individual cases, and at the conclusion of fact discovery, the parties select 15 or fewer individual worker Plaintiff bellwethers to proceed to individual expert discovery, individual summary judgment proceedings, and, if necessary, individual trials. *See* Doc. 454 at 16–17.

As outlined below, Jacobs additionally proposes a revised schedule for the Phase II proceedings given the time that has elapsed due to the mediation requested by Plaintiffs.

# II. The *Adkisson* Cases Should Proceed on an Individual Basis in Phase II.

As a threshold matter, these cases must proceed on an individual basis, because the issues to be tried in Phase II—specific causation, injury, and damages—are not common among the Plaintiffs. The Court has previously recognized that the questions presented by Phase II must be

---

[1] There are 72 plaintiffs in the *Adkisson* cases, consisting of 52 workers and 20 spouses/next of kin.

answered on an individual basis, as it explained in the Phase I bifurcation order: "[T]he cases in this litigation . . . involve individualized issues and evidence specific to each plaintiff, including specific causation with respect to each individual plaintiff, each plaintiff's alleged injuries, and the extent to which individual plaintiffs are entitled to damages." Doc. 136 at 5.

In each of these cases, the jury will need to determine whether Jacobs' conduct caused each *individual* Plaintiff to be exposed to any purported harmful substance at a dangerous "dose" that caused any claimed illness,[2] considering that *individual* Plaintiff's role, responsibilities, and duration of work at the Kingston Site; how other factors—like a history of smoking, exposure to toxic substances at other workplaces, or underlying illness and physical conditions such as obesity—may have contributed to each *individual* Plaintiff's alleged injuries; the result of each *individual* Plaintiff's independent medical examination; and the damages—if any—that each *individual* Plaintiff may be entitled to. It would therefore constitute error under Federal Rule of Civil Procedure 42(a) to consolidate the individual cases any further for Phase II. *See, e.g.*, *Lewis v. Walker*, 2017 WL 1274094, at *2–3 (E.D. Tenn. Apr. 4, 2017) (denying motion for consolidation when no common questions of law or fact existed). And, even if Plaintiffs could make the requisite showing of commonality in order to proceed on a consolidated basis under Rule 42, the discretionary factors in *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993) counsel against consolidation too. *See* Doc. 454 at 3–11.

---

[2] Plaintiffs' misstatements about the law of specific causation (Doc. 490 at 8) go well beyond the Court's request for "recommendations for how this Court should conduct the Phase II proceedings." Doc. 489 at 2. What the law requires for proof of specific causation is not presently before the Court and should be the subject of briefing after discovery, when the issues can be put in context with specific facts of each Plaintiff's case. To the extent the Court wishes to address these important issues now, Jacobs respectfully requests 30 days for supplemental briefing.

Consolidation of Plaintiffs' cases in Phase II would be prejudicial to both Plaintiffs and Jacobs alike. Any jury would likely become confused, or at least influenced, by evidence presented on behalf of different Plaintiffs whose situations and claimed injuries are different. And there is undoubtedly an enormous risk that grouping them by medical condition, as Plaintiffs have proposed, would present a false and highly misleading picture to the jury that *all* of the claimed illnesses must have the same cause—*i.e.*, Jacobs' actions.

Plaintiffs' proposal (filed yesterday—a day before the deadline) for the first two trials only highlights how inappropriate and unconstitutional it would be to group by alleged medical condition. Plaintiffs "propose that the first trial focus on lung disease cases with the 7 Plaintiffs selected"—William Harvey Bass, Jeffrey Brewer, Tim Gibson, Stanley Hill, Mike Shelton, Kenneth Shepherd, and Kevin Thompson—as the "Lung Group." Doc. 490 at 7. Plaintiffs then propose a second trial for the "Cardiovascular Group"—Leonard Bledsoe, Ansol Clark, Dan Cody, John Cox, Enoch "Roy" Edmonds, Jimmy Kilby, and Mike McCarthy. *Id.* Without any medical, legal, or evidentiary support, Plaintiffs simply promise the Court that their self-selected groups based on "primary disease type" will lead to "similar medical proof" and "efficiencies." *Id.* at 6–7.

Plaintiffs' own medical records, however, refute that notion and demonstrate just how individualized these issues are. Take, for instance, Plaintiff ▮▮▮▮ and Plaintiff ▮▮▮▮ from the "Lung Group." They both seek recovery in connection with "lung diseases," but otherwise have nothing in common. ▮▮▮▮ claims he is suffering from asthma, COPD, and respiratory conditions because of exposure to fly ash, but he was diagnosed with asthma and respiratory conditions when he was a child. *See generally* Ex. A. In contrast, ▮▮▮▮ is deceased, and his family members claim that he contracted lung *cancer* from his work at Kingston, and thus "[t]he

3

potential for prejudice resulting from the consolidation of a cancer case with a non-cancer case is obvious," *Cantrell*, 999 F.2d at 1011. ▇▇▇ also smoked for over 30 years, suffered from hypertension and obesity, and previously worked at a recycling plant melting aluminum, which caused him to suffer from a variety of breathing issues. Ex. B at 2; Ex. C at 1–2. In other words, these two Plaintiffs have entirely different diagnoses, medical histories, and lifestyle risk factors. The only medical fact that appears common between ▇▇▇ and ▇▇▇ is that they were both diagnosed with all of their complained-of illnesses before ever setting foot on Kingston—although even that difference spans decades since ▇▇▇ was diagnosed in childhood and ▇▇▇ was diagnosed in the years prior to his work at the Site.

Other members of the "Lung Group" further demonstrate that there will be no "common" medical proof—only confusion and prejudice. Plaintiff ▇▇▇, for example, arrived at Kingston with a long history of respiratory illnesses and does not appear to have smoked—but has *never actually been diagnosed* with COPD. And a medical examination of ▇▇▇ from 2015 concluded that his respiratory conditions were "more likely than not" *unrelated* to fly ash exposure. Ex. L at 1–9. Plaintiff ▇▇▇, in contrast, *has* been diagnosed with COPD, but he admitted at his deposition that his COPD and asthma predated his time at Kingston, Ex. U at 34–35, and his medical records show that he has an extensive history of smoking, Ex. M at 4. Plaintiff ▇▇▇, for his part, has produced medical records confirming that by 2017—well after the completion of the Kingston cleanup—he had "*no* [pulmonary] conditions or symptoms." Ex. O at 3–4 (emphasis added); *see also* Ex. P at 3 (▇▇▇ informed his doctors in 2018 that his "breathing [was] doing well. . . . Patient *denie*[*d*] any current cough, dyspnea, or wheezing" (emphasis added)). Thus, these Plaintiffs alone range from having never been diagnosed with COPD, to having been diagnosed with COPD before arriving at Kingston, to no longer having any respiratory condition at all.

4

No jury could be expected to keep these disparate Plaintiffs' histories straight—not with "notebooks with photographs" or otherwise. Doc. 490 at 8. And the discussion above does not even consider the other *non*-lung diseases that at least six of the seven "Lung" Plaintiffs attribute to coal ash—████████████████████████████████████████████████████████████████████████████████████████████████████████████████████—which would make them all candidates for the "Cardiovascular Group" too, assuming anyone could decipher how Plaintiffs determined what was a given Plaintiff's "primary disease type for which recovery is sought." *Id.* at 7.

Plaintiffs' grouping of individuals in the "Cardiovascular Group" (a.k.a., "Heart Group") is similarly problematic: all of them have drastically different medical histories. Plaintiff ██, for example, has a unique history of ignoring medical advice, making his illnesses worse. His doctors warned him that his refusal to take his hypertension medication would lead to serious heart issues, to which ██ replied that he was doing the same thing his own father had—*i.e.*, "basically ignor[ing] all of his medical problems until they killed him." Ex. Q at 5. Plaintiff ██ would also be subject to a unique defense: he produced records from an independent doctor who saw no "immediate cause and effect" regarding his work at Kingston. Ex. R at 6. Like many other Plaintiffs, ██ and ██ were diagnosed with hypertension before they started working at Kingston, Ex. S at 3; Ex. Q at 6; but another Plaintiff, ████, was not, despite medical records showing that he smoked a half-pack of cigarettes per day for 34 years. Ex. T at 4.

In addition to different medical conditions, histories, and risk factors, all of these Plaintiffs—whether assigned to the "Lung Group" or "Cardiovascular Group—have different potential exposures to coal ash given the different roles each had at the Site, along with their different dates and durations of employment. At bottom, that many of the Plaintiffs claim to suffer

5

from overlapping diseases is almost beside the point: each and every one of their individual circumstances will need to be litigated to determine whether Jacobs' actions actually caused their claimed illnesses, and if so, what damages (if any) they are owed.[3]

Indeed, it is striking that Plaintiffs cannot cite a single case that supports their grouping by disease, and the one case they cite undermines their own proposal. In *Auchard v. Tennessee Valley Authority*, 2011 WL 444845 (E.D. Tenn. Feb. 1, 2011), the plaintiffs proposed a single "bellwether" trial of "11 individuals" to go first. *Id.* at *1. The court rejected that approach because of "the highly individualized causation and damages determinations," including for "personal injury." *Id.* at *3. The same is true here. Although Plaintiffs have two groups of seven here instead of one group of eleven as in *Auchard*, grouping is still not permissible because of the "the highly individualized causation and damages determinations" necessary for "personal injury" claims. *Id.*

Moreover, because the issues of specific causation and damages are necessarily individualized, combining these cases in Phase II would violate Jacobs' due process rights under the Constitution. Jacobs is entitled to present "*every* available defense," tailored to each Plaintiff's individual circumstances. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (emphasis added) (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *see also* Doc. 454 at 10–11. Consolidating the claims as Plaintiffs proposed—with respect to proceedings that are supposed to concern individualized issues of specific causation, injury, and damages—would effectively eliminate

---

[3] Jacobs continues to believe that the Phase II juries will necessarily have to reexamine that question for themselves, which will violate Jacobs' Seventh Amendment rights. At a minimum, Plaintiffs may not be able to carry their burden of proof because there are "questions about how Plaintiffs are going to prove that Jacobs caused specific diseases in individual Plaintiffs without reexamining evidence about what duties Jacobs owed (and breached)." *In re Jacobs Eng'g Grp., Inc.*, No. 19-5508, at *4 (6th Cir. Aug. 13, 2019) (Nalbandian, J., concurring). Jacobs recognizes that those issues are not presently before the Court.

Jacobs' ability to defend against each Plaintiff's claims. The Court should thus reject Plaintiffs' proposal to consolidate their claims for trial.

**III.     Substantial Fact Discovery Is Still Required Across Individual Cases.**

Substantial discovery remains necessary before the parties can select bellwether Plaintiffs and proceed with any Phase II trials. Plaintiffs are still in the process of producing medical information, and certain Plaintiffs have provided very little information to date. Additionally, Plaintiffs' counsel has suggested that many of the Plaintiffs' medical conditions have changed significantly in the last couple of years, thus requiring supplemental productions.

Most critically, the parties will also need to conduct numerous depositions, including of many of the individual Plaintiffs (and their spouses) who were not deposed prior to the Phase I trial. Indeed, it is striking that the Plaintiffs have proposed proceeding to trial only on Plaintiffs who have already been deposed, even though more than 20 other Plaintiffs have not. Additionally, some of the Plaintiffs who were deposed prior to the Phase I trial may need to be deposed a second time, if they are claiming new or changed medical conditions. Additionally, all of the Plaintiffs' treating physicians and medical providers (many of whom have not yet been identified by Plaintiffs) still need to be deposed, as will other fact witnesses with knowledge of Plaintiffs' claimed injuries and damages. This discovery must be completed before bellwether Plaintiffs are selected or any case is set for trial.

**IV.     The Parties Should Select 15 Bellwethers for Expert Disclosure, Summary Judgment, and, if Necessary, Trial.**

Jacobs proposes that, following completion of the Plaintiff-specific fact discovery, the parties should then select bellwether Plaintiffs to proceed to expert discovery, and it believes that

no more than 15 bellwethers will be necessary.[4] Proceeding to individual Phase II trials with bellwethers will allow the parties to evaluate the strength of their evidence and assess the value of Plaintiffs' cases, which is all the more important after the lengthy yet unsuccessful efforts to settle this case during the past year. The use of bellwethers in mass tort cases is now the gold standard because the procedure does not have preclusive effect (as each case is individualized); it allows the parties to produce sufficiently "representative" results that "enable the parties and the court to determine the nature and strength of the claims"; and it can inform the parties' respective postures for further negotiations, trials, and potential resolution of the remaining claims. *See* Federal Judicial Ctr., Manual for Complex Litigation, Fourth § 22.315 (2004); *see also* Doc. 454 at 11–12.

The procedure for selecting bellwethers should be determined by the Court based on further briefing from the parties, and Jacobs reserves its rights to challenge any procedure offered by Plaintiffs. The two most common procedures are to allow each side to select the same number of Plaintiffs or to have a random selection with each side having strikes. Manual for Complex Litigation, § 22.315. Plaintiffs have no authority to support their claim that Plaintiffs "should be able to select the Plaintiffs for each trial," Doc. 490 at 8, and their proposal neither is the normal practice nor would serve the purpose of a bellwether process, which is to test a representative group of plaintiffs so the parties can assess the overall merits and settlement value of the case. *See* Manual for Complex Litigation, § 22.315.

Once the bellwethers are selected, the parties will need to disclose, provide reports for, and depose experts. Specifically, Plaintiffs' expert or experts will need to present reliable, scientific

---

[4] Jacobs previously proposed 20 bellwethers—two per injury group. Doc. 454 at 11. The medical records produced since then have shown that there is no way to assign Plaintiffs to injury groups (even just to select individual bellwethers) given the disparate medical histories and overlapping conditions discussed above, and Jacobs now believes that 15 bellwethers, or possibly fewer, will suffice.

proof showing that each individual bellwether Plaintiff does (or does not) in fact have the medical conditions alleged and that those conditions were caused by Jacobs' allegedly wrongful conduct.

Once expert discovery is complete, Jacobs proposes that the Court hear bellwether summary judgment motions, and then proceed to individual bellwether trials if necessary.

V.  **If Punitive Damages Are Tried, They Too Should Be Litigated for Each Individual Plaintiff Following a Damages Finding.**

The Phase II juries will need to examine the possibility of punitive damages for an individual Plaintiff only in the event the jury has determined that the individual Plaintiff has (1) proven his case (*i.e.*, specific causation, injury, and compensatory damages); and (2) proven by "clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently, or recklessly." Tenn. Code Ann. § 29-39-104(a)(1). If, and only if, those findings are made will the same jury be asked in a second proceeding the amount of punitive damages, as required by Tennessee law and U.S. Constitution. *Id.* § 29-39-104(a)(2) (emphasis added); *see Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007); *Blyden v. Mancusi*, 186 F.3d 252, 267–69 (2d Cir. 1999).[5] This is critical because the Due Process Clause requires a plaintiff-by-plaintiff examination of punitive damages, which must be relative to the individual plaintiff's harm. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996).

Plaintiffs do not dispute these requirements, but instead sorely misconstrue the Phase I finding here, wrongly suggesting that the Phase I jury found that Jacobs "was held liable for negligence in Phase I." Doc. 490 at 5; *id.* at 4 ("found Jacobs was negligent"). Of course, there was no finding of liability made in Phase I, nor could there have been, given that Plaintiffs still

---

[5] As Jacobs explained previously, it did not object to postponing the punitive damages inquiry from Phase I to Phase II, Doc. 454 at 19–20, but it has never condoned using multiple juries within a single Phase II trial, which would impermissibly allow two juries to examine questions that should be decided by one, *see Blyden*, 186 F.3d at 267–69.

must prove "specific causation" and "damages"—two elements of their claims—as they admit elsewhere. *Id.* at 3. That will be the focus of the Phase II trials.

## VI. Proposed Updated Schedule for Phase II

Given the extensive time that has elapsed since the Court ordered a stay of proceedings in these cases in favor of mediation, Jacobs proposes the following schedule with the assumption that the ongoing COVID-19 pandemic does not make it impossible or impractical[6]:

- Within 15 days of the Court's order setting the procedures for Phase II, all Plaintiffs shall provide updated disclosures regarding each of their alleged injuries and medical conditions purportedly attributable to Jacobs' actions and specify the nature, extent, and date of onset of each alleged injury and medical condition. Plaintiffs shall be precluded from introducing at trial any evidence regarding alleged injuries or medical conditions that are not disclosed by this deadline.

- Within 15 days of the Court's order setting the procedures for Phase II, all Plaintiffs must identify all prior treating physicians, the time period those physicians treated each Plaintiff, and for what reason(s). Plaintiffs shall be precluded from introducing at trial: (1) the testimony of any treating physician who is not disclosed by this deadline; and (2) any record evidencing or relating to treatment provided by any such physician.

- Within 15 days of the Court's order, all Plaintiffs must identify any relevant medical treatment that they have received from any medical provider since records were last obtained through Black Oak Services (formerly Records Acquisition Services) and produced to Jacobs, so updated medical records can be timely requested. Plaintiffs shall

---

[6] The COVID-19 pandemic is very fluid at this time, and it is very difficult to predict the impact it will have on business and travel over six months. Accordingly, it will likely be necessary to revisit the proposed timeline, particularly if the crisis does not subside soon.

supplement these records on an ongoing basis, providing notice of any additional treatment within 30 days of receiving such treatment. Plaintiffs shall also produce authorizations for all medical providers to the extent they have not been produced already. Plaintiffs shall be precluded from introducing at trial evidence regarding any treatment, and any related injuries or illnesses, for which they have not provided notice in accordance with this section.

- Fact discovery—including depositions of Plaintiffs, their treating physicians, and percipient witnesses, as well as written discovery (*i.e.*, interrogatories, requests for production, and requests for admission)—must be complete within nine months of the Court's order, assuming that within three months of the Court's order business (and travel) has returned to normal in light of the COVID-19 pandemic. If business has not returned to normal within three months of the Court's order, Jacobs recommends that fact discovery be extended accordingly. Following the fact discovery cut-off date, the parties shall appear at a status conference—to be set at the Court's convenience—to discuss:

    o The process for selecting Plaintiffs to serve as bellwether Plaintiffs for purposes of further individual proceedings[7];

    o The schedule by which further bellwether proceedings, comprising expert discovery, bellwether summary judgment motions, and trial, shall proceed; and

    o The procedures that shall govern further individual bellwether proceedings.

---

[7] If the Court is inclined to adopt Plaintiffs' proposal of a "Lung Group" and a "Cardiovascular Group," Doc. 490 at 8, Jacobs requests an additional 45 days to more closely assess the medical records produced to date and counter-propose individual Plaintiffs to be part of those groups.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By: /s/ James F. Sanders
James F. Sanders (No. 005267)
jsanders@nealharwell.com
J. Isaac Sanders (No. 029372)
isanders@nealharwell.com
Marie T. Scott (No. 032771)
mscott@nealharwell.com
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee  37203
Telephone:  (615) 244-1713
Facsimile:  (615) 726-0573

**GIBSON, DUNN & CRUTCHER LLP**
Theane Evangelis (*pro hac vice*)
tevangelis@gibsondunn.com
Jeremy S. Smith (*pro hac vice*)
jssmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

*Attorneys for Defendant*
*Jacobs Engineering Group Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of March 2020, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

                                                  /s/ James F. Sanders