# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# <u>AT KNOXVILLE</u>

| | |
|---|---|
| GREG ADKISSON, et al., <br>     Plaintiffs, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:13-CV-00505-TAV-HBG <br><br> *Lead case consolidated with* |
| KEVIN THOMPSON, et al., <br>     Plaintiffs, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:13-CV-00666-TAV-HBG |
| JOE CUNNINGHAM, et al., <br>     Plaintiffs, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | *as consolidated with* <br><br> No. 3:14-CV-00020-TAV-HBG |
| BILL ROSE, <br>     Plaintiff, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:15-CV-00017-TAV-HBG |
| CRAIG WILKINSON, et al., <br>     Plaintiffs, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No.: 3:15-CV-00274-TAV-HBG |
| ANGIE SHELTON, as wife and next of kin on behalf of Mike Shelton, et al., <br>     Plaintiffs, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No.: 3:15-CV-00420-TAV-HBG |
| JOHNNY CHURCH, <br>     Plaintiff, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No.: 3:15-CV-00460-TAV-HBG |

| | |
|---|---|
| DONALD R. VANGILDER, JR., <br>     Plaintiff, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:15-CV-00462-TAV-HBG |
| JUDY IVENS, as sister and next of kin, <br> on behalf of JEAN NANCE, deceased, <br>     Plaintiff, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:16-CV-00635-TAV-HBG |
| PAUL RANDY FARROW, <br>     Plaintiff, <br> v. <br> JACOBS ENGINEERING GROUP, INC., <br>     Defendant. | No. 3:16-CV-00636-TAV-HBG |

**JACOBS ENGINEERING GROUP INC.'S SUPPLEMENTAL REPLY IN SUPPORT OF RENEWED MOTION FOR JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 1

    I.    Plaintiffs Cannot Escape the Fact That the Court's *Yearsley* Analysis Was "Informed" by the Discretionary-Function Test. ................................................... 1

    II.    Jacobs Is Entitled to Government-Contractor Immunity Because It Did Not Violate Federal Law or the Government's Express Instructions. .......................... 4

    III.    TVA, and Therefore Jacobs, Are Immune Under *Thacker*'s Two-Part Test. ......... 6

        A.    In Assisting With TVA's Kingston Removal Efforts, Jacobs Was Performing a Governmental Function. ...................................................... 7

        B.    Plaintiffs' Claims Clearly Amount to a Grave Interference With TVA's Governmental Function. .............................................................. 10

CONCLUSION ......................................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
   790 F.3d 641 (6th Cir. 2015) ...................................................................................2, 3, 7

*Bultema v. United States*,
   359 F.3d 379 (6th Cir. 2004) ................................................................................................2

*Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*,
   840 F.2d 691 (9th Cir. 1988) ..............................................................................................11

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016).........................................................................................................2, 3, 5

*Desiano v. Warner-Lambert & Co.*,
   467 F.3d 85 (2d Cir. 2006)..................................................................................................10

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ...............................................................................................3

*Lincoln v. Republic Ecology Corp.*,
   765 F. Supp. 633 (C.D. Cal. 1991) .....................................................................................9

*Long v. Tenn. Valley Auth.*,
   2009 WL 3784963 (E.D. Tenn. Nov. 9, 2009) ..................................................................7

*Miller v. C.H. Robinson Worldwide, Inc.*,
   976 F.3d 1016 (9th Cir. 2020) ...........................................................................................10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   585 F. Supp. 2d 583 (D. Del. 2008)....................................................................................4

*Sass v. MTA Bus Co.*,
   6 F. Supp. 3d 229 (E.D.N.Y. 2014) ....................................................................................4

*Thacker v. Tenn. Valley Auth.*,
   139 S. Ct. 1435 (2019).........................................................................................................1

*Transp. Leasing Co. v. State of California (CalTrans)*,
   861 F. Supp. 931 (C.D. Cal. 1993) .....................................................................................9

*United States v. Duke Energy Carolinas, LLC*,
   2020 WL 6545988 (M.D.N.C. Nov. 6, 2020)....................................................................9

*Vandenbark v. Owens-Illinois Glass Co.*,
   311 U.S. 538 (1941).............................................................................................................4

**Page(s)**

*W. Va. State Univ. Bd. of Governors ex rel. W. Va. State Univ. v. Dow Chem. Corp.*,
  2020 WL 2842057 (S.D.W. Va. June 1, 2020) ........................................................................8

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940) ........................................................................................................2, 3, 4, 5

**Statutes**

42 U.S.C. § 9604 ...........................................................................................................................8, 10

**Regulations**

Exec. Order No. 12580 (1987) ..........................................................................................................8

# INTRODUCTION

Plaintiffs' supplemental response rests on the mistaken premise that the Court's rulings on immunity under *Yearsley* were independent of its analysis of the discretionary-function exception. As explained below, they were not. The Court repeatedly relied on the Sixth Circuit's decision in finding that the discretionary-function exception "informed" the *Yearsley* analysis, and the Court followed that previously binding guidance. Because the discretionary-function test can no longer play any role in the immunity analysis following *Thacker*, that analysis must begin anew. The Court should find that Jacobs is entitled to immunity as a matter of law or, at a minimum, order a new trial.

# ARGUMENT

**I. Plaintiffs Cannot Escape the Fact That the Court's *Yearsley* Analysis Was "Informed" by the Discretionary-Function Test.**

Plaintiffs' supplemental response argues that "[t]he Supreme Court's decision in *Thacker v. TVA*, 139 S. Ct. 1435 (2019), does not change the analysis of derivative government contractor immunity by this Court in any way" and therefore the Court's previous decision "is still valid." Doc. 748 at 3, 7. Plaintiffs' argument directly contradicts what the Court (and the Sixth Circuit) actually said.

In denying Jacobs' motions for a new trial and for judgment as a matter of law, the Court explained that "discretionary-function immunity . . . ***informs*** the scope of *Yearsley immunity*." Doc. 462 at 4 (emphasis added). As the Court correctly recognized, this concept came directly from the Sixth Circuit, which expressly equated government contractor immunity under *Yearsley* with the discretionary-function exception.[1]

---

[1] The Court relied on the following passage from the Sixth Circuit's opinion:

1

The Court then reiterated this point when examining the jury instructions and the six specific theories presented to the Phase I jury.[2] The Court explained that those six theories "fall[] outside the ***discretionary-function exception***," "[w]hich again <u>*informs*</u> *the scope of Jacobs's immunity under Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940)*." Doc. 462 at 24 & n.9 (emphasis added). For this proposition, the Court cited once more to language in the Sixth Circuit's opinion equating government contractor immunity with the discretionary-function exception. *Id.* (citing *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015)).

Collapsing the analysis under *Yearsley* and discretionary-function exception made perfect sense before the *Thacker* decision. Under *Yearsley*, a government contractor is entitled to immunity to the same extent as the government, so long as the government contractor does not violate "federal law [or] the Government's explicit instructions." *Campbell-Ewald Co. v. Gomez*,

---

> The district court, in holding that the discretionary-function exception applied, found that various regulations, contractual provisions, and the SWSHP all failed to prescribe a specific course of action that Jacobs had to follow. ***But just because certain conduct fails to be specifically mandated does not necessarily mean that the government contractor is protected from liability***. Discretionary conduct may fall outside the protection of the discretionary-function exception if the conduct is not a "deliberate or necessary result of a discretionary general policy"; in other words, government conduct "does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act." *Bultema v. United States*, 359 F.3d 379, 383–85 (6th Cir. 2004) (holding that the prison staff's alleged failure to carry out the prison's bunk-pass-notification policy was not protected by the discretionary-function exception because, even if the policy allowed for discretion, the staff's alleged negligence was "not a necessary concomitant of the prison's notification policy").

Doc. 462 at 4–5 (emphasis added) (quoting *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015)).

[2] These six theories include claims that the Defendant "(A) Deliberately manipulated or tampered with any monitoring results or processes; (B) Did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash; (C) Failed to comply with the provisions of the Safety and Health Plan with respect to voluntary use of dust masks; (D) Threatened workers when they asked for dust masks or respirators; (E) Communicated to workers that fly ash was safe to consume; or (F) Otherwise failed to train or warn workers about the dangers of excessive fly-ash exposure." Doc. 462 at 23–24 & n.9.

2

577 U.S. 153, 154 (2016). "*Yearsley* recognizes that private employees can perform the same functions as government employees and concludes that they should receive immunity from suit when they perform these functions." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 344 (4th Cir. 2014). Or more simply, "[t]he action of the agent is 'the act of the government.'" *Yearsley*, 309 U.S. at 22 (citation omitted); Doc. 462 at 24 & n.9; *Adkisson*, 790 F.3d at 648–49.

Thus, there is no difference between the conduct for which TVA and Jacobs are entitled to immunity, so long as Jacobs did not violate the law or an explicit TVA direction. Prior to *Thacker*, the discretionary-function exception was the determining factor for whether TVA was entitled to immunity. As a result, the discretionary-function exception was inextricably tied to the question of whether Jacobs was entitled to derivative immunity under *Yearsley*. There was no need to divorce the discretionary-function exception from the analysis under *Yearsley*, so neither this Court nor the Sixth Circuit did. Indeed, the Court allowed the six theories to go to the jury—and then survive Jacobs' post-trial motions—because this conduct was "not 'the kind that the discretionary function exception was designed to shield.'" Doc. 462 at 27 (citation omitted).

Now that the discretionary-function exception has no role to play in this case, the Court's analysis of the six theories and the evidence supporting them cannot be "still valid." Doc. 748 at 3, 7. As Jacobs explained previously, Doc. 559 at 7, even if Jacobs did "tak[e] dust masks away from employees who wore them," Doc. 462 at 29, that did not violate "federal law and the Government's explicit instructions," *Campbell-Ewald*, 577 U.S. at 166. Similarly, while discussing the amount of fly ash a worker could ingest without meeting the allowable limit for arsenic may have caused confusion, there is no contention that this illustration violated "federal law [or] the Government's explicit instructions," *id.* Rather, the Court allowed these theories and the others to go to the jury because this conduct was "not 'the kind that the discretionary function

3

exception was designed to shield.'" Doc. 462 at 27 (citation omitted). But the discretionary-function exception no longer governs TVA's immunity, so it can no longer "inform" Jacobs' derivative immunity under *Yearsley*. Again, the whole idea of *Yearsley* is that "[t]he action of the agent is 'the act of the government.'" 309 U.S. at 22 (citation omitted).

As explained below, this means the Court should grant judgment in Jacobs' favor, because under *Yearsley* (now disentangled from the discretionary-function exception) and the new law announced by *Thacker*, Jacobs is entitled to derivative immunity. But at a minimum, the Court should grant a new trial because the six theories presented to the jury were based in part on the now-discarded discretionary-function exception. *See, e.g.*, *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 229, 238 (E.D.N.Y. 2014) (granting defendant's motion for a new trial due to an intervening change in law occasioned by a Supreme Court ruling); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 583, 587–88 (D. Del. 2008) (granting a new trial when the "Court's jury instructions were erroneous in light of the intervening change in the law"); *see also Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941) ("Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered.").

## II. Jacobs Is Entitled to Government-Contractor Immunity Because It Did Not Violate Federal Law or the Government's Express Instructions.

Absent reliance on the discretionary-function test, immunity under *Yearsley* and its progeny boils down to the simple question of whether a government contractor like Jacobs disobeyed a governmental directive: if it did, the contractor is *not* immune; if it didn't, the contractor's immunity is co-extensive with the government's immunity. In other words, derivative immunity "shields the contractor from suit" when the government would be immune for the same conduct and the contractor neither violates federal law nor the explicit instructions of an immune

4

government entity.  *Campbell-Ewald*, 577 U.S. at 166; *see also Yearsley*, 309 U.S. at 20–21 ("[T]here is no liability on the part of the contractor for executing [the government's] will.").

As Jacobs has explained throughout this case, its contract with TVA generally provided that Jacobs would assist TVA in managing safety during the coal-ash removal process at Kingston. *See* Doc. 546 at 8.  As part of those efforts, Jacobs was tasked with helping to develop and implement the sitewide safety and health plan ("SWSHP").  *Id.*  Although that document contained broad guidelines for safety programs, it did not lay out express directives from TVA, the violation of which would jeopardize Jacobs' derivative contractor immunity under *Yearsley*.  And as Jacobs previously explained, the Court's prior holding that Jacobs would not be entitled to immunity if it engaged in one of the six acts or omissions presented to the jury has no salience in a post-*Thacker* landscape, where the discretionary-function exception cannot inform the evaluation of governmental, and thus contractor, immunity.

Try as they might, Plaintiffs cannot extricate the six theories presented to the Phase I jury from the discretionary-function exception.  As noted above, the Court's position that Jacobs would not be entitled to immunity based on the six theories was inextricably bound up with its view that the "conduct at issue falls outside the discretionary-function exception," Doc. 546 at 4, which is no longer a relevant consideration.  While Plaintiffs argue generally that the Court heard "extensive testimony during the trial, which demonstrated that Jacobs' acts did not comply with directions in Jacobs' TVA contract and in the Site Wide Safety and Health Plan," Doc. 748 at 7–8, they have never once attempted to connect *any* of the six theories with *any* language in either the TVA contract or the SWSHP.[3]  Those documents contain only broad guidelines, and none of those six

---

[3]     Even if one of the six theories could theoretically fit the *Campbell-Ewald* test (*i.e.*, by violating federal law or an express governmental instruction), the parties and Court cannot know

5

theories represent potential violations of an express directive that would negate Jacobs' derivative immunity under *Yearsley*.

And the Phase I jury verdict does not alter whether Jacobs has derivative immunity. The verdict form itself asks whether "Plaintiffs ha[d] proved, by a preponderance of the evidence, that Defendant failed to adhere to the terms of its contract with TVA, or the requirements set forth in the Site Wide Safety and Health Plan for the Kingston site." Doc. 408 at 2. Although the jury answered "Yes" answer to the question, *id.*, that was based on the Court's instruction linking it to the six liability theories. In instructing the jury the Court noted, "I have ruled that Defendant would be acting contrary to the will of the government and is not immune from suit if Defendant" committed one of the six acts or omissions. Doc. 424 at PageID # 10902–04. To reiterate the point, soon after listing the six theories, the Court noted that "[a]s previously stated, Defendant can potentially be held liable if you find that it" committed "any of these six acts or omissions." *Id.* at PageID # 10904–05. As explained above, because those six theories derive from the Court's consideration of the discretionary-function exception, and not solely the question of whether Jacobs violated a federal law or government directive, that verdict cannot withstand the intervening change in law brought on by *Thacker*.

Accordingly, the question of whether Jacobs is immune depends on whether TVA would be immune under *Thacker*. It would be, and Jacobs is as well.

### III.  TVA, and Therefore Jacobs, Are Immune Under *Thacker*'s Two-Part Test.

TVA is immune under *Thacker*'s two-part test because (1) it was the "lead agency" in charge of a significant coal-ash removal action and thus undertook an inherently governmental

---

whether the Phase I jury agreed with that specific theory as opposed to one of the others, since the verdict form did not ask the jury to specify. Doc. 408 at 2–3.

6

function, and (2) permitting tort suits under state law related to that conduct would gravely interfere with TVA's governmental function. Because TVA is immune from Plaintiffs' claims, and because, as explained above, Jacobs is entitled to contractor immunity under *Yearsley*, Jacobs is likewise immune.

> **A. In Assisting With TVA's Kingston Removal Efforts, Jacobs Was Performing a Governmental Function.**

Plaintiffs argue that TVA was not acting in a governmental capacity by analogizing TVA to "any other responsible party for an environmental disaster." Doc. 748 at 15, 19. Specifically, Plaintiffs claim that TVA's "coal ash removal activities were part and parcel of TVA's commercial operation of coal-fired power plants." *Id.* at 19. This is contrary to the evidence.

As Jacobs explained in its motion, TVA was not just the "responsible party"—it was the officially designated "lead agency" for the Kingston coal-ash removal effort. Doc. 546 at 10–11. As the Sixth Circuit noted, "EPA delegated its authority to TVA to remove the coal ash," and "TVA has been the lead agency authority for all further coal-ash cleanup, removal, and remediation" after EPA terminated its initial emergency-response efforts in early 2009. *Adkisson*, 790 F.3d at 643–44; *see also Long v. Tenn. Valley Auth.*, 2009 WL 3784963, at *7 (E.D. Tenn. Nov. 9, 2009) (holding the designation of "TVA as lead agency [was] clear and unambiguous" and that "TVA should be designated a federal agency for the purposes of the response and remedial activities described in the EPA Order").[4]

Plaintiffs' supplemental response attempts to dismiss TVA's lead agency role as a "mere formality, which did not transform TVA's removal of coal ash into a governmental activity." Doc.

---

[4] In a January 10, 2009 memorandum entitled "Transfer of Federal Lead Agency Authority," EPA's "Federal On-Scene Coordinator" noted that while "TVA and EPA . . . ha[d] operated in a unified command during the emergency phase of the [Kingston] incident," for the long-term recovery "EPA transfers the lead federal agency role to TVA." Pls.' Trial Ex. 272.

7

748 at 20. Plaintiffs' argument appears to rest on the mistaken belief that the lead federal agency cannot perform the cleanup itself, or that EPA was somehow still actually the lead federal agency. Plaintiffs have fundamentally misconstrued the role of a lead agency in a CERCLA cleanup.

Under Section 104(a) of CERCLA, whenever a hazardous substance is released into the environment, "the President is authorized to act . . . ***to remove or arrange for the removal of***, and provide for remedial action relating to such hazardous substance."  42 U.S.C. § 9604(a)(1)–(2) (emphasis added) (referring also to "removal action[s] undertaken by the President").  Under Executive Order 12580, the President expressly delegated this authority under Section 104(a) to TVA for any CERCLA cleanups at TVA facilities.[5]  Thus, as lead agency under CERCLA Section 104(a), TVA had the express authority to perform the cleanup, as well as to direct others to do so.[6] *See W. Va. State Univ. Bd. of Governors ex rel. W. Va. State Univ. v. Dow Chem. Corp.*, 2020 WL 2842057, at *14 (S.D.W. Va. June 1, 2020) (noting that under CERCLA the "lead federal agency is responsible for . . . [among other things] conducting removal of the contaminants," and that it "is at the discretion of the *federal agency*" to allow the owner or operator of a contaminated facility to "take part in removal" (emphasis added)).

TVA was plainly acting in a governmental capacity in exercising its authority, delegated from the President, to conduct the Kingston cleanup under CERCLA Section 104(a).  Under this

---

[5] Under Executive Order 12580, which concerns "Superfund implementation," "the functions vested in the President by Section[] 104(a) . . . of [CERCLA] are delegated to the heads of . . . agencies, with respect to remedial actions for releases . . . and removal actions other than emergencies, where either the release is on or the sole source of the release is from any facility . . . under the jurisdiction, custody or control of those . . . agencies." Exec. Order No. 12580(e)(1) (1987).  The EPA Administrative Order that conferred lead-agency status on TVA did so "pursuant to the authority vested in the President of the United States by Section 104(a) of CERCLA." Doc. 267-1 ¶ 2.

[6] Doc. 267-1 (EPA Admin. Order & Agreement on Consent) ¶ 13 (noting that when the emergency phase of the cleanup was complete, EPA "transferred the lead federal agency role to TVA" and "demobilized from the Site").

8

authority, TVA and its agents developed and oversaw implementation of the cleanup plan, including the SWSHP and related documents and programs. While a private company could engage in cleanup actions as the "responsible party," it could only do so at the direction of the lead agency and certainly could not itself serve as a lead agency as TVA did here. Contrary to Plaintiffs' argument, TVA's lead-agency designation is not "irrelevant" to the determination of whether TVA's removal efforts, and those TVA farmed out to Jacobs, were governmental. They were.

None of Plaintiffs' authorities is to the contrary, because none involves a lead federal agency like TVA. In both *Transportation Leasing Co. v. State of California (CalTrans)* and *Lincoln v. Republic Ecology Corp.*, the parties ultimately liable for performing certain remedial actions under CERCLA were *private entities*. Doc. 748 at 19–20 (citing these cases for the proposition that parties that are responsible for the release of hazardous substances are responsible for the cost of cleanup under CERCLA). Plaintiffs' citation to *United States v. Duke Energy Carolinas, LLC* is similarly inapposite, because unlike here a private company owned the coal-ash basin under which the storm water pipe failed and Duke was, of course, not designated as a lead federal agency vested with Presidential authority. 2020 WL 6545988, at *1 (M.D.N.C. Nov. 6, 2020). In sum, Plaintiffs' case law does not account for a situation like this one where TVA (and Jacobs as a contractor) undertook removal activity *in its capacity as lead federal agency*.

All of TVA's activities at Kingston were part and parcel of its function as lead federal agency with authority vested originally in the President. As a result, its activities were inherently "governmental," and the actions Jacobs performed on TVA's behalf at Kingston were likewise governmental.

9

### B. Plaintiffs' Claims Clearly Amount to a Grave Interference With TVA's Governmental Function.

Plaintiffs' lawsuit has gravely interfered with TVA's remediation of areas affected by the release of hazardous materials, and will continue to do so. Plaintiffs' two arguments to the contrary only confirm the grave interference.

*First*, Plaintiffs return to their mistaken belief that TVA's role as the "lead federal agency" was simply "titular." Doc. 748 at 23. As explained above, this is contrary to the facts and the law, which recognize that TVA was acting "pursuant to the authority vested in the **President of the United States** by Section 104(a) of CERCLA." Doc. 267-1 ¶ 2 (emphasis added); *see also* 42 U.S.C. § 9604(a)(1)–(2).

*Second*, Plaintiffs argue that their lawsuits could not possibly interfere with TVA's governmental functions because "these claims were filed after the conclusion of the ash removal." Doc. 748 at 23 n.10. This argument ignores the fact that imposition of significant tort liability under state common law is the functional equivalent of regulating TVA's conduct as lead agency. This is because Plaintiffs' tort claims seek to impose a different standard of care than TVA itself chose, as lead agency, for the remediation safety programs. Fundamentally, Plaintiffs are asking the Court to second-guess TVA's decisions as lead federal agency.

Courts have recognized that tort lawsuits under state law serve the function of regulating conduct. In *Miller v. C.H. Robinson Worldwide, Inc.*, for example, a Ninth Circuit court considered whether the "'the safety regulatory authority of a State' encompasses common-law tort claims." 976 F.3d 1016, 1026 (9th Cir. 2020). In holding that it did, the court reasoned that a state's "power plainly includes the ability to regulate safety through common-law tort claims." *Id.* (citing *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006), which held that "common law liability has formed the bedrock of state regulation"). If plaintiffs can bring the

safety regulatory authority of a state, via common-law tort claims, to bear on a governmental entity (or its contractor, as the case may be), such authority will clearly and "gravely interfere" with that entity's activities.

The *Cadillac Fairview/California, Inc. v. Dow Chemical Co.* case, which Plaintiffs rely on, does not support their position. 840 F.2d 691 (9th Cir. 1988). As Plaintiffs acknowledge, Doc. 748 at 24, that case involved claims to "recover . . . costs of responding to the hazardous substances," *Cadillac Fairview*, 840 F.2d at 693. In this case, by contrast, the costs of the Kingston cleanup are not at issue. Nor is Jacobs claiming that the payment by TVA of response costs under CERCLA would constitute a "grave interference" with TVA's role as lead agency. Rather, it is the imposition of hefty state-law tort damages for TVA's decisions as lead agency that would do so.

In addition, the potential imposition of multi-billion dollar liability will make contractors think twice (at least) about whether to engage at all in the removal of hazardous wastes from CERCLA sites on behalf of governmental agencies, and at what price. That is particularly true now that Plaintiffs are seeking over $3 billion in damages in *Adkisson* alone, Doc. 698-1 ¶¶ 142–43—damages which would, if actually imposed, provide a substantial disincentive for contractors like Jacobs to work with TVA and other agencies that are engaged in important cleanup work and are necessary to complete it.

As a result, permitting this suit to move forward will necessarily gravely interfere with TVA's governmental function as a lead federal agency on a CERCLA remediation site.

## **CONCLUSION**

Accordingly, this Court should grant Jacobs' renewed motion for judgment as a matter of law, or in the alternative order a new trial to determine whether Jacobs is immune from suit.

11

Respectfully submitted,

**PAINE TARWATER BICKERS, LLP**
By: /s/ Dwight E. Tarwater
Dwight E. Tarwater (No. 007244)
det@painetarwater.com
Catherine Williams Anglin (No. 028120)
cwa@painetarwater.com
900 S. Gay Street, Suite 2200
Knoxville, Tennessee 37902-1821
Telephone: (865) 525-0880
Facsimile: (865) 229-7441

**NEAL & HARWELL, PLC**
James F. Sanders (No. 005267)
jsanders@nealharwell.com
J. Isaac Sanders (No. 029372)
isanders@nealharwell.com
Marie T. Scott (No. 032771)
mscott@nealharwell.com
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous (*pro hac vice*)
tboutrous@gibsondunn.com
Theane Evangelis (*pro hac vice*)
tevangelis@gibsondunn.com
Peter Modlin (*pro hac vice*)
pmodlin@gibsondunn.com
Diana M. Feinstein (*pro hac vice*)
dfeinstein@gibsondunn.com
Jeremy S. Smith (*pro hac vice*)
jssmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Attorneys for Defendant*
*Jacobs Engineering Group Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 10th day of February 2021, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

      /s/ *Dwight E. Tarwater*